UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) ) ) | Case No. 1:21-cv-262 |
| Plaintiff, | ) ) | Judge Douglas R. Cole |
| v. | ) ) ) | |
| Fifth Third Bank, National Association, | ) ) ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

The Bureau of Consumer Financial Protection (Bureau) files this Amended Complaint against Fifth Third Bank, National Association (Fifth Third) and alleges as follows.

### Introduction

1.     Fifth Third tells consumers and otherwise creates a reasonable belief that Fifth Third's consumer-financial-product sales are in the consumers' best interests.

2.     Contrary to what Fifth Third tells consumers, Fifth Third designs and conducts its consumer-financial-product sales based on its own financial interests.

1

3.      Fifth Third has known for more than a decade that its acts or practices have led to the opening of consumer-financial products that are not in consumers' interests.

4.      Fifth Third has known for more than a decade that its acts or practices have led to the opening of products in consumers' names without consumers' knowledge or consent.

5.      Fifth Third admitted in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017.

6.      Fifth Third has known for more than a decade that its employees have, without consumer consent, transferred consumer funds, changed account types, misrepresented terms and conditions, falsified records, and assigned personal-identification numbers and passwords to consumer accounts.

7.      Fifth Third also used or obtained consumer-reporting-agency reports without a permissible purpose.

8.      Yet Fifth Third has taken insufficient steps to identify and remediate affected consumers.

9.      Fifth Third has focused on its own financial interests to the detriment of consumers.

10. Fifth Third's conduct violates the Consumer Financial Protection Act of 2010 (CFPA), the Truth in Lending Act (TILA), the Truth in Savings Act (TISA), the Fair Credit Reporting Act (FCRA), and the TILA and TISA implementing regulations.

11. The Bureau brings this action to stop Fifth Third's unlawful conduct and to obtain redress for affected consumers and an appropriate penalty and other monetary relief.

12. The Bureau brings this action under §§ 1031, 1036(a)(1), 1054, and 1055 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1), 5564, 5565; TILA, 15 U.S.C. § 1601 et seq., and its implementing regulation, Regulation Z, 12 C.F.R. part 1026; FCRA, 15 U.S.C. § 1681 et seq.; and TISA, 12 U.S.C. § 4301 et seq., and its implementing regulation, Regulation DD, 12 C.F.R. part 1030.

## Jurisdiction

13. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

## Venue

14. Venue is proper in this district because Fifth Third is located, resides, or does business in this district. 12 U.S.C. § 5564(f).

3

**Parties**

15.     The Bureau is an independent agency of the United States created by the CFPA and charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b).

16.     Fifth Third operates, among other things, a branch-banking business that offers and provides an array of financial products and services primarily used by consumers for personal, family, or household purposes. Fifth Third is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5), (6), (15)(A).

**Factual Background**

17.     Fifth Third has more than $200 billion in total assets and, through its branch-banking business, operates more than 1,000 full-service branches in Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, North Carolina, Ohio, South Carolina, Tennessee, and West Virginia.

18.     Among the products or services (hereinafter referred to as products) Fifth Third offers through its branch-banking business are checking accounts, savings accounts, credit cards, online banking, overdraft protection, and lines of credit.

Fifth Third's Sales Practices

19.     Fifth Third's product sales are profitable because they improve customer retention and generate fees.

20.     To increase the number of products sold to its consumers, Fifth Third conditioned employee-performance ratings and, in some instances, continued employment on whether managers and their subordinate employees met sales goals. Fifth Third also used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products.

21.     Fifth Third imposed sales goals on all levels of branch—also known as financial center—employees.

22.     Fifth Third's sales goals have been structured to incentivize employees to push products that are most profitable to the bank.

23.     Fifth Third has hidden the existence of these incentives from consumers.

24.     Fifth Third has trained its employees to tell and to otherwise convince consumers that the products being sold to them are in their best interests.

25.     Fifth Third's sales goals have included a point-based system, with different point values assigned to different products.

26.     Fifth Third has assigned the point values primarily based on the revenue that each product generates for the bank.

5

27.     Fifth Third has set sales goals for thousands of employees at a level higher than their anticipated sales.

28.     Fifth Third has used the achievement or non-achievement of sales goals as a key component in performance ratings and promotion decisions for managers and their subordinate employees. Low performance ratings could result in disciplinary action, including termination.

29.     From at least 2010 through at least 2019, Fifth Third also used a "cross-sell" strategy to increase the total number of products it provided to new and existing customers.

30.     According to Fifth Third, cross-selling—which means selling multiple products to each consumer—improves "customer loyalty."

