**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | |
| Plaintiff, | Case No. 1:21-cv-00262-DRC Related Case No. 1:21-cv-00173-DRC |
| v. | Judge Douglas R. Cole |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

**FIFTH THIRD BANK, N.A.'s ANSWER**

Fifth Third Bank, N.A. ("Fifth Third" or "Bank") respectfully responds to the Consumer

Financial Protection Bureau's ("CFPB" or "Bureau") June 16, 2021 Amended Complaint as

follows.

**Preliminary Statement[1]**

Fifth Third does not have, and has never had, a systemic or widespread problem with

unauthorized accounts. (*See, e.g.*, Answer ¶¶ 5, 47, 51, 55, 57, 75) The Bureau's sweeping

allegations amplify and distort a handful of limited, historical, and already remediated instances

of misconduct—less than 0.02% of accounts opened between 2010 and 2016—that Fifth Third

properly addressed. Fifth Third trained its nearly 30,000 customer-facing employees to follow

its policies, and the overwhelming majority of employees did so. (*See, e.g.*, Answer ¶¶ 8, 24,

---

[1] While we recognize that Answers typically respond only to the specific allegations on a paragraph-by-paragraph basis, in some instances that format does not provide the Court with a clear idea of the scope of the dispute between the parties. We offer this Preliminary Statement because we believe it will assist the Court in understanding that scope precisely.

34–36, 42)  For the few who did not, Fifth Third had controls in place to detect, investigate, and discipline them, and to ensure that any customer harm was promptly remediated.  (*See, e.g.*, Answer ¶¶ 8, 64, 67, 74)  For more than a decade, the Bank has committed to structural and strategic changes and made significant investments in personnel and technology to enhance its controls and compliance framework.  Therefore, to the extent that the Amended Complaint paints a generalized and misleading picture of a bank that turned a blind eye to misconduct or that set out, intentionally and systematically, to encourage employees to open unauthorized customer accounts, the allegations are DENIED.  (*See, e.g.*, Answer ¶¶ 4, 6, 46, 104)

The allegations in the Amended Complaint do not fairly describe the facts known to both the CFPB and Fifth Third.  Over the course of the CFPB's three-year investigation (and in the two years since then), Fifth Third produced nearly a half-billion data points regarding more than 10 million customer accounts opened by approximately 30,000 retail employees between 2010 and 2016 and provided the Bureau with access to documents and witnesses.  Critically, the Bureau fails to identify a population of *unauthorized* accounts from these half-billion data points that has not already been identified and remediated by Fifth Third.

Instead, the Bureau identifies various criteria that it unilaterally brands as "suspicious" and then alleges large numbers of accounts that have these criteria, all to suggest that there is a broad problem.  Fifth Third denies the substance of these allegations; the large numbers that the Bureau recites in its Amended Complaint are not unauthorized accounts.  As the facts will clearly and indisputably demonstrate, Fifth Third took that population of "suspicious" accounts, applied factors discussed with the CFPB for identifying high-risk or so-called "red flag" accounts, and engaged a globally recognized consulting firm to analyze each red flag account on an individual basis to determine whether it was opened improperly by a Bank employee.

2

That review, which was conducted utilizing methods and quality control procedures validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found an extraordinarily small number of potentially unauthorized accounts. Derived from an initial population of more than 10 million accounts, the potentially unauthorized accounts opened in branches between 2010 and 2016 numbered fewer than 800 and generated a total of less than $3,000 in unwarranted fees that were promptly remediated. The methodology and results were provided to the CFPB, along with Fifth Third's confirmation that it had voluntarily remediated all potentially unauthorized fees. This was done prior to the filing of the Amended Complaint, but is omitted from the pleading. Combined with the potentially unauthorized accounts contemporaneously identified and remediated by the Bank between 2010 and 2016, the Bank has now identified fewer than 2,000 customer accounts (or less than 0.02% of accounts opened) that may have been unauthorized, and approximately $30,000 in total unwarranted fees. This extremely small total disproves the Bureau's theory of widespread and systemic problems.

Fifth Third also denies other allegations in the Amended Complaint that are ambiguously drafted. Alleging that the Bank knew "by 2010" or "since 2010" or "from/since at least 2010"—formulations that were used more than a dozen times in the Amended Complaint—the Bureau unfairly suggests that problems that occurred in Chicago in 2010—before the Bureau existed or had enforcement power—were more widespread and continued unabated. In reality, Fifth Third investigated the 2010 situation in Chicago, disciplined employees who had engaged in misconduct, and brought in new management. Fifth Third has worked continuously since then to strengthen and improve controls and update and improve its compensation system to focus on customer experience and revenue metrics.

Resorting to artful pleading does not change the fact that these issues were limited, historical, and remediated. The Bureau knows, or should know, that of the 10 million-plus customer accounts opened during the seven-year period between 2010 and 2016:

- Less than 0.02% of the accounts were potentially unauthorized. (Answer ¶¶ 118, 211, 217, 218)

- Even those accounts that were potentially unauthorized do not necessarily equate to employee misconduct. There are many explanations for potentially unauthorized accounts, including mistakes or the actions of a family member or third party. (*See, e.g.*, Answer ¶¶ 5, 42, 47, 53)

- Fewer than 500 customers complained about a potentially unauthorized account or service between 2010 and 2016 in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. (*See, e.g.*, Answer ¶¶ 42, 47, 53, 54, 56)

- Potentially unauthorized accounts were concentrated primarily in the 2010–2012 time period, in many instances before Congress transferred enforcement power to the CFPB. (*See, e.g.*, Answer ¶¶ 5, 11, 42, 47)

- Employees suspected of misconduct were investigated by the Bank and were disciplined or terminated, as appropriate. (*See, e.g.*, Answer ¶¶ 5, 38, 43, 47)

Fifth Third offers the following paragraph-by-paragraph response to the Complaint:

| Para | Allegation | Answer |
|---|---|---|
| 1. | Fifth Third tells consumers and otherwise creates a reasonable belief that Fifth Third's consumer-financial-product sales are in the consumers' best interests. | Deny, except to admit that Fifth Third strives to put the customer at the center of everything it does so it can be the bank customers most value and trust. To that end, Fifth Third uses a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 2. | Contrary to what Fifth Third tells consumers, Fifth Third designs and conducts its consumer-financial-product sales based on its own financial interests. | Deny. Offering products and services that meet its customers' needs benefits Fifth Third. |
| 3. | Fifth Third has known for more than a decade that its acts or practices have led to the opening of consumer-financial products that are not in consumers' interests. | Deny. |
| 4. | Fifth Third has known for more than a decade that its acts or practices have led to the opening of products in consumers' names without consumers' knowledge or consent. | Deny. |
| 5. | Fifth Third admitted in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 6. | Fifth Third has known for more than a decade that its employees have, without consumer consent, transferred consumer funds, changed account types, misrepresented terms | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
|  | and conditions, falsified records, and assigned personal- identification numbers and passwords to consumer accounts. | |
| 7. | Fifth Third also used or obtained consumer-reporting-agency reports without a permissible purpose. | Deny. |
| 8. | Yet Fifth Third has taken insufficient steps to identify and remediate affected consumers. | Deny. Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized account openings. Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership. There are numerous ways for customers to submit complaints. Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct. When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination. The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.<br><br>This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at high risk of having been unauthorized. Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee. That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |

| Para | Allegation | Answer |
|---|---|---|
| 9. | Fifth Third has focused on its own financial interests to the detriment of consumers. | Deny. |
| 10. | Fifth Third's conduct violates the Consumer Financial Protection Act of 2010 (CFPA), the Truth in Lending Act (TILA), the Truth in Savings Act (TISA), the Fair Credit Reporting Act (FCRA), and the TILA and TISA implementing regulations. | Deny. |
| 11. | The Bureau brings this action to stop Fifth Third's unlawful conduct and to obtain redress for affected consumers and an appropriate penalty and other monetary relief. | Deny. The Bureau has no basis to allege ongoing unlawful conduct related to unauthorized account openings. Fifth Third has effective controls to document customer authorization at account opening, such as requiring PIN-based electronic consents and sending email notifications to customers at the time of account opening.<br><br>To the extent there is evidence of any potentially unauthorized accounts, they were concentrated at the beginning of the relevant time period (before 2012) and the number of potentially unauthorized accounts after 2015 is barely distinguishable from zero. There is, in short, no basis to obtain any injunctive relief, nor is there any basis for liability, much less a need to impose a penalty or other monetary relief. Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized accounts. |
| 12. | The Bureau brings this action under §§ 1031, 1036(a)(1), 1054, and 1055 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1), 5564, 5565; TILA, 15 U.S.C. § 1601 et seq., and its implementing regulation, Regulation Z, 12 C.F.R. part 1026; FCRA, 15 U.S.C. § 1681 et seq.; and TISA, 12 U.S.C. § 4301 et seq., and its implementing regulation, Regulation DD, 12 C.F.R. part 1030. | This paragraph is not directed at Fifth Third and no response is required. This paragraph contains a legal conclusion as to which no response is required. |
| 13. | This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. | This paragraph is not directed at Fifth Third and no response is required. This paragraph contains a legal conclusion as to which no response is |