31.     Cross-selling improves customer retention because it becomes harder for the customer to detach from the bank.

32.     From at least 2010 until at least 2017, Fifth Third set a cross-sell goal of at least four products per customer.

33.     Fifth Third's cross-sell goal of four products per customer was not based on an analysis of individual consumers' needs but was instead based on Fifth Third's goals to increase customer retention and bank revenue.

34.     Fifth Third has instructed its employees to find sales opportunities by conducting what the bank calls a "financial needs assessment" of individual

6

consumers. Employees are to use this "assessment" to build their "book of business." Through this process, consumers are ranked by "relationship potential," which is a measure of the "cross-sell opportunity" that each customer represents. Employees are instructed to use the "financial needs assessment" to "become the customer's Trusted Advisor."

35.     Fifth Third trains its employees engaged in financial-needs assessments to cite tax and other financial concerns to "widen" the gap between the consumer's "present state" and "desired state," making the gap "appear larger" in order to promote sales.

36.     Fifth Third's employees conducting financial-needs assessments are often not qualified to make tax and other financial recommendations.

37.     Fifth Third tracked cross-selling effectiveness and, from at least 2010 to at least 2017, pressured employees to meet cross-selling goals.

38.     In 2010, Fifth Third's head of retail banking wrote that the bank's Chicago "leadership team [has] a reputation of less than desirable sales management practices," and that "[b]ullying and threats are often used to achieve results."

39.     Fifth Third does not tell consumers about bank-employee sales goals or cross-selling requirements or that the bank and its employees are acting in the bank's financial interests.

40.     To the contrary, Fifth Third tells consumers that they can be sure that the bank is acting in consumers' interests.

<u>Unauthorized Accounts and Transactions</u>

41.     Thousands of Fifth Third branch employees are unable to meet their sales goals even with Fifth Third's sales tactics.

42.     Fifth Third, without consumers' knowledge and consent, opened deposit accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; applied for and issued credit cards; enrolled consumers in online banking; opened lines of credit on consumers' accounts; and enrolled consumers in overdraft protection and other financial products.

43.     Fifth Third has known since at least 2010 that one reason that employees were opening unauthorized consumer-financial products was Fifth Third's pressure on employees to sell.

44.     By 2010, at the latest, Fifth Third was aware that employees were opening products in consumers' names without those consumers' knowledge and consent in order to achieve sales goals or obtain incentive rewards.

45.     In 2010, Fifth Third's head of retail banking wrote that "there have been consistent problems around unauthorized credit card sales in Chicago."

46.     Fifth Third's unauthorized accounts were the predictable result of its acts and practices and occurred in many of the bank's geographic markets.

47.     Fifth Third also changed without consumer consent the types of accounts or services in which consumers were enrolled; made false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in them; used or obtained consumers' credit reports without an authorized purpose; and, without consumer authorization, assigned personal-identification numbers or falsified consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers.

48.     Fifth Third has admitted to almost 400 instances of the acts or practices described in paragraph 47.

49.     There were more than 400 instances of the acts or practices described in paragraph 47.

50.     Fifth Third claims to have opened fewer than 1,100 unauthorized consumer-financial products.

51.     Fifth Third opened more than 1,100 unauthorized consumer-financial products.

<u>Deposit Accounts</u>

52.     Fifth Third imposed aggressive sales goals for its employees to open new deposit accounts, and its incentive-compensation program rewarded employees for

9

opening new deposit accounts funded with a specified minimum balance within a defined period.

53.     Fifth Third opened deposit accounts for Fifth Third consumers without the consumers' knowledge and consent.

54.     Some of these unauthorized accounts were "funded" when a bank employee transferred funds to the unauthorized account from the same consumer's authorized account without the consumer's knowledge and consent. Often, once an unauthorized account was "funded," such that it qualified under the sales-goal tracking or incentive program, the bank employee transferred some or all of the funds back to the consumer's authorized account, again without the consumer's knowledge and consent.

55.     In more than 26,000 instances since 2010, a new Fifth Third deposit-account was funded with $100 or less from an existing Fifth Third account and had no activity other than the subsequent transfer, within 90 days, of those funds back to the original account.

56.     Sometimes, Fifth Third's employee would fund a consumer's account initially with the employee's own money and then take reimbursement funds— without authorization—from the consumer.

57.     Since 2010, more than 124,000 new Fifth Third deposit-accounts have been funded with $100 or less and defunded to a zero balance within 90 days.

58.     Sometimes, Fifth Third's employee closed an existing account and immediately opened a new one or reopened the just-closed account, getting sales credit for a new account.

59.     Fifth Third has allowed employees to earn sales credit for "suppression" of paper account-statements, after which the consumer would not receive account statements by mail.