| Para | Allegation | Answer |
|------|-----------|--------|
|  | § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345. | required.  To the extent a response is required, Fifth Third denies the allegation. |
| 14. | Venue is proper in this district because Fifth Third is located, resides, or does business in this district. 12 U.S.C. § 5564(f). | This paragraph is not directed at Fifth Third and no response is required.  To the extent a response is required, Fifth Third admits that venue is appropriate in the Southern District of Ohio. |
| 15. | The Bureau is an independent agency of the United States created by the CFPA and charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b). | This paragraph is not directed at Fifth Third and no response is required.  This paragraph contains a legal conclusion as to which no response is required. |
| 16. | Fifth Third operates, among other things, a branch-banking business that offers and provides an array of financial products and services primarily used by consumers for personal, family, or household purposes. Fifth Third is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(5), (6), (15)(A). | The first sentence is admitted.  The second sentence contains a legal conclusion as to which no response is required. |
| 17. | Fifth Third has more than $200 billion in total assets and, through its branch-banking business, operates more than 1,000 full-service branches in  Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, North Carolina, Ohio, South Carolina, Tennessee, and West Virginia. | Admit. |
| 18. | Among the products or services (hereinafter referred to as products) Fifth Third offers through its branch-banking business are checking accounts, savings accounts, credit cards, online | Admit. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | banking, overdraft protection, and lines of credit. | |
| 19. | Fifth Third's product sales are profitable because they improve customer retention and generate fees. | Deny, except to admit that customer retention and fee generation through product sales are two of numerous factors that impact revenue. |
| 20. | To increase the number of products sold to its consumers, Fifth Third conditioned employee-performance ratings and, in some instances, continued employment on whether managers and their subordinate employees met sales goals. Fifth Third also used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Employees received the vast majority of their compensation from salary, with only modest incentive compensation, subject to clawback, for selling products and services that met minimum account quality characteristics. Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered. |
| 21. | Fifth Third imposed sales goals on all levels of branch—also known as financial center—employees. | Deny, except to admit that Fifth Third set reasonable, achievable, and non-mandatory sales goals. |
| 22. | Fifth Third's sales goals have been structured to incentivize employees to push products that are most profitable to the bank. | Deny. |
| 23. | Fifth Third has hidden the existence of these incentives from consumers. | Deny. |
| 24. | Fifth Third has trained its employees to tell and to otherwise convince consumers that the products being sold to them are in their best interests. | Deny. Fifth Third strives to put the customer at the center of everything it does so it can be the bank customers most value and trust. To that end, Fifth Third uses a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 25. | Fifth Third's sales goals have included a point-based system, with different point values assigned to different products. | Admit that, at times, Fifth Third set reasonable, achievable, and non-mandatory sales goals that were point-based. These goals could be met through any combination of products or services. Fifth Third did not impose product-specific quotas. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 26. | Fifth Third has assigned the point values primarily based on the revenue that each product generates for the bank. | Deny. |
| 27. | Fifth Third has set sales goals for thousands of employees at a level higher than their anticipated sales. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Incentive compensation constituted a small portion of an employee's salary (generally only 5-10%), and the vast majority of bankers earned incentive compensation in any given quarter, showing that Fifth Third's goals were reasonable and attainable. |
| 28. | Fifth Third has used the achievement or non-achievement of sales goals as a key component in performance ratings and promotion decisions for managers and their subordinate employees. Low performance ratings could result in disciplinary action, including termination. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered. |
| 29. | From at least 2010 through at least 2019, Fifth Third also used a "cross-sell" strategy to increase the total number of products it provided to new and existing customers. | Deny. |
| 30. | According to Fifth Third, cross-selling—which means selling multiple products to each consumer—improves "customer loyalty." | Deny. Fifth Third trains its employees that excellent customer service and attractive financial products improve customer loyalty. |
| 31. | Cross-selling improves customer retention because it becomes harder for the customer to detach from the bank. | Deny. Customer loyalty is earned when employees offer attractive financial products and excellent service. |
| 32. | From at least 2010 until at least 2017, Fifth Third set a cross-sell goal of at least four products per customer. | Deny. |
| 33. | Fifth Third's cross-sell goal of four products per customer was not based on an analysis of individual consumers' needs but was instead based on Fifth Third's goals to increase customer retention and | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | bank revenue. | |
| 34. | Fifth Third has instructed its employees to find sales opportunities by conducting what the bank calls a "financial needs assessment" of individual consumers. Employees are to use this "assessment" to build their "book of business." Through this process, consumers are ranked by "relationship potential," which is a measure of the "cross-sell opportunity" that each customer represents. Employees are instructed to use the "financial needs assessment" to "become the customer's Trusted Advisor." | Deny, except to admit that the Financial Needs Assessment ("FNA") is the key consultative sales resource that retail bankers are expected to use in customer interactions, through which the Bank records customer needs, preferences, contacts, and referrals, as well as follow-up tasks and recommendations appropriate to the specific customer, depending on the responses provided by the customer. |
| 35. | Fifth Third trains its employees engaged in financial-needs assessments to cite tax and other financial concerns to "widen" the gap between the consumer's "present state" and "desired state," making the gap "appear larger" in order to promote sales. | Deny. Fifth Third strives to put the customer at the center of everything it does so it can be the bank customers most value and trust. To that end, Fifth Third trains its employees to use a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 36. | Fifth Third's employees conducting financial-needs assessments are often not qualified to make tax and other financial recommendations. | Deny. Fifth Third employees do not make tax recommendations. They are trained to use a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer, to benefit the customer. |
| 37. | Fifth Third tracked cross-selling effectiveness and, from at least 2010 to at least 2017, pressured employees to meet cross-selling goals. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals that did not depend on cross-selling. It did not impose product-specific quotas. Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered. |
| 38. | In 2010, Fifth Third's head of retail banking wrote that the bank's | Admit. In response, Fifth Third investigated the situation in Chicago, disciplined employees who |

11

| Para | Allegation | Answer |
|------|-----------|--------|
| | Chicago "leadership team [has] a reputation of less than desirable sales management practices," and that "[b]ullying and threats are often used to achieve results." | had engaged in misconduct, including termination, brought in new management, and revamped its incentive compensation system. |
| 39. | Fifth Third does not tell consumers about bank-employee sales goals or cross-selling requirements or that the bank and its employees are acting in the bank's financial interests. | Deny. |
| 40. | To the contrary, Fifth Third tells consumers that they can be sure that the bank is acting in consumers' interests. | Deny.  Fifth Third strives to put the customer at the center of everything it does so it can be the bank customers most value and trust.  To that end, Fifth Third trains its employees to use a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer.  Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 41. | Thousands of Fifth Third branch employees are unable to meet their sales goals even with Fifth Third's sales tactics. | Deny.  Fifth Third set reasonable, achievable, and non-mandatory sales goals that did not depend on cross-selling.  It did not impose product-specific quotas.  Incentive compensation constituted a small portion of an employee's salary (generally only 5-10%), and the vast majority of bankers earned incentive compensation in any given quarter, showing that Fifth Third's goals were reasonable and attainable. Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered. |
| 42. | Fifth Third, without consumers' knowledge and consent, opened deposit accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; applied for and issued credit cards; enrolled consumers in online banking; opened lines of credit on consumers' accounts; and enrolled consumers in overdraft protection | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the |

| Para | Allegation | Answer |
|------|-----------|--------|
|  | and other financial products. | Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third.  Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 43. | Fifth Third has known since at least 2010 that one reason that employees were opening unauthorized consumer-financial products was Fifth Third's pressure on employees to sell. | Deny, except to admit that in 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third.  Fifth Third investigated the allegations at the time, remediated the affected consumers, disciplined employees who engaged in wrongdoing, including termination, and appointed new management to lead the Chicago region.  Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority.  Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 44. | By 2010, at the latest, Fifth Third was aware that employees were opening products in consumers' names without those consumers' knowledge and consent in order to achieve sales goals or obtain incentive rewards. | Deny, except to admit that in 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third.  Fifth Third investigated the allegations at the time, remediated the affected consumers, disciplined employees who engaged in wrongdoing, including termination, and appointed new management to lead the Chicago region.  Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority.  Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 45. | In 2010, Fifth Third's head of retail banking wrote that "there have been consistent problems around unauthorized credit card sales in Chicago." | Admit that this is a partial and selective quote from a document produced to the Bureau during the investigation, but deny that it accurately reflects the context.  In 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third.  The Bank investigated the allegations at the time, remediated the affected consumers, disciplined employees who engaged in |

| Para | Allegation | Answer |
|------|-----------|--------|
|  |  | wrongdoing, including termination, and appointed new management to lead the Chicago region. Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority. Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 46. | Fifth Third's unauthorized accounts were the predictable result of its acts and practices and occurred in many of the bank's geographic markets. | Deny. |
| 47. | Fifth Third also changed without consumer consent the types of accounts or services in which consumers were enrolled; made false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in them; used or obtained consumers' credit reports without an authorized purpose; and, without consumer authorization, assigned personal-identification numbers or falsified consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts or services may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts and services did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 48. | Fifth Third has admitted to almost 400 instances of the acts or practices described in paragraph 47. | Deny. |
| 49. | There were more than 400 instances of the acts or practices described in paragraph 47. | Deny. |
| 50. | Fifth Third claims to have opened fewer than 1,100 unauthorized consumer-financial products. | Deny, except to admit that Fifth Third released a fact sheet on March 9, 2020 stating that it had "identified fewer than 1,100 unauthorized accounts out of more than 10 million – or just 0.01% of accounts opened between 2010 and 2016." |
| 51. | Fifth Third opened more than 1,100 unauthorized consumer-financial products. | Admit that Fifth Third has now identified fewer than 2,000 customer accounts that may have been unauthorized. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 52. | Fifth Third imposed aggressive sales goals for its employees to open new deposit accounts, and its incentive-compensation program rewarded employees for opening new deposit accounts funded with a specified minimum balance within a defined period. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Employees received the vast majority of their compensation from salary, with only modest incentive compensation, subject to clawback, for selling products and services that met minimum account quality characteristics. |
| 53. | Fifth Third opened deposit accounts for Fifth Third consumers without the consumers' knowledge and consent. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 54. | Some of these unauthorized accounts were "funded" when a bank employee transferred funds to the unauthorized account from the same consumer's authorized account without the consumer's knowledge and consent. Often, once an unauthorized account was "funded," such that it qualified under the sales-goal tracking or incentive program, the bank employee transferred some or all of the funds back to the consumer's authorized account, again without the consumer's knowledge and consent. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 55. | In more than 26,000 instances since 2010, a new Fifth Third deposit-account was funded with $100 or less from an existing Fifth Third account and had no activity other | Admit, but deny that such accounts are unauthorized simply because they meet these criteria. Many of these accounts were opened online and did not involve Fifth Third employees. There are many legitimate reasons why consumers |

| Para | Allegation | Answer |
|------|-----------|--------|
| | than the subsequent transfer, within 90 days, of those funds back to the original account. | open accounts but do not use them. For example, many consumers open checking accounts to obtain promotional giveaways when they have little intention of using the accounts, or they open "aspirational" accounts, or they withdraw the funds to deal with financial emergencies. Further, some consumers will open accounts with a new bank but then change their minds about switching from a prior bank.