60.     If paper account-statements were suppressed, Fifth Third would send account statements by email.

61.     In thousands of instances, Fifth Third suppressed paper account-statements and had no consumer email address to which it could send an electronic account-statement for receipt by a consumer.

62.     In almost 7,000 or more instances since 2010, an existing customer's new deposit-account was funded with $100 or less by cash or internal transfer, had no activity other than the initial funding and defunding, and was associated with a Fifth Third email address even though the consumer was not a Fifth Third employee.

63.     Fifth Third acknowledged that minimum funding, fake email addresses, statement suppression, and new-account funding from an existing account could each indicate a potentially unauthorized deposit account.

64.     Until at least 2020, Fifth Third failed to use any of these indicia or a combination of them to identify unauthorized accounts or victimized consumers.

65.    Fifth Third charged unjustified fees to many consumers who had deposit accounts opened without their knowledge and consent.

Credit Cards

66.    Fifth Third imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards.

67.    Fifth Third applied for and issued credit cards to customers without their knowledge and consent.

68.    Fifth Third credit cards were susceptible to unauthorized applications and issuance in part because Fifth Third bank branches accepted applications over the phone at least until 2017.

69.    Fifth Third allowed its branch employees to take credit-card applications over the phone and to write "phone application" along with the date and time on the signature line of the application. In those instances, and where only a portion of that information was written, the bank retained no other indication of consumer consent.

70.    Fifth Third had no detection capabilities or reporting if an employee failed to forward the phone application to a central repository.

71.    Fifth Third considered disallowing bank-branch phone applications for credit cards by 2010. That year, Fifth Third's head of retail banking advised the head of Fifth Third's consumer bank that Fifth Third continued "to have problems with

12

unauthorized credit card apps" that could be addressed by suspending "the ability of financial center personnel to take apps without a wet signature." He further advised that requiring a "wet signature" would "reduce the issue of customers receiving cards they did not anticipate."

72.     Around that same time, Fifth Third executives discussed the possibility of limiting credit-card sales to instances in which "the customer is physically in the Financial Center" and eliminating phone applications "where we have no customer signature." Fifth Third chose not to impose that limitation until at least seven years later.

73.     Fifth Third acknowledged that the absence of a credit-card application could indicate an unauthorized card.

74.     Yet Fifth Third did not investigate all issued credit cards for which it has no application on file.

75.     Since 2010, more than 218,000 Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions.

76.     Since 2010, more than 4,000 Fifth Third consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third email address where the consumer was not a Fifth Third employee.

77.    Fifth Third has failed to examine these account populations for the absence of signed applications or for phone applications or other indicia of non-authorization.

78.    Fifth Third charged many of these consumers unjustified fees.

<u>Online-Banking Services</u>

79.    Fifth Third imposed aggressive sales goals for its employees to enroll consumers in its online-banking services, and its incentive-compensation program rewarded employees for enrolling consumers in those services.

80.    Fifth Third enrolled consumers in online-banking services without their knowledge and consent.

81.    Fifth Third's sales programs credited employees for enrolling consumers in online-banking services after the consumer logged in to the service at least three times. To effectuate unauthorized enrollments, Fifth Third employees would set up consumers' passwords without consumers' knowledge and consent. To obtain credit for unauthorized enrollments, Fifth Third employees would log in at least the requisite number of times without the consumers' knowledge and consent.

82.    To avoid consumers detecting unauthorized online-banking enrollment, Fifth Third employees sometimes enrolled the consumer using an email address unknown to the consumer, such as a Fifth Third email address. Fifth Third employees also used other nonbank and non-consumer email addresses to avoid detection.

83. Fifth Third's password protocols for online banking have been substandard, increasing the risks to consumers enrolled in online banking knowingly or unknowingly.

84. Since 2010, Fifth Third has completed more than 48,000 consumer enrollments in online banking using a Fifth Third email address. Of those, more than 12,000 had four or fewer login attempts and more than 1,400 had no login attempts.

85. Fifth Third has not scrutinized those enrollments to determine consumer authorization.

86. Fifth Third has not used any systematic or technological method to identify unauthorized or suspicious online-banking enrollments.

<u>Early Access Lines of Credit</u>

87. Early Access is a fee-based line of credit that allows Fifth Third's checking-account holders to withdraw Fifth Third-supplied funds from their checking account before the account holder's reimbursement funds have been deposited in the account. Fifth Third imposed aggressive sales goals for its employees to sell Early Access to consumers, and its incentive-compensation program rewarded employees for enrolling consumers in "fee-based products," including Early Access.