Moreover, the vast majority—approximately 90%—of these "low-funded, no activity" accounts did not generate any incentive compensation credit for Fifth Third employees. And for the small portion that did earn incentive credit, nearly 90% of them had a signature card on file documenting the customer's authorization.

An independent consultant reviewed all deposit accounts opened between 2010 and 2016 that met factors discussed with the CFPB—including having two transactions with a balance less than $5 after 90 days—and determined that fewer than 350 were potentially unauthorized, out of more than 7.2 million deposit accounts opened during that period. Moreover, the vast majority of the potentially unauthorized accounts were opened well before 2016. Fifth Third voluntarily remediated all accounts that the consultant deemed potentially unauthorized. |
| 56. | Sometimes, Fifth Third's employee would fund a consumer's account initially with the employee's own money and then take reimbursement funds—without authorization—from the consumer. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third. Fifth |

| Para | Allegation | Answer |
|------|------------|--------|
|  |  | Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 57. | Since 2010, more than 124,000 new Fifth Third deposit-accounts have been funded with $100 or less and defunded to a zero balance within 90 days. | Admit, but deny that such accounts are therefore unauthorized.  Many of these accounts were opened online and did not involve a Fifth Third employee in a bank branch.  There are many legitimate reasons why consumers open accounts but do not use them.  For example, many consumers open checking accounts to obtain promotional giveaways when they have little intention of using the accounts, or they open "aspirational" accounts, or they withdraw the funds to deal with financial emergencies.  Further, some consumers will open accounts with a new bank but then change their minds about switching from a prior bank.<br><br>An independent consultant reviewed all deposit accounts opened between 2010 and 2016 that met factors discussed with the CFPB—including having two transactions with a balance less than $5 after 90 days—and determined that fewer than 350 were potentially unauthorized, out of more than 7.2 million deposit accounts opened during that period.  Moreover, the vast majority of the potentially unauthorized accounts were opened well before 2016.  Fifth Third voluntarily remediated all accounts that the consultant deemed potentially unauthorized. |
| 58. | Sometimes, Fifth Third's employee closed an existing account and immediately opened a new one or reopened the just-closed account, getting sales credit for a new account. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training.  During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts.  These accounts did not benefit Fifth Third.  Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 59. | Fifth Third has allowed employees to earn sales credit for "suppression" of paper account-statements, after which the consumer would not receive account statements by mail. | Deny, except to admit that at times, Fifth Third provided modest incentive compensation for paper statement suppression. There were no quotas for paper statement suppression. Beginning in 2016, consumers who enrolled in digital statements continued to receive paper statements until they confirmed enrollment. Further, consumers could not enroll in statement suppression unless they had online banking, as the suppression had to be executed within the online banking platform. |
| 60. | If paper account-statements were suppressed, Fifth Third would send account statements by email. | Deny. Fifth Third did not send electronic account statements via email; if a consumer suppressed paper statements and had an email address or mobile phone number on file, Fifth Third would send an email or text notification that the consumer's account statement was available to be viewed on the online banking platform. Regardless of this notification, statements were available to be viewed at all times on the online banking platform. Moreover, beginning in 2016, consumers who enrolled in digital statements continued to receive paper statements until they confirmed enrollment. Further, consumers could not enroll in statement suppression unless they had online banking, as the suppression had to be executed within the online banking platform. |
| 61. | In thousands of instances, Fifth Third suppressed paper account-statements and had no consumer email address to which it could send an electronic account-statement for receipt by a consumer. | Deny. Fifth Third did not send electronic account statements via email; if a consumer suppressed paper statements and had an email address or mobile phone number on file, Fifth Third would send an email or text notification that the consumer's account statement was available to be viewed on the online banking platform. Consumers who suppressed paper account statements and had no email address or mobile phone number on file still had access to their account statements. Statements were always available to be viewed on the online banking platform. |
| 62. | In almost 7,000 or more instances since 2010, an existing customer's new deposit-account was funded with $100 or less by cash or internal transfer, had no activity other than the initial funding and defunding, and was associated with a Fifth | Fifth Third lacks sufficient information to admit or deny, but denies that such accounts are unauthorized simply because they meet these criteria. As discussed above in response to paragraphs 55 and 57, there are many legitimate reasons why customers might open such accounts or have a Fifth Third email address. |

18

| Para | Allegation | Answer |
|------|-----------|--------|
|  | Third email address even though the consumer was not a Fifth Third employee. | Fifth Third's policy was to enter an informational Fifth Third email, such as customerdeclined@53.com or noemail@53.com, when a consumer did not have an email address or declined to provide one. More than 85% of non-customer email addresses have an informational email address. Therefore, the presence of a Fifth Third email address for a non-Fifth Third employee is unsurprising.

An independent expert analyzed whether the presence of Fifth Third email addresses was correlated with criteria the Bureau deemed to be suspicious. He concluded that there is no meaningful correlation, regardless of account type or funding amounts. In other words, the presence of a Fifth Third email is not helpful in identifying unauthorized accounts. This information was shared with the Bureau, but is not mentioned in the Amended Complaint.

Moreover, for accounts opened between 2010 and 2016, more than 95% of low-funded accounts with Fifth Third email addresses have a signature card on file. This information was also shared with the Bureau, but is not mentioned in the Amended Complaint. |
| 63. | Fifth Third acknowledged that minimum funding, fake email addresses, statement suppression, and new-account funding from an existing account could each indicate a potentially unauthorized deposit account. | Deny. |
| 64. | Until at least 2020, Fifth Third failed to use any of these indicia or a combination of them to identify unauthorized accounts or victimized consumers. | Deny. Between 2010 and 2016, Fifth Third contemporaneously identified through various means, including consideration of the indicia described above, a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming, mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third.  Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing.<br><br>Further, Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership.  Further, if a customer opens a credit card but does not activate or use it, Fifth Third will call the customer to see if the customer still wants the account.  These calls are made by trained personnel who were not involved in the account opening process.  Two compliance calling campaigns found that more than 99.5% of customers recalled applying for a credit card.  For those who did not recall, despite their lack of recollection, Fifth Third located an application for each customer. |
| 65. | Fifth Third charged unjustified fees to many consumers who had deposit accounts opened without their knowledge and consent. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. These accounts did not benefit Fifth Third.  There was approximately $30,000 in unwarranted fees associated with these accounts.  Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 66. | Fifth Third imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards. | Deny.  Fifth Third provided modest incentive compensation for new credit card accounts that were underwritten and approved by the Bank's underwriting personnel.  There were no quotas for opening new credit cards. |
| 67. | Fifth Third applied for and issued credit cards to customers without | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized |

| Para | Allegation | Answer |
|------|-----------|--------|
| | their knowledge and consent. | credit card accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 despite Fifth Third's policies, procedures, and training. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 68. | Fifth Third credit cards were susceptible to unauthorized applications and issuance in part because Fifth Third bank branches accepted applications over the phone at least until 2017. | Deny, except to admit that Fifth Third stopped accepting telephone credit card applications at its branch locations in 2017. |
| 69. | Fifth Third allowed its branch employees to take credit-card applications over the phone and to write "phone application" along with the date and time on the signature line of the application. In those instances, and where only a portion of that information was written, the bank retained no other indication of consumer consent. | Deny, except to admit that, at times, Fifth Third had a process for accepting credit card applications over the phone until 2017, when it discontinued this practice until additional controls were implemented. |
| 70. | Fifth Third had no detection capabilities or reporting if an employee failed to forward the phone application to a central repository. | Deny. |
| 71. | Fifth Third considered disallowing bank-branch phone applications for credit cards by 2010. That year, Fifth Third's head of retail banking advised the head of Fifth Third's consumer bank that Fifth Third continued "to have problems with unauthorized credit card apps" that could be addressed by suspending "the ability of financial center personnel to take apps without a wet signature." He further advised that requiring a "wet signature" would "reduce the issue of customers receiving cards they did not anticipate." | Admit that these are partial and selective quotes from a document produced to the Bureau during the investigation, but deny the remainder of the allegations. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 72. | Around that same time, Fifth Third executives discussed the possibility of limiting credit-card sales to instances in which "the customer is physically in the Financial Center" and eliminating phone applications "where we have no customer signature."  Fifth Third chose not to impose that limitation until seven years later. | Admit that these are partial and selective quotes from a document produced to the Bureau during the investigation and that Fifth Third stopped accepting telephone credit card applications at its branch locations in 2017 until additional controls were implemented, but deny the remainder of the allegations. |
| 73. | Fifth Third acknowledged that the absence of a credit-card application could indicate an unauthorized card. | Deny. |
| 74. | Yet Fifth Third did not investigate all issued credit cards for which it has no application on file. | Deny.  Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized account openings.  Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership.  There are numerous ways for customers to submit complaints.  Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct.  When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination.  The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.<br><br>This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at high risk of having been unauthorized.  Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee.  That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of |

| Para | Allegation | Answer |
|------|-----------|--------|
|      |           | the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |
| 75.  | Since 2010, more than 218,000 Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions. | Admit, but deny that such credit card accounts are therefore unauthorized. There are many legitimate reasons why consumers apply for credit cards but do not activate or use them. For example, consumers regularly open "backup accounts" for emergencies or to help establish credit history. They can also use unactivated credit cards for emergency funds, balance transfers, and overdraft protection. And some consumers open credit cards to obtain promotional giveaways when they have little intention of using the accounts. This information was shared with the Bureau, but is not mentioned in the Amended Complaint.