88. Fifth Third opened Early Access lines of credit on consumers' checking accounts without their knowledge and consent. Fifth Third was aware of this by June 2010, when senior management was notified of an increase in the number of calls by

15

employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

89.     Fifth Third did not effectively curtail unauthorized Early Access lines of credit in 2010.

90.     In 2013, Fifth Third found that Early Access was often "being activated without the customer present" and that there was "a 37% error rate in obtaining signatures" on Early Access applications.

91.     Fifth Third employees also sometimes forged consumer signatures on Early Access applications.

92.     Fifth Third opened unauthorized Early Access lines of credit from at least 2010 through 2014, and Fifth Third retained unauthorized Early Access lines of credit even after it stopped offering new Early Access lines of credit.

93.     From 2010 through 2014, more than 19,000 Fifth Third Early Access accounts were opened and closed on the same day without being used.

94.     Fifth Third never further scrutinized the population of Early Access accounts lacking a consumer signature or the population of Early Access accounts opened and closed on the same day without being used.

95.     Fifth Third never used any systematic or technological method to identify unauthorized Early Access enrollments or Early Access enrollments worthy of further scrutiny.

16

<u>Other Products</u>

96.     Fifth Third admits to enrolling more than 125 consumers in overdraft protection without their consent in 2015 and 2016.

97.     Fifth Third also admits to opening other unauthorized consumer-financial products and services, including Express Banking, Identity Alert, and Access 360 prepaid debit cards.

<u>Fifth Third's Understatement of the Number of Unauthorized Accounts</u>

98.     Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct.

99.     There are hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization.

100.    Fifth Third took insufficient steps to detect and stop sales misconduct and to identify and remediate harmed consumers.

101.    Fifth Third failed to implement any system or technology to detect: unauthorized accounts; unauthorized use or obtention of credit reports; unauthorized account changes; false representations of the terms and conditions of consumer-financial products or services; or falsifications of consumer email addresses or passwords to facilitate unauthorized enrollment of consumers in financial products or services.

102.    Instead, Fifth Third's detection efforts relied on consumers to self-identify as victims or employees to allege improper activity.

103.    Fifth Third was aware that many consumers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint.

104.    Fifth Third was aware that many of Fifth Third's employees feared retribution for alleging improper conduct.

105.    Even when consumers or employees alleged improper sales conduct, Fifth Third only recorded the conduct as improper if the allegation was (1) escalated above the bank-branch level, (2) internally investigated, and (3) determined to a bank investigator's satisfaction to be "substantiated."

106.    Fifth Third was aware that many consumer and employee allegations were not escalated or recorded.

107.    Under Fifth Third's policies, a consumer complaint must be submitted for escalation only if a consumer complains in writing or "verbally expresses dissatisfaction AND requests to speak to someone else (e.g., a supervisor)."

108.    As Fifth Third recognized by at least 2015, many consumer complaints are not escalated, even when consumers have detected and reported questionable conduct.

109. In March 2015, a senior vice president wrote that 568 Fifth Third branches "did not submit a single escalated complaint" in the prior month, despite a "systemic issue as a company around card issuance" during that same time.

110. Even where allegations were recorded, escalated, and investigated, Fifth Third did not deem sales-misconduct allegations to be substantiated unless the bank's investigator was satisfied that there was conclusive proof.

111. Fifth Third deemed all sales-misconduct allegations without such conclusive proof, including all "he said/she said" scenarios, to be unsubstantiated.

112. Fifth Third also sometimes failed to substantiate allegations because:

a. elderly consumers were deemed by the bank to be "senile" or otherwise confused;

b. consumers were deemed to be confused because English was not their first language;

c. the accused employee or employees resigned before the internal investigation was completed; or

d. the investigator assumed that there had been a misunderstanding.

113. Sometimes, even when the employee involved in an allegation had been accused of opening unauthorized accounts more than once or when an allegation was deemed substantiated, Fifth Third failed to investigate any accounts beyond those that were the subject of the specific consumer or employee allegation.

114.    Fifth Third failed to investigate all accounts opened by employees alleged or found to have engaged in improper sales acts or practices.

115.    Fifth Third failed to investigate bank branches or branch regions even when the branches or regions were disproportionately the subject of substantiated allegations.

116.    Fifth Third failed to investigate bank branches or branch regions even when the branches or regions were known by Fifth Third to have historically engaged in sales misconduct.

117.    For example, despite knowing since at least 2010 that Chicago had a history of unauthorized credit cards and questionable sales practices, Fifth Third failed to investigate broadly the Chicago region's sales acts or practices.

118.    Fifth Third has been aware of available methods to identify unauthorized accounts beyond those Fifth Third has already admitted to opening or to identify accounts, employees, and bank branches that should be further scrutinized.