An independent expert was engaged to investigate the Bureau's allegation. This analysis demonstrates that Fifth Third email addresses are distributed evenly across all credit card categories, whether they are unactivated, activated but unused, or used. Thus, a Fifth Third email address, by itself, is not predictive of anything. This information was shared with the Bureau, but is not mentioned in the Amended Complaint.

Numerous studies show that a significant percentage of customers apply for credit cards but choose not to activate or use them. The Federal Reserve Bank of Philadelphia, for example, has published research on this phenomenon and has observed non-usage rates as high as 35%, based on data collected from large bank holding companies. Available data reveal that Fifth Third's customers use their credit cards at rates that are comparable to peer banks in the industry.

Further, a globally-recognized consulting firm reviewed all credit card accounts opened between 2010 and 2016 that met factors discussed with the CFPB—including non-activation and non- |

| Para | Allegation | Answer |
|------|-----------|--------|
|  |  | activity—and determined that fewer than 600 credit cards were potentially unauthorized, out of more than 1.7 million credit card accounts opened during that period. Moreover, the vast majority of the potentially unauthorized accounts were opened well before 2016. Fifth Third has remediated all accounts that the consultant deemed potentially unauthorized. |
| 76. | Since 2010, more than 4,000 Fifth Third consumer credit-card accounts have been opened but have had no consumer-initiated purchases and have been associated with a Fifth Third email address where the consumer was not a Fifth Third employee. | Admit, but deny that such accounts are therefore unauthorized.<br><br>Fifth Third's policy was to enter an informational Fifth Third email, such as customerdeclined@53.com or noemail@53.com, when a consumer did not have an email address or declined to provide one. More than 85% of non-customer email addresses have an informational email address. Therefore, the presence of a Fifth Third email address for a non-Fifth Third employee is unsurprising.<br><br>An independent expert was also engaged to investigate the Bureau's allegation. This analysis demonstrates that Fifth Third email addresses are distributed evenly across all credit card categories, whether they are unactivated, activated but unused, or used. Thus, a Fifth Third email address, by itself, is not predictive of anything. This information was shared with the Bureau, but is not mentioned in the Amended Complaint.<br><br>Numerous studies show that a significant percentage of customers apply for credit cards but choose not to activate or use them. The Federal Reserve Bank of Philadelphia, for example, has published research on this phenomenon, and has observed non-usage rates as high as 35% based on data collected from large bank holding companies. Available data reveal that Fifth Third's customers use their credit cards at rates that are comparable to peer banks in the industry.<br>This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at high risk of having been unauthorized, including whether and where communications were sent. |

| Para | Allegation | Answer |
|------|-----------|--------|
|  |  | Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee. That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). Fewer than 600 credit cards were potentially unauthorized, out of more than 1.7 million credit card accounts opened during that period. Moreover, the vast majority of the potentially unauthorized accounts were opened well before 2016. Fifth Third has remediated all accounts that the consultant deemed potentially unauthorized. |
| 77. | Fifth Third has failed to examine these account populations for the absence of signed applications or for phone applications or other indicia of non- authorization. | Deny. Fifth Third identified a small number of instances where unauthorized credit card accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 despite Fifth Third's policies, procedures, and training. During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
|  |  | Separately, a globally recognized consulting firm was engaged to analyze suspicious accounts that met factors discussed with the CFPB, including whether there was a signed application on file. The consultant reviewed each account on an individual basis to determine whether it was opened improperly by a Bank employee. That review, which was conducted utilizing methods and quality control procedures validated by retired senior |

| Para | Allegation | Answer |
|------|------------|--------|
|      |            | officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |
| 78. | Fifth Third charged many of these consumers unjustified fees. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. These accounts did not benefit Fifth Third. Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 79. | Fifth Third imposed aggressive sales goals for its employees to enroll consumers in its online-banking services, and its incentive-compensation program rewarded employees for enrolling consumers in those services. | Deny. Fifth Third at times provided modest incentive compensation when customers used online banking, but not in connection with online banking enrollment. |
| 80. | Fifth Third enrolled consumers in online-banking services without their knowledge and consent. | Deny. |
| 81. | Fifth Third's sales programs credited employees for enrolling consumers in online-banking services after the consumer logged in to the service at least three times. To effectuate unauthorized enrollments, Fifth Third employees would set up consumers' passwords without consumers' knowledge and consent. To obtain credit for unauthorized enrollments, Fifth Third employees would log in at least the requisite number of times without the consumers' knowledge and consent. | Deny. Fifth Third at times provided modest incentive compensation when customers used online banking, but not in connection with online banking enrollment. Fifth Third identified a small number of instances where customers may have been enrolled in online banking without authorization (due to mistake or employee gaming) between 2010 and 2016, despite Fifth Third's policies, procedures, and training. These online banking enrollments did not benefit Fifth Third. Where appropriate, Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 82. | To avoid consumers detecting unauthorized online-banking enrollment, Fifth Third employees sometimes enrolled the consumer using an email address unknown to | Deny. |

| Para | Allegation | Answer |
|---|---|---|
| | the consumer, such as a Fifth Third email address. Fifth Third employees also used other nonbank and non-consumer email addresses to avoid detection. | |
| 83. | Fifth Third's password protocols for online banking have been substandard, increasing the risks to consumers enrolled in online banking knowingly or unknowingly. | Deny. |
| 84. | Since 2010, Fifth Third has completed more than 48,000 consumer enrollments in online banking using a Fifth Third email address. Of those, more than 12,000 had four or fewer login attempts and more than 1,400 had no login attempts. | Admit, but deny that such accounts were enrolled in online banking without authorization. Fifth Third's policy at the time was to enter an "informational" Fifth Third email, such as customerdeclined@53.com or noemail@53.com, when a consumer did not have an email address or declined to provide it. Therefore, the presence of a Fifth Third email address for a non-Fifth Third employee is unsurprising.<br><br>Customers do not need to have or provide an email address to enroll in online banking. If the customer does not provide an email address, the system automatically populates the email field with the email address that Fifth Third already has on file for the customer. |
| 85. | Fifth Third has not scrutinized those enrollments to determine consumer authorization. | Deny. |
| 86. | Fifth Third has not used any systematic or technological method to identify unauthorized or suspicious online-banking enrollments. | Deny. There are no reliable, generally accepted systems, algorithms, or processes available on the market to detect and prevent, without human judgment, all the sales practice violations that could occur at a bank. Fifth Third has a robust system of controls to prevent, detect, investigate, and remediate unauthorized accounts, and to monitor account opening and usage metrics in combination with other indicia to identify suspicious activity. Suspicious issues are referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination. The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct. |
| 87. | Early Access is a fee-based line of credit that allows Fifth Third's checking-account holders to withdraw Fifth Third-supplied funds from their checking account before the account holder's reimbursement funds have been deposited in the account. Fifth Third imposed aggressive sales goals for its employees to sell Early Access to consumers, and its incentive-compensation program rewarded employees for enrolling consumers in "fee-based products," including Early Access. | Deny. Early Access ("EAX") is a deposit advance product, not a line of credit. Enrollment in EAX was free and had no impact on a customer's credit score. Affidavit of Ben Mendelsohn ("Mendelsohn Aff.") ¶ 5. It gave customers who received regular direct deposits the option of taking an advance on the direct deposit. Customers incurred fees only if they initiated an advance, which could not be done without their express knowledge and consent, as it required a separate, affirmative request from the consumer and a separate agreement to the key terms and conditions. *Id.* at ¶¶ 5–6; Ex. 1, EAX Screenshots at 3–5 (also attached as Ex. A to Mendelsohn Aff.) Neither EAX enrollment nor EAX advances were furnished to consumer reporting agencies. Mendelsohn Aff. ¶ 5. |
| 88. | Fifth Third opened Early Access lines of credit on consumers' checking accounts without their knowledge and consent. Fifth Third was aware of this by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit. | Deny, except to admit that Fifth Third identified a small number of instances where customers may have been enrolled in EAX without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2014, despite Fifth Third's policies, procedures, and training. These EAX enrollments did not benefit Fifth Third. Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 89. | Fifth Third did not effectively curtail unauthorized Early Access lines of credit in 2010. | Deny. |
| 90. | In 2013, Fifth Third found that Early Access was often "being activated without the customer present" and that there was "a 37% error rate in obtaining signatures" on Early Access applications. | Admit that this is a partial and selective quote from a document produced to the Bureau during the investigation, but deny that it accurately reflects the context. The document reflects an investigation of a single branch employee by Fifth Third's investigative group. The investigator conducted a review of EAX accounts opened by this employee and found a 37% error rate in obtaining signatures; the employee underwent further coaching and training about the need to obtain the necessary documentation, and management saw a significant improvement thereafter. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 91. | Fifth Third employees also sometimes forged consumer signatures on Early Access applications. | Deny, except to admit that Fifth Third identified a small number of instances where customers may have been enrolled in EAX without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2014, despite Fifth Third's policies, procedures, and training. These EAX enrollments did not benefit Fifth Third. Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 92. | Fifth Third opened unauthorized Early Access lines of credit from at least 2010 through 2014, and Fifth Third retained unauthorized Early Access lines of credit even after it stopped offering new Early Access lines of credit. | Deny, except to admit that Fifth Third identified a small number of instances where customers may have been enrolled in EAX without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2014, despite Fifth Third's policies, procedures, and training. These EAX enrollments did not benefit Fifth Third. Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 93. | From 2010 through 2014, more than 19,000 Fifth Third Early Access accounts were opened and closed on the same day without being used. | Admit, but deny that such accounts are therefore unauthorized. When a Fifth Third employee printed the terms and conditions for EAX, the system automatically opened an EAX account. If the customer changed their mind or decided not to sign up, Fifth Third employees were trained to remove EAX from the account. Employees did not receive incentive compensation credit for EAX accounts that were opened and closed on the same day. |
| 94. | Fifth Third never further scrutinized the population of Early Access accounts lacking a consumer signature or the population of Early Access accounts opened and closed on the same day without being used. | Deny. Fifth Third identified a small number of instances where customers may have been enrolled in EAX without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2014, despite Fifth Third's policies, procedures, and training. These EAX enrollments did not benefit Fifth Third. Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 95. | Fifth Third never used any systematic or technological method to identify unauthorized Early Access enrollments or Early Access enrollments worthy of further scrutiny. | Deny. Fifth Third has a robust system of controls to prevent, detect, investigate, and remediate unauthorized accounts, and to monitor account opening and usage metrics in combination with other indicia to identify suspicious activity. Suspicious issues are referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | law enforcement and/or fraud examination.  The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.  There is no fully automated solution that exists anywhere in the world that can do this. |
| | | Fifth Third identified a small number of instances where customers may have been enrolled in EAX without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2014, despite Fifth Third's policies, procedures, and training.  These EAX enrollments did not benefit Fifth Third.  Fifth Third disciplined employees found to have engaged in wrongdoing. |
| 96. | Fifth Third admits to enrolling more than 125 consumers in overdraft protection without their consent in 2015 and 2016. | Deny. |
| 97. | Fifth Third also admits to opening other unauthorized consumer-financial products and services, including Express Banking, Identity Alert, and Access 360 prepaid debit cards. | Deny, except to admit that Fifth Third identified a small number of instances where customers may have been enrolled in or had opened Express Banking, Identity Alert, or Access 360 prepaid debit cards without authorization (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016, despite Fifth Third's policies, procedures, and training.  During that same period of time, fewer than 500 customers complained about a potentially unauthorized account or service in connection with any of the products or services referenced in the Amended Complaint, and such complaints do not necessarily reflect actual unauthorized accounts.  These openings and enrollments did not benefit Fifth Third.  Where appropriate, Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 98. | Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct. | Deny.  Fifth Third's statements regarding unauthorized account openings are based on analyses performed by independent professionals, including an expert statistician and a globally-recognized consulting firm, using a methodology |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency and factors discussed with the CFPB for identifying accounts at high risk of being unauthorized. |
| 99. | There are hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization. | Deny. For the reasons explained in the Preliminary Statement and paragraphs 55, 57, 62, 75, 76, and 84 above, the Bureau's so-called "indicia of non-authorization" are not meaningful and reliable means of identifying unauthorized accounts. To this day, despite more than three years of investigation and the production by Fifth Third of almost half a billion account data points, the CFPB has not identified a single unauthorized account that Fifth Third did not already detect, investigate, and remediate. |
| 100. | Fifth Third took insufficient steps to detect and stop sales misconduct and to identify and remediate harmed consumers. | Deny. Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized account openings. Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership. Further, if a customer opens a credit card but does not activate or use it, Fifth Third will call the customer to see if the customer still wants the account. These calls are made by trained personnel who are not involved in the account opening process.