119.    Fifth Third has, and members of Fifth Third's senior management are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021.

120.    Fifth Third's current Chairman and Chief Executive Officer—formerly Fifth Third's Chief Information Officer, Chief Operating Officer, and President—has

at various times been responsible for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices.

121. Fifth Third has failed to use systematic or technological or other reasonable methods to identify unauthorized accounts beyond those it has admitted to opening or to identify accounts, employees, and bank branches that should be further scrutinized.

122. Fifth Third, through its senior management, chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm.

123. Unauthorized consumer-financial products or services have been likely to cause substantial injury to consumers, including the imposition of unjustified fees, the consumer's inability to meet other financial obligations, negative effects on consumer-reporting-agency information, and the expenditure of consumer time and effort investigating the facts, seeking closure of unwanted accounts, and monitoring and mitigating harm going forward.

**Violations of Law**

124.    Fifth Third's conduct, described above, violated and, where uncorrected, continues to violate the CFPA, FCRA, TILA, TISA, and the TILA and TISA implementing regulations.

**The CFPA**

125.    The CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

126.    The CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with a consumer's ability to understand a term or condition of a consumer-financial product or service. 12 U.S.C. § 5531(d)(1).

127.    Additionally, an act or practice is abusive if it takes unreasonable advantage of a consumer's (A) lack of understanding of the material risks, costs, or conditions of the product or service; (B) inability to protect the consumer's interests in selecting or using a consumer-financial product or service; or (C) reasonable reliance on an offeror to act in the interests of the consumer. 12 U.S.C. § 5531(d)(2).

**Count I**
*Abusive Sales Practices*
*(Abusiveness, in Violation of the CFPA)*

128.    The Bureau realleges and incorporates by reference paragraphs 1-123.

129.    Fifth Third told consumers that the bank was acting in the consumers' best interests in conducting its product or service sales.

130.    For example, Fifth Third trained its sales employees to tell consumers that "you can trust and have confidence that Fifth Third is acting in your best interest."

131.    Fifth Third made public statements that support a reasonable belief that Fifth Third's sales practices are based on and are always in consumers' interests.

132.    Fifth Third made public statements that support a reasonable belief that Fifth Third's employees are not incentivized to sell products that are not in consumers' best interests.

133.    Fifth Third's sales practices have not been based on the consumers' best interests.

134.    Fifth Third incentivized its employees to sell products that are in the bank's financial interests.

135.    Fifth Third conducted assessments of individual consumers that it called a "financial needs assessment" but by which Fifth Third encouraged its employees to determine sales opportunities based on the number of products already cross-sold to

23

the consumer's household, their household's income-producing assets, and the bank's rating of further opportunity to cross-sell to the consumer as low, medium, or high. Fifth Third instructed its employees to use this process to "become the consumer's Trusted Advisor"

136.   Until at least 2017, Fifth Third set a cross-selling goal of at least four products per customer and pressured salespeople to deliver that average regardless of consumers' best interests.

137.   The goal of four products per customer was intended by Fifth Third to promote "customer loyalty" and increase Fifth Third's revenue.

138.   Fifth Third earned more than $10 million per year from cross-selling alone.

139.   Fifth Third also set a point-total goal for its employees. The employees earned points for selling from an array of consumer-financial products and services.

140.   The primary factor for Fifth Third's assignment of a point value to a product has been the revenue that product generates for Fifth Third.

141.   Thousands of Fifth Third's branch employees could not meet their sales goals and were, therefore, subject to disciplinary action, including employment termination.

142.   Fifth Third's sales practices lead its employees to apply for or open consumer-financial products under false pretenses or without consumer consent;

24

change without consumer consent the types of accounts or services in which consumers were enrolled; make false representations relating to the terms and conditions of consumer-financial products or services offered by Fifth Third to induce consumers to accept, change, or enroll in products; use or obtain consumer reports from consumer reporting agencies without a permissible purpose; assign personal-identification numbers without authorization from consumers or falsify consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers in products offered by Fifth Third; and engage in unauthorized transactions on behalf of consumers.

143.    Fifth Third's sales practices take unreasonable advantage of the reasonable reliance by consumers on Fifth Third to act in the interests of the consumers, in violation of §§ 1031(d)(2)(C) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(C), 5536(a)(1)(B).

144.    Fifth Third's sales practices lead to product issuances and product changes without consumer knowledge and consent, and, thus, Fifth Third's sales practices take unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of products or services, and take unreasonable advantage of the inability of consumers to protect the interests of consumers in selecting or using consumer-financial products or services, in violation of

25

§§ 1031(d)(2)(A)-(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A)-(B), 5536(a)(1)(B).