There are numerous ways for customers to submit complaints. Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct. When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination. The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct. |

| Para | Allegation | Answer |
|------|------------|--------|
| | | This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at the greatest risk of having been unauthorized.  Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee.  That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |
| 101. | Fifth Third failed to implement any system or technology to detect: unauthorized accounts; unauthorized use or obtention of credit reports; unauthorized account changes; false representations of the terms and conditions of consumer- financial products or services; or falsifications of consumer email addresses or passwords to facilitate unauthorized enrollment of consumers in financial products or services. | Deny.  Fifth Third has a robust system of controls to prevent, detect, investigate, and remediate unauthorized accounts, and to monitor account opening and usage metrics in combination with other indicia to identify suspicious activity.  Suspicious issues are referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination.  The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.  There is no fully automated solution that exists anywhere in the world that can do this. |
| | | Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership.  There are numerous ways for customers to submit complaints.  Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct.  When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained |

| Para | Allegation | Answer |
|------|-----------|--------|
|  |  | investigators, many of whom have backgrounds in law enforcement and/or fraud examination.  The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct. <br><br> This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at high risk of being unauthorized.  Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee.  That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |
| 102. | Instead, Fifth Third's detection efforts relied on consumers to self-identify as victims or employees to allege improper activity. | Deny.  In addition to using customer complaints and employee reporting, Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership.  Fifth Third also engaged a globally recognized consulting firm to analyze "red flag" accounts on an individual basis to determine whether it was opened improperly by a Bank employee.  That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found an extraordinarily small number of potentially unauthorized accounts. |
| 103. | Fifth Third was aware that many consumers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint. | Deny. |
| 104. | Fifth Third was aware that many of | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | Fifth Third's employees feared retribution for alleging improper conduct. | |
| 105. | Even when consumers or employees alleged improper sales conduct, Fifth Third only recorded the conduct as improper if the allegation was (1) escalated above the bank-branch level, (2) internally investigated, and (3) determined to a bank investigator's satisfaction to be "substantiated." | Deny. |
| 106. | Fifth Third was aware that many consumer and employee allegations were not escalated or recorded. | Deny. Fifth Third had robust customer and employee complaint processes whereby complaints, comments, and tips could be submitted through numerous channels and could be done anonymously. |
| 107. | Under Fifth Third's policies, a consumer complaint must be submitted for escalation only if a consumer complains in writing or "verbally expresses dissatisfaction AND requests to speak to someone else (e.g., a supervisor)." | Deny. |
| 108. | As Fifth Third recognized by at least 2015, many consumer complaints are not escalated, even when consumers have detected and reported questionable conduct. | Deny. Fifth Third has robust processes for referring complaints alleging employee misconduct for investigation, remediation, and employee discipline, if appropriate, by the Bank's investigations and employee relations groups. |
| 109. | In March 2015, a senior vice president wrote that 568 Fifth Third branches "did not submit a single escalated complaint" in the prior month, despite a "systemic issue as a company around card issuance" during that same time. | Admit that these are partial and selective quotes from a document produced to the Bureau during the investigation, but deny the remainder of the allegations and the suggestion that complaints were not reported appropriately. The referenced document reflects the start-up phase of a new Complaint Management Program. These issues were promptly resolved. |
| 110. | Even where allegations were recorded, escalated, and investigated, Fifth Third did not deem sales-misconduct allegations to be substantiated unless the bank's investigator was satisfied that there was conclusive proof. | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 111. | Fifth Third deemed all sales-misconduct allegations without such conclusive proof, including all "he said/she said" scenarios, to be unsubstantiated. | Deny.  Investigations are handled by a specialized group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination.  Fifth Third investigates the allegations—giving the benefit of the doubt to customers when it comes to remediation—and disciplines employees who engaged in misconduct. |
| 112. | Fifth Third also sometimes failed to substantiate allegations because:<br><br>a.   elderly consumers were deemed by the bank to be "senile" or otherwise confused;<br>b.   consumers were deemed to be confused because English was not their first language;<br>c.   the accused employee or employees resigned before the internal investigation was completed; or<br>d.   the investigator assumed that there had been a misunderstanding. | Deny. |
| 113. | Sometimes, even when the employee involved in an allegation had been accused of opening unauthorized accounts more than once or when an allegation was deemed substantiated, Fifth Third failed to investigate any accounts beyond those that were the subject of the specific consumer or employee allegation. | Deny.  Fifth Third investigators routinely examine accounts beyond those that are the subject of a specific customer or employee allegation. |
| 114. | Fifth Third failed to investigate all accounts opened by employees alleged or found to have engaged in improper sales acts or practices. | Deny.  Fifth Third investigators routinely examine accounts beyond those that are the subject of a specific customer or employee allegation. |
| 115. | Fifth Third failed to investigate bank branches or branch regions even when the branches or regions were disproportionately the subject of substantiated allegations. | Deny.  In 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third.  Fifth Third investigated |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | the allegations at the time, remediated the affected consumers, disciplined employees who engaged in wrongdoing, including termination, and appointed new management to lead the Chicago region. Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority. Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 116. | Fifth Third failed to investigate bank branches or branch regions even when the branches or regions were known by Fifth Third to have historically engaged in sales misconduct. | Deny. In 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third. Fifth Third investigated the allegations at the time, remediated the affected consumers, disciplined employees who engaged in wrongdoing, including termination, and appointed new management to lead the Chicago region. Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority. Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 117. | For example, despite knowing since at least 2010 that Chicago had a history of unauthorized credit cards and questionable sales practices, Fifth Third failed to investigate broadly the Chicago region's sales acts or practices. | Deny. In 2010, Fifth Third identified a few instances of employees in Chicago opening accounts without authorization in violation of Fifth Third's policies, procedures, and training and that did not benefit Fifth Third. Fifth Third investigated the allegations at the time, remediated the affected consumers, disciplined employees who engaged in wrongdoing, including but not limited to senior retail executive management, and appointed new management to lead the Chicago region. Those personnel changes occurred a decade ago and before the CFPB existed or had enforcement authority. Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts. |
| 118. | Fifth Third has been aware of available methods to identify unauthorized accounts beyond those Fifth Third has already admitted to | Deny. Although there are no reliable, generally accepted systems, algorithms, or processes available on the market to detect and prevent, without human judgment, all the sales practice |

| Para | Allegation | Answer |
|------|------------|--------|
|  | opening or to identify accounts, employees, and bank branches that should be further scrutinized. | violations that could occur at a bank, Fifth Third voluntarily engaged an independent consultant to review accounts opened between 2010 and 2016 that met factors discussed with the CFPB, and the consultant found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period. Fifth Third promptly remediated those customers. |
| 119. | Fifth Third has, and members of Fifth Third's senior management are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021. | Admit that Fifth Third has data and other information that would be useful in implementing available unauthorized-account-identification methods, but deny the implication that Fifth Third does not already implement such methods.

Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized account openings. For example, Fifth Third's "Conduct Risk Dashboard" marshals resources from across the Bank to analyze EthicsLine complaints, customer complaints, employee turnover, and other relevant data to identify areas of potential concern and formulate solutions. The program is viewed as a model by other financial institutions, and Fifth Third's Chief Ethics Officer has made presentations on the program to peer banks at numerous industry conferences and other events.

Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership. There are numerous ways for customers to submit complaints. Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct. When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination. The Bank investigates the allegations—giving the |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct. |
| 120. | Fifth Third's current Chairman and Chief Executive Officer—formerly Fifth Third's Chief Information Officer, Chief Operating Officer, and President—has at various times been responsible for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices. | Admit that Fifth Third's current Chairman and Chief Executive Officer has also served as Chief Information Officer and Chief Operating Officer, but deny the remainder of this allegation, including the purported responsibilities described therein. |
| 121. | Fifth Third has failed to use systematic or technological or other reasonable methods to identify unauthorized accounts beyond those it has admitted to opening or to identify accounts, employees, and bank branches that should be further scrutinized. | Deny.  Fifth Third has rigorous controls to detect, investigate, and remediate unauthorized account openings.  There are no reliable, generally accepted systems, algorithms, or processes available on the market to detect and prevent, without human judgment, all the sales practice violations that could occur at a bank.  Fifth Third performs monthly testing and review of each financial center's account opening documentation to ensure that new account applications are documented with, among other things, customer signatures and appropriate identification/account ownership.  Further, if a customer opens a credit card but does not activate or use it, Fifth Third will call the customer to see if the customer still wants the account.  These calls are made by trained personnel who are not involved in the account opening process.  In addition, most deposit accounts are closed automatically if they have no balance for 45 days, even if they previously were funded.

There are numerous ways for customers to submit complaints.  Fifth Third employees are also trained to report any potential violation of law or policy as part of the Bank's "speak up" culture, and there are multiple channels for reporting suspected employee misconduct.  When a complaint or report involves potential employee misconduct, it is referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination.  The Bank investigates the allegations—giving the |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.<br><br>This allegation also ignores that Fifth Third and the CFPB discussed factors to identify accounts at the greatest risk of having been unauthorized. Fifth Third engaged a globally recognized consulting firm to analyze each such account on an individual basis to determine whether it was opened improperly by a Bank employee. That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). |
| 122. | Fifth Third, through its senior management, chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm. | Deny. Fifth Third engaged independent professionals to assess the Bureau's allegations. Fifth Third engaged a globally recognized consulting firm to conduct an account-level review of each suspicious account identified using factors discussed with the CFPB to determine whether the account was opened improperly by a Bank employee. That review, which was conducted utilizing methods and quality control procedures validated by retired senior officials of the Federal Reserve and the Office of the Comptroller of the Currency, found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period (less than 0.01%). Fifth Third also engaged an expert who analyzed the Bureau's broad criteria, including the presence of Fifth Third email addresses, to see whether they were correlated with accounts the Bureau deemed to be suspicious. He concluded that there is no meaningful correlation, regardless of account type or funding amounts. This information was shared with the Bureau, but is not mentioned in the Amended Complaint. |
| 123. | Unauthorized consumer-financial products or services have been likely | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | to cause substantial injury to consumers, including the imposition of unjustified fees, the consumer's inability to meet other financial obligations, negative effects on consumer-reporting-agency information, and the expenditure of consumer time and effort investigating the facts, seeking closure of unwanted accounts, and monitoring and mitigating harm going forward. | |
| 124. | Fifth Third's conduct, described above, violated and, where uncorrected, continues to violate the CFPA, FCRA, TILA, TISA, and the TILA and TISA implementing regulations. | Deny. |
| 125. | The CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1). | This paragraph contains a legal conclusion as to which no response is required. |
| 126. | The CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with a consumer's ability to understand a term or condition of a consumer-financial product or service. 12 U.S.C. § 5531(d)(1). | This paragraph contains a legal conclusion as to which no response is required. |
| 127. | Additionally, an act or practice is abusive if it takes unreasonable advantage of a consumer's (A) lack of understanding of the material risks, costs, or conditions of the product or service; (B) inability to protect the consumer's interests in selecting or using a consumer-financial product or service; or (C) reasonable reliance on an offeror to | This paragraph contains a legal conclusion as to which no response is required. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | act in the interests of the consumer. 12 U.S.C. §5531(d)(2). | |
| 128. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 129. | Fifth Third told consumers that the bank was acting in the consumers' best interests in conducting its product or service sales. | Deny, except to admit that Fifth Third uses a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 130. | For example, Fifth Third trained its sales employees to tell consumers that "you can trust and have confidence that Fifth Third is acting in your best interest." | Admit that this is a partial and selective quote from a document produced to the Bureau during the investigation, but deny that it accurately reflects the context. Fifth Third uses a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 131. | Fifth Third made public statements that support a reasonable belief that Fifth Third's sales practices are based on and are always in consumers' interests. | Deny, except to admit that Fifth Third made public statements about its sales practices that are consistent with its policies, procedures, and training, and are supported by analyses performed by an independent, third-party consultant using a methodology validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency. |
| 132. | Fifth Third made public statements that support a reasonable belief that Fifth Third's employees are not incentivized to sell products that are not in consumers' best interests. | Deny, except to admit that Fifth Third made public statements about its sales practices that are consistent with its policies, procedures, and training, and are supported by analyses performed by an independent, third-party consultant using a methodology validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 133. | Fifth Third's sales practices have not been based on the consumers' best interests. | Deny. Fifth Third strives to put the customer at the center of everything it does so it can be the bank customers most value and trust. To that end, Fifth Third uses a consultative sales process that requires bankers to ask questions of the customer, listen to their needs, and analyze what recommendations the banker can make, working in partnership with the customer. Further, if a customer opens a new account, bankers are expected to use a "2-2-2" approach, where they follow up with the customer after two days, two weeks, and then two months to determine if the customer is satisfied with the product. |
| 134. | Fifth Third incentivized its employees to sell products that are in the bank's financial interests. | Deny, except to admit that at times, employees have received modest incentive compensation, subject to clawback, for products and services that met minimum account quality characteristics (for example, minimum balance requirements and not closed within ninety days). Fifth Third did not impose any product-specific quotas on its employees. |
| 135. | Fifth Third conducted assessments of individual consumers that it called a "financial needs assessment" but by which Fifth Third encouraged its employees to determine sales opportunities based on the number of products already cross-sold to the consumer's household, their household's income-producing assets, and the bank's rating of further opportunity to cross-sell to the consumer as low, medium, or high. Fifth Third instructed its employees to use this process to "become the consumer's Trusted Advisor" | Deny, except to admit that the FNA is the key consultative sales resource that retail bankers are expected to use in customer interactions, through which the Bank records customer needs, preferences, contacts, and referrals, as well as follow-up tasks and recommendations appropriate to the specific customer, depending on the responses provided. |
| 136. | Until at least 2017, Fifth Third set a cross-selling goal of at least four products per customer and pressured salespeople to deliver that average regardless of consumers' best interests. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Employees received the vast majority of their compensation from salary, with only modest incentive compensation, subject to clawback, for selling products and services that met minimum account quality characteristics. Fifth Third evaluated employee performance holistically, |

| Para | Allegation | Answer |
|---|---|---|
| | | with sales performance being only one of a number of factors considered. Fifth Third terminated or otherwise disciplined employees who opened accounts without customer authorization or engaged in other forms of gaming. |
| 137. | The goal of four products per customer was intended by Fifth Third to promote "customer loyalty" and increase Fifth Third's revenue. | Deny. |
| 138. | Fifth Third earned more than $10 million per year from cross-selling alone. | It is unclear what types of activities the Bureau alleges constitute "cross-selling"; in any event, the Bank does not track revenue in this manner, and therefore the allegation is denied. Further, Fifth Third notes that even if true, $10 million per year would be immaterial for a bank of its size. |
| 139. | Fifth Third also set a point-total goal for its employees. The employees earned points for selling from an array of consumer-financial products and services. | Admit that, at times, Fifth Third set reasonable, achievable, and non-mandatory sales goals that were point-based. These goals could be met through any combination of products or services. Fifth Third did not impose product-specific quotas. |
| 140. | The primary factor for Fifth Third's assignment of a point value to a product has been the revenue that product generates for Fifth Third. | Deny. |
| 141. | Thousands of Fifth Third's branch employees could not meet their sales goals and were, therefore, subject to disciplinary action, including employment termination. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Employees received the vast majority of their compensation from salary, with only modest incentive compensation, subject to clawback, for selling products and services that met minimum account quality characteristics. Incentive compensation constituted a small portion of an employee's salary (generally only 5-10%), and the vast majority of bankers earned incentive compensation in any given quarter, showing that Fifth Third's goals were reasonable and attainable. Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered. Fifth Third terminated or otherwise disciplined employees who opened accounts without customer authorization or engaged in other forms of gaming. |
| 142. | Fifth Third's sales practices lead its employees to apply for or open consumer-financial products under | Deny. |