### Count II
#### *Unauthorized Deposit Accounts*
#### *(Unfairness and Abusiveness, in Violation of the CFPA)*

145.    The Bureau realleges and incorporates by reference paragraphs 1-123.

146.    Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent are likely to cause substantial injury in the form of fees, penalties, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort.

147.    Fifth Third's acts or practices of transferring funds between consumers' accounts without their knowledge and consent are likely to cause substantial injury in the form of fees, penalties, the inability to withdraw funds, the inability to meet other financial obligations, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort.

148.    Fifth Third has charged many of these consumers unjustified fees.

149.    Because these acts or practices occur without consumers' knowledge and consent, the injuries are not reasonably avoidable by consumers, and they are also not outweighed by countervailing benefits to consumers or to competition.

150.    Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

151.    Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of the deposit accounts.

152.    Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service.

153.    Fifth Third's acts or practices of transferring funds between consumers' accounts without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in using a consumer-financial product or service.

154.    Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

## Count III
### *Unauthorized Credit Cards*
### *(Unfairness and Abusiveness, in Violation of the CFPA)*

155.    The Bureau realleges and incorporates by reference paragraphs 1-123.

156.    Fifth Third's acts or practices of applying for or issuing credit cards to consumers without their knowledge and consent are likely to cause substantial injury

27

in the form of fees, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort.

157. Consumers cannot reasonably avoid these injuries because the credit-card applications and issuances occur without their knowledge and consent.

158. The injuries to consumers are not outweighed by countervailing benefits to consumers or to competition.

159. Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

160. Fifth Third's acts or practices of applying for or issuing credit cards to consumers without consumers' knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of the credit cards.

161. Fifth Third's acts or practices of applying for or issuing credit cards to consumers without consumers' knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service.

162. Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

**Count IV**
*Unauthorized Enrollment in Online-Banking Services*
*(Unfairness and Abusiveness, in Violation of the CFPA)*

163.    The Bureau realleges and incorporates by reference paragraphs 1-123.

164.    Fifth Third's acts or practices of enrolling consumers in online-banking services without consumers' knowledge and consent are likely to cause substantial injury in the form of the increased risk of data theft, money theft, and improper personal-data use, and the expenditure of consumer time and effort determining the facts and attempting to monitor and mitigate the harm.

165.    Because these enrollments occur without consumers' knowledge and consent, the injuries are not reasonably avoidable by consumers, and they are not outweighed by countervailing benefits to consumers or to competition.

166.    Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

167.    Fifth Third's acts or practices of enrolling consumers in online-banking services without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of online banking.

168.    Fifth Third's acts or practices of enrolling consumers in online-banking services without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service.

169.    Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

## Count V
### *Unauthorized Opening of Early Access*
### *(Unfairness and Abusiveness, in Violation of the CFPA)*

170.    The Bureau realleges and incorporates by reference paragraphs 1-123.

171.    Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent are likely to cause substantial injury in the form of negative effects on consumers' credit profiles and expenditure of consumer time and effort.

172.    Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition.

173.    Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

174.    Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent materially interfere with consumers' ability to understand Early Access's terms and conditions.

175.    Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent take unreasonable

advantage of consumers' inability to protect their interests in selecting or using a consumer-financial product or service.

176. Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

**Count VI**
*Unauthorized Enrollment in Overdraft Protection*
*(Unfairness and Abusiveness, in Violation of the CFPA)*

177. The Bureau realleges and incorporates by reference paragraphs 1-123.

178. Fifth Third enrolled consumers in overdraft protection, including linked-account protection and line-of-credit protection, without the consumers' knowledge and consent. In some instances, the line-of-credit overdraft protection was in the form of a credit card that the consumer also did not know of and authorize.

179. Fifth Third's acts or practices of enrolling consumers in overdraft protection without consumers' knowledge and consent are likely to cause substantial injury in the form of fees, expenditure of consumer time and effort, and negative effects on consumer-reporting-agency information.

180. Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition.

31

181.    Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

182.    Fifth Third's acts or practices of enrolling consumers in overdraft protection without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of overdraft protection and, where applicable, the accompanying credit card.

183.    Fifth Third's acts or practices of enrolling consumers in overdraft protection without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service.

184.    Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

## Count VII
### *Unauthorized Enrollment in Other Consumer-Financial Products*
### *(Unfairness and Abusiveness, in Violation of the CFPA)*

185.    The Bureau realleges and incorporates by reference paragraphs 1-123.

186.    Fifth Third, without consumer knowledge and consent, enrolled consumers in other consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards.

187. Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without consumers' knowledge and consent are likely to cause substantial injury in the form of expenditure of consumer time and effort.

188. Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition.

189. Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

190. Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of those products.

191. Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service.

33

192.     Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B).

## Count VIII
### *Unauthorized Credit-Card Issuance*
### *(Violations of TILA and Regulation Z)*

193.     The Bureau realleges and incorporates by reference paragraphs 1-123.

194.     Under TILA, "no credit card shall be issued except in response to a request or application therefor." 15 U.S.C. § 1642. Regulation Z requires that "regardless of the purpose for which a credit card is to be used, including business, commercial, or agricultural use, no credit card shall be issued to any person except in response to an oral or written request or application for the card; or as a renewal of, or substitute for, an accepted credit card." 12 C.F.R. § 1026.12(a).

195.     Fifth Third issued credit cards to consumers without their knowledge or consent and not in response to an oral or written request or application for the card.

196.     Therefore, Fifth Third violated TILA and Regulation Z, 15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a).

## Count IX
### *Unauthorized Deposit Accounts*
### *(Violations of TISA and Regulation DD)*

197.     The Bureau realleges and incorporates by reference paragraphs 1-123.

198. TISA's purpose is "to require the clear and uniform disclosure of—(1) the rates of interest which are payable on deposit accounts by depository institutions; and (2) the fees that are assessable against deposit accounts, so that consumers can make a meaningful comparison between the competing claims of depository institutions with regard to deposit accounts." 12 U.S.C. § 4301(b). TISA further authorizes the Bureau to issue implementing regulations, including regulations to carry out these purposes. E.g., 12 U.S.C. § 4308(a).

199. TISA's implementing regulation, 12 C.F.R. § 1030.4 (Regulation DD), requires the disclosure of the annual percentage yield and interest rate, compounding and crediting information, balance information, fees, and more. 12 C.F.R. § 1030.4(b). Those disclosures must be made before account opening. 12 C.F.R. § 1030.4(a)(1)(i).

200. By opening deposit-accounts without consumer authorization and, in the process, failing to make the required disclosures to the affected consumers, Fifth Third violated TISA and Regulation DD, 12 U.S.C. § 4301(b); 12 C.F.R. § 1030.4.

## Count X
### *Unauthorized Consumer Reports*
### *(Violations of FCRA)*

201. The Bureau realleges and incorporates by reference paragraphs 1-123.

202. Section 604(f) of FCRA mandates that consumer reports be used or obtained only for permissible purposes enumerated in the statute. 15 U.S.C. § 1681b(f).

203.    Under FCRA, a "person shall not use or obtain a consumer report for any purpose unless—(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished" and one other condition is met. 15 U.S.C. § 1681b(f).

204.    The authorized purposes specified in FCRA include consumer reports furnished "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

205.    It was Fifth Third's practice to obtain consumer reports in the course of considering consumers for new credit cards and other credit products.

206.    Fifth Third used or obtained consumer reports to consider consumers for new credit products even when the consumers had not applied for or did not want the products and where Fifth Third had no permissible purpose for the consumer reports.

207.    Fifth Third used or obtained consumer reports without a permissible purpose in connection with unauthorized applications for credit cards, overdraft protection linked to a credit card, other consumer-credit products, and Fifth Third's attempts to sell consumer-credit products.

208.    By using or obtaining consumer reports without a permissible purpose, Fifth Third violated § 604(f) of FCRA, 15 U.S.C. § 1681b(f).

**Count XI**
*Unfair Sales Practices*
*(Unfairness, in Violation of the CFPA)*

209.   The Bureau realleges and incorporates by reference paragraphs 1-123.

210.   Even after learning by 2008 of unauthorized Fifth Third consumer-financial products and services and applications therefor, Fifth Third failed to change its sales practices to avoid consumer harm. Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services and applications therefor.

211.   Fifth Third imposed sales goals on all levels of branch employees; set goals that thousands of its employees could not achieve; threatened employees with termination or other disciplinary action if they failed to meet their goals; established a system under which managers pressured subordinate employees to sell; failed to take steps to determine and address a root cause of unauthorized accounts, applications, and obtention of credit reports, which was consistently said by employees to be intense sales-pressure; and failed to close known loopholes in its collection of proof of consumer authorization.

212.   Fifth Third's sales practices were likely to cause substantial injury to consumers, including negative effects on their consumer-reporting-agency information, the expenditure of consumer time and effort, the imposition of unjustified fees, the theft of funds or private information, and the inability to meet

financial obligations. This substantial injury to consumers is a predictable consequence of Fifth Third's sales practices.