| Para | Allegation | Answer |
|---|---|---|
| | false pretenses or without consumer consent; change without consumer consent the types of accounts or services in which consumers were enrolled; make false representations relating to the terms and conditions of consumer-financial products or services offered by Fifth Third to induce consumers to accept, change, or enroll in products; use or obtain consumer reports from consumer reporting agencies without a permissible purpose; assign personal-identification numbers without authorization from consumers or falsify consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers in products offered by Fifth Third; and engage in unauthorized transactions on behalf of consumers. | |
| 143. | Fifth Third's sales practices take unreasonable advantage of the reasonable reliance by consumers on Fifth Third to act in the interests of the consumers, in violation of §§ 1031(d)(2)(C) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(C), 5536(a)(1)(B). | Deny. |
| 144. | Fifth Third's sales practices lead to product issuances and product changes without consumer knowledge and consent, and, thus, Fifth Third's sales practices take unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of products or services, and take unreasonable advantage of the inability of consumers to protect the interests of consumers in selecting or using consumer- | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | financial products or services, in violation of §§ 1031(d)(2)(A)-(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A)-(B), 5536(a)(1)(B). | |
| 145. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 146. | Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent are likely to cause substantial injury in the form of fees, penalties, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort. | Deny. |
| 147. | Fifth Third's acts or practices of transferring funds between consumers' accounts without their knowledge and consent are likely to cause substantial injury in the form of fees, penalties, the inability to withdraw funds, the inability to meet other financial obligations, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort. | Deny. |
| 148. | Fifth Third has charged many of these consumers unjustified fees. | Deny. |
| 149. | Because these acts or practices occur without consumers' knowledge and consent, the injuries are not reasonably avoidable by consumers, and they are also not outweighed by countervailing benefits to consumers or to competition. | Deny. |
| 150. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B). | Deny. |
| 151. | Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
|  | materially interfere with consumers' ability to understand the terms and conditions of the deposit accounts. |  |
| 152. | Fifth Third's acts or practices of opening deposit accounts without consumers' knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service. | Deny. |
| 153. | Fifth Third's acts or practices of transferring funds between consumers' accounts without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in using a consumer-financial product or service. | Deny. |
| 154. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 155. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 156. | Fifth Third's acts or practices of applying for or issuing credit cards to consumers without their knowledge and consent are likely to cause substantial injury in the form of fees, negative effects on consumer-reporting-agency information, and expenditure of consumer time and effort. | Deny. |
| 157. | Consumers cannot reasonably avoid these injuries because the credit-card applications and issuances occur without their knowledge and consent. | Deny. |
| 158. | The injuries to consumers are not outweighed by countervailing benefits to consumers or to | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | competition. | |
| 159. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B). | Deny. |
| 160. | Fifth Third's acts or practices of applying for or issuing credit cards to consumers without consumers' knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of the credit cards. | Deny. |
| 161. | Fifth Third's acts or practices of applying for or issuing credit cards to consumers without consumers' knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service. | Deny. |
| 162. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 163. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 164. | Fifth Third's acts or practices of enrolling consumers in online-banking services without consumers' knowledge and consent are likely to cause substantial injury in the form of the increased risk of data theft, money theft, and improper personal-data use, and the expenditure of consumer time and effort determining the facts and attempting to monitor and mitigate the harm. | Deny.  Online banking is simply another way for customers to access their accounts, on top of options like visiting a retail branch, calling the bank, or using an ATM.  Accessing an account through online banking is completely free to the customer.  Mendelsohn Aff. ¶ 4. |
| 165. | Because these enrollments occur without consumers' knowledge and | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
|  | consent, the injuries are not reasonably avoidable by consumers, and they are not outweighed by countervailing benefits to consumers or to competition. | |
| 166. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B). | Deny. |
| 167. | Fifth Third's acts or practices of enrolling consumers in online-banking services without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of online banking. | Deny. |
| 168. | Fifth Third's acts or practices of enrolling consumers in online-banking services without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer- financial product or service. | Deny. |
| 169. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 170. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 171. | Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent are likely to cause substantial injury in the form of negative effects on consumers' credit profiles and expenditure of consumer time and effort. | Deny. Enrollment in EAX was free and had no impact on a customer's credit. Mendelsohn Aff. ¶ 5. It gave customers who received regular direct deposits the option of taking an advance on the direct deposit. Customers incurred fees only if they initiated an advance, which could not be done without their express knowledge and consent, as it required a separate, affirmative request from the consumer and a separate agreement to the key terms and conditions. *Id.* at ¶¶ 5–6; Ex. 1, EAX |

| Para | Allegation | Answer |
|---|---|---|
| | | Screenshots at 3–5 (also attached as Ex. A to Mendelsohn Aff.)  Neither EAX enrollment nor EAX advances were furnished to consumer reporting agencies.  Mendelsohn Aff. ¶ 5. |
| 172. | Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition. | Deny. |
| 173. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B). | Deny. |
| 174. | Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent materially interfere with consumers' ability to understand Early Access's terms and conditions. | Deny. |
| 175. | Fifth Third's acts or practices of opening Early Access lines of credit on consumers' deposit accounts without their knowledge and consent take unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer-financial product or service. | Deny. |
| 176. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 177. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 178. | Fifth Third enrolled consumers in overdraft protection, including linked- account protection and line-of-credit protection, without the | Deny. |

| Para | Allegation | Answer |
|------|------------|--------|
|      | consumers' knowledge and consent. In some instances, the line-of-credit overdraft protection was in the form of a credit card that the consumer also did not know of and authorize. | |
| 179. | Fifth Third's acts or practices of enrolling consumers in overdraft protection without consumers' knowledge and consent are likely to cause substantial injury in the form of fees, expenditure of consumer time and effort, and negative effects on consumer-reporting-agency information. | Deny.  Overdraft protection is a service available for checking accounts that allows transactions exceeding the balance in the checking account to be approved.  If a customer overdraws the balance of a checking account, the overdraft protection service automatically transfers funds from the customer's linked account, thereby allowing the customer to avoid an overdraft fee and possibly other fees. Mendelsohn Aff. ¶ 7.  Enrollment in overdraft protection was completely free and had no impact on a customer's credit.  Customers incurred a fee only if overdraft protection was actually utilized (i.e., if the customer's checking account was overdrawn and a transfer was successful in covering one or more items in the overdraft).  In that case, the customer could incur up to a $12 transfer fee per transaction, which was less than what the customer would have paid for an overdraft fee.  At any point and at no cost, customers can change how their account is protected or remove overdraft protection altogether.  *Id.* ¶ 8. |
| 180. | Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition. | Deny. |
| 181. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B). | Deny. |
| 182. | Fifth Third's acts or practices of enrolling consumers in overdraft protection without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of overdraft protection and, where applicable, the | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | accompanying credit card. | |
| 183. | Fifth Third's acts or practices of enrolling consumers in overdraft protection without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer-financial product or service. | Deny. |
| 184. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 185. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 186. | Fifth Third, without consumer knowledge and consent, enrolled consumers in other consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards. | Deny. |
| 187. | Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without consumers' knowledge and consent are likely to cause substantial injury in the form of expenditure of consumer time and effort. | Deny. |
| 188. | Because these acts or practices occurred without consumers' knowledge, the injuries were not reasonably avoidable by consumers, and they were also not outweighed by countervailing benefits to consumers or to competition. | Deny. |
| 189. | Therefore, Fifth Third engaged in unfair acts or practices that violate §§ 1031(c)(1) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | 5536(a)(1)(B). | |
| 190. | Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without their knowledge and consent materially interfere with consumers' ability to understand the terms and conditions of those products. | Deny. |
| 191. | Fifth Third's acts or practices of enrolling consumers in consumer-financial products, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, without their knowledge and consent take unreasonable advantage of the inability of consumers to protect their interests in selecting or using a consumer- financial product or service. | Deny. |
| 192. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(1), 1031(d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(1), 5531(d)(2)(B), 5536(a)(1)(B). | Deny. |
| 193. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 194. | Under TILA, "no credit card shall be issued except in response to a request or application therefor." 15 U.S.C. § 1642. Regulation Z requires that "regardless of the purpose for which a credit card is to be used, including business, commercial, or agricultural use, no credit card shall be issued to any person except in response to an oral or written request or application for the card; or as a renewal of, or substitute for, an accepted credit card." 12 C.F.R. § 1026.12(a). | This paragraph contains a legal conclusion as to which no response is required. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 195. | Fifth Third issued credit cards to consumers without their knowledge or consent and not in response to an oral or written request or application for the card. | Fifth Third denies this allegation and incorporates its response to ¶ 67. |
| 196. | Therefore, Fifth Third violated TILA and Regulation Z, 15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a). | Deny. |
| 197. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 198. | TISA's purpose is "to require the clear and uniform disclosure of—(1) the rates of interest which are payable on deposit accounts by depository institutions; and (2) the fees that are assessable against deposit accounts, so that consumers can make a meaningful comparison between the competing claims of depository institutions with regard to deposit accounts." 12 U.S.C. § 4301(b). TISA further authorizes the Bureau to issue implementing regulations, including regulations to carry out these purposes. E.g., 12 U.S.C. § 4308(a). | This paragraph contains a legal conclusion as to which no response is required. |
| 199. | TISA's implementing regulation, 12 C.F.R. § 1030.4 (Regulation DD), requires the disclosure of the annual percentage yield and interest rate, compounding and crediting information, balance information, fees, and more. 12 C.F.R. § 1030.4(b). Those disclosures must be made before account opening. 12 C.F.R. § 1030.4(a)(1)(i). | This paragraph contains a legal conclusion as to which no response is required. |
| 200. | By opening deposit-accounts without consumer authorization and, in the process, failing to make the required disclosures to the affected consumers, Fifth Third violated TISA and Regulation DD, 12 U.S.C. § 4301(b); 12 C.F.R. § 1030.4. | Deny. |

| Para | Allegation | Answer |
|---|---|---|
| 201. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 202. | Section 604(f) of FCRA mandates that consumer reports be used or obtained only for permissible purposes enumerated in the statute. 15 U.S.C. § 1681b(f). | This paragraph contains a legal conclusion as to which no response is required. |
| 203. | Under FCRA, a "person shall not use or obtain a consumer report for any purpose unless—(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished" and one other condition is met. 15 U.S.C. § 1681b(f). | This paragraph contains a legal conclusion as to which no response is required. |
| 204. | The authorized purposes specified in FCRA include consumer reports furnished "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A). | This paragraph contains a legal conclusion as to which no response is required. |
| 205. | It was Fifth Third's practice to obtain consumer reports in the course of considering consumers for new credit cards and other credit products. | Admit that Fifth Third obtained consumer reports when it had a permissible purpose to do so. |
| 206. | Fifth Third used or obtained consumer reports to consider consumers for new credit products even when the consumers had not applied for or did not want the products and where Fifth Third had no permissible purpose for the consumer reports. | Deny. |
| 207. | Fifth Third used or obtained consumer reports without a permissible purpose in connection with unauthorized applications for credit cards, overdraft protection linked to a credit card, other | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| | consumer-credit products, and Fifth Third's attempts to sell consumer-credit products. | |
| 208. | By using or obtaining consumer reports without a permissible purpose, Fifth Third violated § 604(f) of FCRA, 15 U.S.C. § 1681b(f). | Deny. |
| 209. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 210. | Even after learning by 2008 of unauthorized Fifth Third consumer-financial products and services and applications therefor, Fifth Third failed to change its sales practices to avoid consumer harm. Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services and applications therefor. | Deny. Fifth Third properly implemented and monitored its sales and incentive compensation program, and disciplined employees who disregarded those policies, procedures, and training, including by terminating their employment. Throughout the relevant period, Fifth Third has continued to improve its controls and revise its policies in order to better train its employees, document customer authorization, and detect and deter improper sales practices. |
| 211. | Fifth Third imposed sales goals on all levels of branch employees; set goals that thousands of its employees could not achieve; threatened employees with termination or other disciplinary action if they failed to meet their goals; established a system under which managers pressured subordinate employees to sell; failed to take steps to determine and address a root cause of unauthorized accounts, applications, and obtention of credit reports, which was consistently said by employees to be intense sales-pressure; and failed to close known loopholes in its collection of proof of consumer authorization. | Deny. Fifth Third set reasonable, achievable, and non-mandatory sales goals. It did not impose product-specific quotas. Employees received modest incentive compensation for selling certain products and services that met minimum account quality characteristics, and received the vast majority of their compensation from salary. Incentive compensation constituted a small portion of an employee's salary (generally only 5-10%), and the vast majority of bankers earned incentive compensation in any given quarter, showing that Fifth Third's goals were reasonable and attainable. Fifth Third trained its employees to use fair and responsible sales practices and evaluated employee performance holistically, with sales performance being only one of a number of factors considered.