213. Because any unauthorized applications, products, or services and Fifth Third's conduct occur without consumers' knowledge, the substantial injury to consumers is not reasonably avoidable by consumers.

214. Further, the substantial injury to consumers is not outweighed by countervailing benefits to consumers or to competition.

215. Therefore, Fifth Third engaged in unfair practices that violate §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

**Count XII**
*Failure to Identify and Remediate Affected Consumers*
*(Abusiveness, in Violation of the CFPA)*

216. The Bureau realleges and incorporates by reference paragraphs 1-123.

217. Fifth Third is aware of reasonable methods available to it to identify additional consumers that it subjected to unauthorized financial products or services or applications therefor.

218. Fifth Third declined, and still declines, to make reasonable efforts to identify additional consumers that it subjected to unauthorized financial products or services or applications therefor.

219.    Fifth Third declined to make these reasonable efforts because it believes that identification of additional affected consumers would cause it reputational and other harm.

220.    Some consumers who Fifth Third victimized with unauthorized products or services had those products or services open for months or years without their knowledge.

221.    Compounding the harm to consumers, Fifth Third made statements to consumers that could cause reasonable consumers to believe that Fifth Third acts in their interests and has identified and remediated all consumers that it subjected to unauthorized financial products or services.

222.    These acts or practices take unreasonable advantage of a lack of understanding on the part of consumers of the material risks, costs, or conditions of Fifth Third's products or services.

223.    These acts or practices take unreasonable advantage of the inability of consumers to protect the interests of consumers in selecting or using consumer-financial products or services because the consumers are unaware of those products or services.

224.    These acts or practices take unreasonable advantage of the reasonable reliance by consumers on Fifth Third to act in the interests of the consumers.

225. Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(2)(A), 1031(d)(2)(B), 1031(d)(2)(C), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5531(d)(2)(B), 5531(d)(2)(C), 5536(a)(1)(B).

### Count XIII
### *Fifth Third's Additional Violations of the CFPA*

226. The Bureau realleges and incorporates by reference paragraphs 1-123.

227. By violating TILA, Regulation Z, FCRA, TISA, and Regulation DD, Fifth Third violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

### Demand for Relief

The Bureau requests that the Court:

a.      permanently enjoin Fifth Third from, without the consumer's consent: (1) opening any deposit account; (2) transferring funds between deposit accounts; (3) issuing any credit card; (4) enrolling the consumer in online-banking services; (5) opening any line of credit; (6) submitting any credit-card application; and (7) using or obtaining the consumer's consumer-reporting-agency report;

b.      order Fifth Third to take all reasonable steps to avoid and correct any statement to consumers by Fifth Third that its sales acts and practices are in consumer interests when they are not or may not be in consumer interests;

c.      order Fifth Third to take all reasonable steps to identify and notify consumers who may have had a consumer-financial product or service opened or

applied for without their consent, and allow those consumers to have their products or services closed without fees or penalties;

d.      order Fifth Third to take all reasonable steps to identify and notify consumers who, because of Fifth Third's acts or practices, may have had their consumer-reporting-agency report furnished to or used by Fifth Third without a permissible purpose;

e.      order Fifth Third to correct harmful consumer-reporting-agency information, including but not limited to correcting any harmful trade lines on consumer-credit reports resulting from unauthorized consumer-financial products or services at Fifth Third or applications therefor;

f.      order Fifth Third to pay damages, restitution, and other monetary relief to consumers;

g.      order Fifth Third to pay disgorgement or compensation for unjust enrichment;

h.      impose on Fifth Third a civil money penalty under 12 U.S.C. § 5565(c);

i.      order Fifth Third to pay the costs incurred in connection with prosecuting this action, under 12 U.S.C. § 5565(b); and

j.      award additional relief as the Court may determine to be just and proper.

Dated: June 16, 2021

Respectfully submitted,

Cara M. Petersen
*Acting Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

/s/ Barry E. Reiferson
BARRY E. REIFERSON, NY Reg. #24343893 (Trial Attorney)
Email: barry.reiferson@cfpb.gov
LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
LANE C. POWELL, MI Bar #P79432
Email: lane.powell@cfpb.gov
MEGHAN SHERMAN CATER, NY Reg. #4473120
Email: meghan.sherman@cfpb.gov

1700 G Street, NW
Washington, DC 20552
Telephone: (212) 328-7020
Facsimile: (202) 435-5477

Attorneys for the Bureau of Consumer Financial Protection

**<u>Certificate of Service</u>**

I certify that, on June 16, 2021, the foregoing AMENDED COMPLAINT was filed electronically using the Court's CM/ECF system, and notice of this filing will be sent to attorneys of record who are registered users of the system.

/s/Barry Reiferson