Fifth Third properly implemented and monitored its sales and incentive compensation program, and disciplined employees who disregarded those policies, procedures, and training, including by terminating their employment. Their actions did not benefit Fifth Third, and any potentially unauthorized accounts constituted a tiny fraction— |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | approximately 0.02%—of the more than 10 million accounts opened between 2010–2016 (mostly concentrated before 2012). Throughout the relevant period, Fifth Third has continued to improve its controls and revise its policies in order to better train its employees, document customer authorization, and detect improper sales practices. |
| 212. | Fifth Third's sales practices were likely to cause substantial injury to consumers, including negative effects on their consumer-reporting-agency information, the expenditure of consumer time and effort, the imposition of unjustified fees, the theft of funds or private information, and the inability to meet financial obligations. This substantial injury to consumers is a predictable consequence of Fifth Third's sales practices. | Deny. |
| 213. | Because any unauthorized applications, products, or services and Fifth Third's conduct occur without consumers' knowledge, the substantial injury to consumers is not reasonably avoidable by consumers. | Deny. |
| 214. | Further, the substantial injury to consumers is not outweighed by countervailing benefits to consumers or to competition. | Deny. |
| 215. | Therefore, Fifth Third engaged in unfair practices that violate §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B). | Deny. |
| 216. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 217. | Fifth Third is aware of reasonable methods available to it to identify additional consumers that it subjected to unauthorized financial products or services or applications therefor. | Deny. There are no reliable, generally accepted systems, algorithms, or processes available on the market to detect and prevent all the sales practice violations that could occur at a bank without human judgment. Fifth Third has a robust system of controls to prevent, detect, investigate, and |

| Para | Allegation | Answer |
|------|-----------|--------|
| | | remediate unauthorized accounts, and to monitor account opening and usage metrics in combination with other indicia to identify suspicious activity. Suspicious issues are referred to a specialized investigations group staffed by trained investigators, many of whom have backgrounds in law enforcement and/or fraud examination. The Bank investigates the allegations—giving the benefit of the doubt to customers with respect to remediation—remediates any consumer harm, and disciplines employees who engaged in misconduct.<br><br>Further, Fifth Third voluntarily engaged an independent consultant to review accounts opened between 2010 and 2016, using a methodology validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency and factors discussed with the CFPB. The consultant found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period. Fifth Third promptly remediated those customers. This information was shared with the Bureau, but is not mentioned in the Amended Complaint. |
| 218. | Fifth Third declined, and still declines, to make reasonable efforts to identify additional consumers that it subjected to unauthorized financial products or services or applications therefor. | Deny. Among other things, Fifth Third voluntarily engaged an independent consultant to review accounts opened between 2010 and 2016, using a methodology validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency and factors discuss with the CFPB for identifying accounts at high risk of being unauthorized. The consultant found fewer than 800 potentially unauthorized accounts opened in branches between 2010 and 2016, out of more than 10 million accounts opened during that period. Fifth Third promptly remediated those customers. This information was shared with the Bureau, but is not mentioned in the Amended Complaint. |
| 219. | Fifth Third declined to make these reasonable efforts because it believes that identification of additional affected consumers would cause it reputational and other harm. | Deny. |

| Para | Allegation | Answer |
|------|-----------|--------|
| 220. | Some consumers who Fifth Third victimized with unauthorized products or services had those products or services open for months or years without their knowledge. | Deny, except to admit that Fifth Third identified a small number of instances where unauthorized accounts may have been opened for customers (due to mistake, the actions of family members or other third parties, or employee gaming) between 2010 and 2016 (mostly concentrated before 2012) despite Fifth Third's policies, procedures, and training. These accounts did not benefit Fifth Third. Where appropriate, Fifth Third remediated the consumers and disciplined employees found to have engaged in wrongdoing. |
| 221. | Compounding the harm to consumers, Fifth Third made statements to consumers that could cause reasonable consumers to believe that Fifth Third acts in their interests and has identified and remediated all consumers that it subjected to unauthorized financial products or services. | Deny, except to admit that Fifth Third made public statements about its sales practices that are consistent with its policies, procedures, and training, and are supported by analyses performed by an independent, third-party consultant using a methodology validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency. |
| 222. | These acts or practices take unreasonable advantage of a lack of understanding on the part of consumers of the material risks, costs, or conditions of Fifth Third's products or services. | Deny. |
| 223. | These acts or practices take unreasonable advantage of the inability of consumers to protect the interests of consumers in selecting or using consumer- financial products or services because the consumers are unaware of those products or services. | Deny. |
| 224. | These acts or practices take unreasonable advantage of the reasonable reliance by consumers on Fifth Third to act in the interests of the consumers. | Deny. |
| 225. | Therefore, Fifth Third engaged in abusive acts or practices that violate §§ 1031(d)(2)(A), 1031(d)(2)(B), 1031(d)(2)(C), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5531(d)(2)(B), | Deny. |

| Para | Allegation | Answer |
|---|---|---|
| | 5531(d)(2)(C), 5536(a)(1)(B). | |
| 226. | The Bureau realleges and incorporates by reference paragraphs 1-123. | Fifth Third repeats and reasserts paragraphs 1–123 in this Answer and incorporates them by reference as though fully set forth herein. |
| 227. | By violating TILA, Regulation Z, FCRA, TISA, and Regulation DD, Fifth Third violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A). | Deny. |

## DEFENSES

Fifth Third sets forth the following defenses and reserves the right to assert additional defenses that it may later discover.  By listing a defense below, Fifth Third does not concede that it has the burden of proof as to all or any portion of that defense.

1.      The Bureau fails to state a claim upon which relief may be granted.

2.      Each of the Bureau's claims are barred, in whole or in part, by the statute of limitations. The parties entered into eight tolling agreements at various points during the Bureau's investigation, not all of which ran consecutively.  The dates of those agreements are set forth in the following chart.

| Date | Tolling Agreement |
|---|---|
| April 17, 2018 to July 17, 2018 | First Tolling Agreement (Ex. 2) |
| November 6, 2018 to April 6, 2019 | Second Tolling Agreement (Ex. 3) |
| June 5, 2019 to August 4, 2019 | Third Tolling Agreement (Ex. 4) |
| August 4, 2019 to November 30, 2019 | Fourth Tolling Agreement (Ex. 5) |
| November 27, 2019 to December 31, 2019 | Fifth Tolling Agreement (Ex. 6) |

| December 17, 2019 to January 30, 2020 | Sixth Tolling Agreement (Ex. 7) |
|---|---|
| January 28, 2020 to March 2, 2020 | Seventh Tolling Agreement (Ex. 8) |
| February 26, 2020 to March 9, 2020 | Eighth Tolling Agreement (Ex. 9) |

3. The Bureau's abusiveness claims violate Due Process and are barred, in whole or in part, insofar as they seek to impose retroactive liability for acts that were previously permitted, authorized, or not prohibited by law.

4. The Bureau lacks authority to prosecute conduct that occurred before the July 21, 2011 Transfer Date established by Congress.

5. The Bureau has failed to assert violations of law that are ongoing or likely to recur, and is therefore not entitled to injunctive relief.

6. The Bureau's claims violate the Excessive Fines Clause recited in and/or incorporated into the Fifth and Eighth Amendments to the United States Constitution.

7. At the time this lawsuit was filed, the Bureau was unconstitutionally structured, given the Director's for-cause removal protections.

8. The Bureau's claims are barred, in whole or in part, to the extent they attempt to hold Fifth Third vicariously liable for acts of employees who violated Fifth Third's policies, procedures, and training and whose actions were not authorized by Fifth Third and/or did not benefit Fifth Third.

## **PRAYER FOR RELIEF**

1. Dismiss the complaint with prejudice and on the merits;

2. Award Fifth Third its fees, costs, and attorney's fees incurred herein, under any applicable statute; and

3.      Grant such other and further relief as the Court deems equitable and just.


Dated: June 16, 2021                Respectfully submitted,


/s/ Ryan Scarborough
WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac vice*)
Enu Mainigi (*pro hac vice*)
Ryan Scarborough (*pro hac vice*)
725 12th Street, N.W.
Washington, DC 20005
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com

DINSMORE & SHOHL LLP
Laurie A. Witek (0083955)
Michael Ferrara (0097584)
Katherine Rasmussen (0093928)
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
513-977-8648
Laurie.Witek@Dinsmore.com
Michael.Ferrara@Dinsmore.com
Katherine.Rasmussen@Dinsmore.com

*Attorneys for Defendant Fifth Third Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on June 16, 2021, the foregoing Answer was filed electronically using the

Court's CM/ECF system, and notice of this filing will be sent to attorneys of record who are

registered users of the system.

/s/ Ryan Scarborough