# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | Civil Case No. 1:21-cv-00262-DRC |
| | Related Case No. 1:21-cv-00173-DRC |
| Plaintiff, | |
| | Judge Douglas R. Cole |
| v. | |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

## DEFENDANT FIFTH THIRD BANK'S MEMORANDUM IN OPPOSITION TO PLAINTIFF CONSUMER PROTECTION FINANCIAL BUREAU'S <u>MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS</u>

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................. 1

II.    FACTUAL BACKGROUND .......................................................................... 2

III.   LEGAL STANDARD..................................................................................... 6

IV.   ARGUMENT .................................................................................................. 7

       A.     The Bureau's Motion for Judgment on the Pleadings Must Be Denied Because the Material Facts Are in Dispute. ................................................................. 7

             1.     Fifth Third Has Denied the Core Allegations on Which the Bureau's Motion Relies............................................................................... 7

             2.     The Admitted Facts Do Not Entitle the Bureau to Judgment on the Pleadings. ......................................................................... 11

       B.     Fifth Third, Not the Bureau, Is Entitled to Judgment on the Pleadings................ 13

V.     CONCLUSION............................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

### CASES

*McDonald v. Dna Diagnostics Ctr.*, No. 3:20-CV-391-CRS, 2020 U.S. Dist. LEXIS
202174 (W.D. Ky. Oct. 29, 2020)......................................................................................10, 13

*Ohio Citizen Action v. City of Englewood*, No. 3:05cv263, 2007 U.S. Dist. LEXIS
118189 (S.D. Ohio Oct. 18, 2007)..........................................................................................6, 7

*Ohio Nat'l Life Ins. Co. v. Cetera Advisor Networks, LLC*, No. 1:19-cv-47, 2021 U.S.
Dist. LEXIS 125908 (S.D. Ohio July 7, 2021)......................................................................6, 7

*Pension Benefit Guar. Corp. v. BankOne N.A.*, 34 F. Supp. 2d 608 (S.D. Ohio Dec. 10,
1998) .......................................................................................................................................6, 10

*PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), *aff'd in relevant part and rev'd in part
on other grounds en banc*, 881 F.3d 75 (D.C. Cir. 2018)..........................................................15

*Wash. v. Vendors Res. Mgmt.*, No. 3:19-cv-00402, 2020 U.S. Dist. LEXIS 249322 (S.D.
Ohio Apr. 2, 2020)........................................................................................................................6

## I.     <u>INTRODUCTION</u>

Incredibly, the Bureau of Consumer Financial Protection ("Bureau" or "CFPB") is seeking judgment in its favor, as a matter of law, that Fifth Third's alleged failure to investigate and remediate unauthorized customer accounts was "abusive" under the Consumer Financial Protection Act ("CFPA"), even though it has not identified a single unauthorized account that Fifth Third failed to identify or remediate. Instead, the Bureau seeks judgment based solely on the Bank's alleged failure to timely remediate fewer than 800 "potentially unauthorized" accounts in 2020—not because the Bank did not remediate those accounts promptly after they were identified, but because the Bank did not do the lookback years earlier. The Bureau's Motion turns Federal Rule of Civil Procedure 12(c) on its head by disregarding Fifth Third's denials and specific allegations, thereby seeking judgment based purely on allegations that Fifth Third has denied and the Bureau's implausible and unwarranted factual inferences. Moreover, the Motion relies on concepts such as reasonableness, timeliness, and thoroughness, all of which are inherently fact-intensive and thus ill-suited for a Rule 12(c) motion.

Accepting as true Fifth Third's denials and drawing all reasonable inferences in the Bank's favor—as the Court must—it is clear that there was no widespread or systemic problem with unauthorized accounts. Fifth Third's system of robust internal controls and reporting were effective at identifying and deterring unauthorized accounts, and therefore, there was no need to do a lookback in the first place, much less years earlier. For this reason alone, the Bureau's Motion should be denied.

But the Motion should also be denied because Count 12 is legally defective. The Bureau presumes that the accounts were unauthorized, when in fact they are merely *potentially* unauthorized. There has been no admission or determination to the contrary. Nowhere in the Complaint does the Bureau allege that Fifth Third failed to conduct a timely lookback review,

much less with the plausibility and particularity required by Rules 8 and 9(b). Moreover, the Bureau's insistence that it was abusive under the CFPA not to perform a "lookback" prior to 2020 finds no basis in law or regulation, and the Bureau's allegation, articulated for the first time in its Motion, amounts to impermissible "regulation by enforcement." Nothing in the CFPA requires a lookback, much less a costly one that approached seven figures, when there is no evidence of widespread or systemic misconduct that has gone undetected or unremediated. Apart from the failures of this particular count, the Bureau's Motion also depends on the outcome of numerous other defenses that have been raised by Fifth Third in its Motion for Judgment and its Amended Answer, including defenses that the Bureau's claims are time-barred and that it lacks the necessary enforcement authority. For these reasons and those detailed in Fifth Third's affirmative Motion for Judgment on the Pleadings, Fifth Third—*not* the Bureau—is entitled to judgment as a matter of law as to Count 12.

## II.   **FACTUAL BACKGROUND**

Fifth Third does not have, and has never had, a systemic or widespread issue with unauthorized accounts. *See* ECF No. 82, at PageID 329 (Preliminary Statement). The Bank fully cooperated with the Bureau's three-year investigation, which generated nearly a half-billion data points, thousands of documents, and extensive testimony in response to six civil investigative demands. *See id.* at 330. And to this day, the Bureau "fails to identify a population of *unauthorized* accounts from these half-billion data points that has not already been identified and remediated by Fifth Third." *Id.* As Fifth Third alleged in its Answer, it "denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts." *Id.* at 341.

Fifth Third denied the allegation that it had "taken insufficient steps to identify and remediate affected consumers." *Id.* at 334. The Bureau ignores this denial in its Motion, but

pretending it does not exist does not justify judgment as a matter of law. Instead, the Bureau points to the results of an expansive and expensive "lookback" commissioned by Fifth Third and conducted in 2020 by a globally recognized consultant that analyzed every account that met Bureau-specified "red flag" criteria for being potentially unauthorized. *Id.* at 330. Rather than simply rely on data-driven "indicia of non-authorization," the consultant performed an account-level review utilizing methods and quality control procedures validated by former senior officials of the Federal Reserve and the Office of the Comptroller of the Currency. *Id.* at 331.

The Bureau's Complaint does not include any allegations about the lookback, much less about when the lookback supposedly should have been conducted or why it would have been appropriate to do it sooner. The lookback itself was referenced by Fifth Third to refute the Bureau's central hypothesis—that "indicia of non-authorization" reflect a widespread and systemic problem with unauthorized account openings. The results of this lookback categorically disprove the Bureau's theory. Out of more than 10 million customer accounts that were opened by approximately 30,000 retail employees between 2010 and 2016, fewer than 800 branch accounts were identified as being potentially unauthorized. *Id.* at 330–31. These potentially unauthorized accounts primarily were concentrated before 2012 (almost none after 2015), when the available documentation was sparser, and they generated less than $3000 in fees that Fifth Third promptly remediated. *Id*. at 331–32.

The accounts are "potentially unauthorized" because there are many reasons other than employee misconduct—such as mistake, actions by family members and other third parties, or stale records given the passage of time—that could explain why this small subset of accounts lack clear indicia of authorization. *Id*. Nonetheless, Fifth Third gave the benefit of the doubt to these customers and "promptly remediated" each of the potentially unauthorized accounts. *Id.* at 331,

365.  Given the high six-figure cost of undertaking the review, the cost to Fifth Third was exponentially greater than the amount of remediation.  Thus, the CFPB is asking this Court to conclude—sight unseen and as a matter of law—that it was abusive not to conduct earlier a review that cost hundreds of times more than any potential harm.

The extreme rarity of unauthorized accounts is due in large part to Fifth Third's internal controls and compensation system, which did not incentivize or reward unauthorized account openings.  Employees received the vast majority of their compensation from salary, with only modest incentive compensation (generally only 5–10%) for selling products and services that met minimum account quality characteristics.  ECF No. 82, at PageID 337–38, 340, 383–84.  Even those incentives were subject to clawback.  *Id.* at 337.  Fifth Third set reasonable, achievable, and non-mandatory sales goals, and it did *not* impose product-specific quotas.  *Id*. at 337, 339.  Instead, Fifth Third evaluated employee performance holistically, with sales performance being only one of a number of factors considered.  *Id*. at 337.

When Fifth Third detected possible misconduct, it investigated the situation, promptly remediated customers, and disciplined any bad actors.  *Id*. at 333–34, 339–43, 348–49.  For example, Fifth Third detected potential misconduct in the Chicago region in 2010.  After determining that certain employees had opened accounts in violation of Fifth Third's policies, procedures, and training, the Bank "disciplined employees who had engaged in misconduct, including termination, brought in new management, and revamped its incentive compensation system."  *Id.* 339–42; *see also id.* at 331.

Fifth Third's ability to detect and remediate potentially unauthorized accounts is a product of Fifth Third's rigorous control procedures and reporting mechanisms.  For example, the Bank performs monthly testing and review of each financial center's account opening documentation to

ensure that new account applications are documented with, among other things, customer signatures and appropriate identification and account ownership. *Id.* at 348. Fifth Third also offers numerous ways for both customers and employees to affirmatively report unauthorized accounts. It utilizes effective controls to document customer authorization at account opening, such as requiring PIN-based electronic consents and sending email notifications to customers at the time of account opening, and customers have several options by which to submit complaints. *Id.* at 335, 350–51. And, Fifth Third trains employees to report any potential violation of law or policy as part of its "speak up" culture and provides multiple channels for doing so. *Id.* at 350–51.

Fifth Third took allegations of misconduct seriously. Reports of unauthorized account openings are scrutinized by a specialized group staffed by trained investigators (many of whom have backgrounds in law enforcement and/or fraud examination). *Id.* They analyze available documentation, interview witnesses when necessary, and are trained to give customers the benefit of the doubt with respect to remediation, in the absence of clear evidence to the contrary. *Id.* Fifth Third's management team monitors potential misconduct utilizing a state-of-the-art "Conduct Risk Dashboard," which marshals information from across the Bank to analyze EthicsLine complaints, customer complaints, employee turnover, and other relevant data to identify areas of potential concern. *Id.* at 365–66. The program is widely viewed as a model by other financial institutions, and Fifth Third's Chief Ethics Officer has made presentations on the program to peer banks at numerous industry conferences and other events. *Id.*

These rigorous controls—some of which have been in place since 2010, and others of which were put in place at various points during the past decade—contradict the Bureau's assertion that Fifth Third "waited until the Bureau sued" before remediating potential wrongs, and that Fifth

Third conducted its "first and only" remediation effort after March 2020. ECF No. 89-1, at PageID 569–70.

### III.  <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 12(c), a plaintiff is not entitled to judgment on the pleadings unless it establishes that "no material issue of fact exists and [it] is entitled to judgment as a matter of law." *Wash. v. Vendors Res. Mgmt.*, No. 3:19-cv-00402, 2020 U.S. Dist. LEXIS 249322, at *7 (S.D. Ohio Apr. 2, 2020) (Cole, J.) (citations omitted). To determine whether the plaintiff satisfies its burden, the Court "assum[es] as true all the material allegations of fact in the answer," along with the "*undenied* facts alleged in the complaint." *Ohio Nat'l Life Ins. Co. v. Cetera Advisor Networks, LLC*, No. 1:19-cv-47, 2021 U.S. Dist. LEXIS 125908, at *4–5 (S.D. Ohio July 7, 2021) (Cole, J.) (citations omitted) (emphasis added). When a plaintiff moves for judgment on the pleadings, "all allegations of the moving party which have been denied are taken as false." *Pension Benefit Guar. Corp. v. BankOne N.A.*, 34 F. Supp. 2d 608, 609 (S.D. Ohio Dec. 10, 1998). Accordingly, a plaintiff can prevail under Rule 12(c) only if it shows that even in the face of the defendant's allegations—along with all reasonable inferences and viewed in the light most favorable to the defendant—there is still no dispute as to any material fact. *Id.*; *see also Ohio Citizen Action v. City of Englewood*, No. 3:05cv263, 2007 U.S. Dist. LEXIS 118189, at *16 (S.D. Ohio Oct. 18, 2007) ("Court must assume as true the material allegations contained in the Defendant's Amended Answer and draw all reasonable inferences from the pleadings in the favor of the Defendant.").

## IV.   ARGUMENT

### A.   The Bureau's Motion for Judgment on the Pleadings Must Be Denied Because the Material Facts Are in Dispute.

The Bureau's own caselaw makes clear that in seeking judgment on the pleadings, a plaintiff may rely only on the "*undenied* facts alleged in the complaint." *Ohio Nat'l Life Ins.*, 2021 U.S. Dist. LEXIS 125908, at *4–5 (Cole, J.) (citations omitted) (emphasis added).  Fifth Third has denied all allegations material to Count 12.  The few admissions Fifth Third makes in its Answer rebut the Bureau's allegations and fall far short of establishing liability for Count 12, particularly on a motion for judgment on the pleadings, where all inferences must be drawn in the light most favorable to Fifth Third.  *See Ohio Citizen Action*, 2007 U.S. Dist. LEXIS 118189, at *16.

### 1.   Fifth Third Has Denied the Core Allegations on Which the Bureau's Motion Relies.

The Bureau's argument that Fifth Third engaged in abusive acts under the CFPA by failing to perform a comprehensive "lookback" prior to this lawsuit is a new theory the Bureau unveiled for the first time in its Motion.  Nothing in the Bureau's Complaint mentioned a lookback, much less faulted Fifth Third for failing to perform one sooner.  Count 12 simply talked about amorphous and undefined concepts like "reasonable methods" or "reasonable efforts" without once articulating what those methods were or when they should have been utilized.  ECF No. 73, at PageID 95–96.  In other words, there are no allegations in the Complaint about the failure to perform a "lookback" to deem as either true or admitted for purposes of this Motion.  The Bureau is not entitled to judgment on an unpled "lookback" theory.

Second, this newly concocted theory of liability under Count 12 rests almost entirely on allegations that Fifth Third has either denied or directly contradicted.  Specifically, there are four key factual allegations on which the Bureau's new abusiveness theory relies:  (1) Fifth Third has been on notice since 2010 of a longstanding and widespread problem with unauthorized accounts;

(2) the small number of "potentially unauthorized" accounts Fifth Third has identified actually are unauthorized accounts that were opened by Bank employees; (3) the Bank failed to adequately investigate and remediate the unauthorized accounts; and (4) it did so for its own financial benefit to the detriment of its customers. *See* ECF No. 89-1, at PageID 569–71. Fifth Third has unequivocally denied each these allegations.

As to the first key factual issue, Fifth Third clearly and repeatedly denied any longstanding or widespread issue with unauthorized accounts. Fifth Third prefaced its Answer with a preliminary statement expressly stating that it "does not have, and has never had, a systemic or widespread problem with unauthorized accounts." ECF No. 82, at PageID 329; *see also id.* at 341–42 ("Fifth Third denies the existence of any pattern of such acts, awareness of continuing or unremediated issues, or corporate approval of such acts."). Ignoring these denials, the Bureau misconstrues Fifth Third's explanation that it knew of isolated incidents of unauthorized accounts in Chicago in 2010, which it promptly addressed and remediated, as an admission that Fifth Third knew "by 2010" that it had "an unauthorized-accounts problem." ECF No. 89-1, at PageID 569. Of course, knowing of isolated issues in a single region that were remediated a decade ago is not tantamount to being "aware [of] an unauthorized-accounts problem." *Id.*

A second misguided assumption the Bureau makes is to equate a "potentially unauthorized" account with an account that was actually opened by a Fifth Third employee without customer knowledge or authorization. *Id.* at 569–70. Fifth Third has admitted to receiving customer complaints about *potentially* unauthorized accounts, and to identifying *potentially* unauthorized accounts as part of an effort to demonstrate to the Bureau that Fifth Third *did not* have a widespread problem with Bank employees opening unauthorized accounts. ECF No. 82, at PageID 333–34, 340, 342–45, 348–49, 351, 354, 356–57, 360–62, 365, 367, 385–86. These do

not constitute an admission that (1) any account with indicia of non-authorization actually was unauthorized, or (2) if an account was unauthorized, a Fifth Third employee was responsible for opening it. The Bureau itself has admitted that its inferences that these potentially unauthorized accounts are actually unauthorized and were opened by Fifth Third employees are unwarranted. *See* Ex. A, Resp. to RFAs 4–6 (admitting there may be legitimate reasons consumers open accounts or services but do not utilize them); *id.* at RFA 3 ("The Bureau admits that it is possible that [accounts] bearing one or more of the indicia of non-authorization . . . [were] not necessarily opened or enrolled in by a Fifth Third employee(s) without the consumer's knowledge and consent."). Similarly, the fact that Fifth Third offered remediation to customers whose accounts were identified as "potentially unauthorized" does not mean that the account actually was unauthorized, that a Fifth Third employee opened the account, or that Fifth Third was legally obligated to remediate the accounts. As Fifth Third explained in its Answer, it "[gave] the benefit of the doubt to customers with respect to remediation." ECF No. 82, at PageID 334. It did not insist on proof that would satisfy evidentiary standards in federal court or shift the burden to the consumer to prove something based on a preponderance of the evidence.

Next, the Bureau argues that Fifth Third did not timely identify and remediate customers identified by the lookback. Here, the Bureau assumes that, because Fifth Third performed a lookback as part of its efforts to persuade the Bureau that an enforcement action was unwarranted, Fifth Third should have, and was legally obligated to, perform that same review years earlier. But Fifth Third has repeatedly denied the allegation that its remediation efforts were untimely or insufficient. *See id.* (denying allegation that Fifth Third has taken insufficient steps to identify and remediate affected consumers); *see also id.* at 347, 350–51, 353–54, 356, 358, 359–60, 364–65

(denying allegations that Fifth Third failed to investigate and identify potentially unauthorized accounts).

Finally, the Bureau alleges that Fifth Third avoided timely identifying and remediating the potentially unauthorized accounts because it was putting its own financial interests ahead of its customers.  This, too, is an allegation that Fifth Third expressly and unequivocally denied.  *Id.* at 335 (denying that "Fifth Third has focused on its own financial interests to the detriment of consumers"); *id.* at 367–68 (denying allegation that "Fifth Third, through its senior management, chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm").

In sum, the Bureau asks the Court to grant judgment on the pleadings based on allegations that Fifth Third has flatly denied.  As this Court made clear, Rule 12(c) requires that denied allegations be taken as false.  *Pension Benefit Guar. Corp.*, 34 F. Supp. 2d at 608 (noting "all allegations of the moving party which [are] denied are taken as false").  For this reason alone, the Court should reject the Bureau's Motion.  *McDonald v. Dna Diagnostics Ctr.*, No. 3:20-CV-391-CRS, 2020 U.S. Dist. LEXIS 202174, at *5 (W.D. Ky. Oct. 29, 2020) ("In their answer, Defendants unequivocally deny each of the allegations that correspond to the required elements of Plaintiff's fraudulent misrepresentation claim.  Since the Court must take the allegations of the non-movant as true, and 'need not accept as true legal conclusions or unwarranted factual inferences,' Plaintiff cannot prove her claim of fraudulent misrepresentation on the pleadings alone as Rule 12(c) requires her to do." (citations omitted)).

2.      The Admitted Facts Do Not Entitle the Bureau to Judgment on the
        Pleadings.

The Bureau's motion for judgment on the pleadings can properly rest only on those allegations that Fifth Third has admitted as true.  But the inferences that can be drawn from the admissions also must be those most favorable to Fifth Third, not the Bureau.  In its Answer, Fifth Third admitted that (1) it identified a small number of unauthorized accounts in Chicago in 2010, which were promptly remediated; (2) fewer than 500 customers complained about unauthorized accounts; and (3) Fifth Third identified fewer than 1,100 potentially unauthorized accounts opened between 2010 and 2016 out of more than 10 million accounts—or 0.01% of accounts opened during that time period—and remediated those customers.  ECF No. 82, at PageID 341–42, 347–48.  These facts fall far short of establishing, as a matter of law, that Fifth Third engaged in abusive acts by failing to conduct earlier a wide-ranging "lookback" of all accounts opened in this time period.

The Bureau asks the Court to conclude—based on the existence of a handful of unauthorized accounts in Chicago, fewer than 500 customer complaints about unauthorized accounts, and the identification of fewer than 1,100 *potentially* unauthorized accounts, out of 10 million, that Fifth Third knew of a widespread problem, did nothing, and intentionally ignored that problem to the detriment of its customers in order to protect its profits and reputation.  *See generally* ECF No. 89-1, at PageID 566–67, 572–73.  This inference is not warranted based on the limited facts admitted, and it certainly is not the inference that is most favorable to Fifth Third.  In fact, the Bureau has admitted that "just because a consumer complains that he or she did not authorize an account or service does not necessarily mean that the consumer in fact did not know about or consent to the account or service."  Ex. A, Resp. to RFA 12.  Indeed, three such customers

went so far as to file two separate lawsuits against Fifth Third alleging unauthorized accounts, only to voluntarily dismiss those claims after being presented with proof of authorization.

Instead, there is a far more plausible and favorable inference to be drawn in Fifth Third's favor. As Fifth Third explained in its Answer, when it became aware in 2010 that employees in Chicago improperly opened unauthorized accounts, Fifth Third responded promptly and appropriately by investigating, disciplining the responsible employees (including termination), and bringing in new management. Fifth Third also improved its internal controls and changed its employee compensation system. ECF No. 82, at PageID 331, 341. Fifth Third contends that there was no reason to believe the conduct in Chicago was widespread, and it relied on its robust internal controls and reporting systems to identify unauthorized accounts. Neither the existence of fewer than 500 customer complaints about potentially unauthorized accounts nor the identification of fewer than 1,100 potentially unauthorized accounts renders unreasonable Fifth Third's belief that unauthorized accounts were sporadic and isolated incidents, particularly for an institution that employed nearly 30,000 retail personnel during the relevant period. *Id.* at 329. As Fifth Third noted in its Answer, these potentially unauthorized accounts represent a miniscule fraction of the total accounts opened during the relevant time period. It was entirely proper and reasonable for Fifth Third to believe that its policies and procedures, internal controls, and robust reporting systems were effective at identifying and deterring unauthorized accounts.

Similarly, the fact that Fifth Third did eventually perform a "lookback" for the purpose of demonstrating to the Bureau that there was no widespread pattern or practice of opening unauthorized accounts is not evidence that a lookback was necessary or should have been performed sooner. In fact, it is evidence of the opposite: the review confirms Fifth Third's belief that there was no widespread unauthorized-account problem and that the Bank's rigorous internal

controls worked. This undermines, rather than supports, the Bureau's allegation that Fifth Third's failure to perform the lookback sooner was "abusive."

In short, Fifth Third's denials of the central factual allegations underpinning Count 12 of the Complaint, combined with the favorable inferences that can be drawn from the admitted facts, support the reasonableness of Fifth Third's conduct and preclude judgment in the Bureau's favor. *McDonald*, 2020 U.S. Dist. LEXIS 202174, at *5 (denying plaintiff's motion for judgment on the pleadings because the court "need not accept as true legal conclusions or unwarranted factual inferences" regarding the significance of defendant's admissions (citation omitted)).

### B. Fifth Third, Not the Bureau, Is Entitled to Judgment on the Pleadings.

Judgment on the pleadings for Count 12 is warranted, but for *Fifth Third*, not the Bureau. Count 12 suffers from several fatal legal defects that defeat not only the Bureau's motion for judgment on the pleadings, but the claim itself.

First, Count 12 lacks sufficient detail to meet either Rule 9(b)'s heightened particularity requirements or Rule 8's lower plausibility standard. The Bureau's Motion is premised entirely on the notion that Fifth Third failed to perform a lookback before it was sued by the CFPB. Count 12 does not allege the failure to timely perform a "lookback." Instead, it simply references the alleged failure to comply with amorphous and undefined concepts like "reasonable methods," without once articulating what those methods were or when they should have been utilized, much less why the Bureau is entitled to judgment as a matter of law. This does not satisfy the Bureau's obligation to plausibly plead a claim for abusiveness under the CFPA premised on the failure to timely perform a lookback, let alone with the particularly required by Rule 9(b).

Second, and relatedly, faulting a defendant for failing to remediate when the defendant challenges the very basis for the action amounts to impermissible regulation by enforcement. The Bureau's attempt to impose liability for supposed abusive conduct has no grounding in the statute,

-13-

regulation, guidance, or caselaw.  Indeed, the Bureau does not cite a *single* case actually supporting its argument that Fifth Third's conduct was abusive: two of its cases stand for general propositions of statutory interpretation, and the third discusses the "ordinary meaning" of abusiveness in a context not involving a "lookback."  ECF No. 89-1, at PageID 568.  The abusiveness prong of the CFPA, 12 U.S.C. § 5531(d)(2), does not impose a "lookback" requirement, and no court has ever found that an entity "abused" its customers by not conducting a "lookback"—a standard that would transform an institution's alleged failure to remediate an alleged substantive violation into a separate substantive violation.  In essence, this penalizes institutions that refuse to acquiesce to the CFPB's one-sided consent orders.  More troubling, the Bureau has *never* issued any regulation or guidance even suggesting such a requirement, nor has the Bureau ever advanced such a theory.

In its public issuance last year, the Bureau admitted that there is virtually no authority for *any* definition of "abuse" under Section 5531(d)(2).  *See Statement of Policy Regarding Prohibition on Abusive Acts or Practices*.[1]  As to the limited guidance that the Bureau itself has offered, the Bureau explained that "these documents only rarely have described citations of abusive acts or practices in a manner that would provide guidance as to how the Bureau concluded the statutory language used in section 1031(d) applied to the conduct at issue," and although the Bureau has "mentioned the risk of abusive acts or practices," it "has not set forth a detailed explication of the abusiveness standard in such documents."  *Id*. at 4–5.  In *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, the only case cited by the Bureau relating to abusiveness, the Southern District of Indiana attempted to fill this void and supply a definition, but

---

[1] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_abusiveness-enforcement-policy_statement.pdf.  While the Bureau recently rescinded this guidance, *see* https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-rescinds-abusiveness-policy-statement-to-better-protect-consumers/, the vagueness of its abusiveness standard remains in place and unaddressed.

-14-

that definition undermines the Bureau's case. 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015). Specifically, the court's standard for "abuse" would require the Bureau to prove that Fifth Third benefitted or "profit[ed]" from the isolated incidents of unauthorized accounts. *Id.* (citation omitted). Yet, Fifth Third has expressly denied any such benefit or profit, and the Bureau (despite years of investigation) has been unable to identify a *single* unauthorized account that Fifth Third has not already identified, investigated, and remediated. The Bureau's imposition of this "lookback" requirement for the first time, in litigation, without having identified a single unauthorized account, or even any threshold for when an obligation to perform a lookback would arise, raises serious due process concerns. *Cf. PHH Corp. v. CFPB*, 839 F.3d 1, 46, 48 (D.C. Cir. 2016) (holding that "[t]he CFPB . . . violated due process by retroactively applying its changed interpretation to [defendant's] past conduct and requiring [defendant] to pay $109 million for that conduct"), *aff'd in relevant part and rev'd in part on other grounds en banc*, 881 F.3d 75 (D.C. Cir. 2018).

Finally, Count 12 is also directly impacted by at least two other defenses raised by Fifth Third: Transfer Date and Statute of Limitations. As explained in greater detail in Fifth Third's Motion for Judgment, the Bureau has no enforcement authority for accounts opened before the Transfer Date, and therefore it cannot enforce any obligation to remediate pre-Transfer Date accounts. Likewise, because the Bureau's credit card claims prior to October 2017 are time-barred by the statute of limitations, it cannot enforce any obligation to remediate those accounts, either. *See* ECF No. 85-1, at PageID 455–59; ECF No. 91 at PageID 608–18.

## V.  CONCLUSION

Fifth Third does not have, and has never had, a systemic or widespread issue with unauthorized accounts, and when isolated incidents occurred in the face of its rigorous controls and reporting mechanisms—amounting to less than 0.02% over the course of nearly a decade—

Fifth Third actively identified and remediated customers who were potentially affected. Accordingly, even if the Bureau's "identifying and remediating" rule was the law, Fifth Third has—by any measure—more than satisfied it.  For the foregoing reasons, Fifth Third respectfully requests that this Court deny the Bureau's Motion and enter judgment in Fifth Third's favor as to Count 12 of the Amended Complaint for the reasons set forth in Fifth Third's Motion for Judgment on the Pleadings.

Dated: September 3, 2021                              Respectfully submitted,

/s/ Ryan Scarborough
WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac vice*)
Enu Mainigi (*pro hac vice*)
Ryan Scarborough (*pro hac vice*)
725 12th Street, N.W.
Washington, DC 20005
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com

DINSMORE & SHOHL LLP
Laurie A. Witek (0083955)
Michael Ferrara (0097584)
Katherine Rasmussen (0093928)
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
513-977-8648
Laurie.Witek@Dinsmore.com
Michael.Ferrara@Dinsmore.com
Katherine.Rasmussen@Dinsmore.com

*Attorneys for Defendant Fifth Third Bank, N.A.*

-16-

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Memorandum in Opposition to Plaintiff Consumer Financial Protection Bureau's Motion for Partial Judgment on the Pleadings was electronically filed with the Clerk of the Court by utilizing the CM/ECF System on September 3, 2021, which will provide electronic notification to all counsel of record.


/s/ Laurie A. Witek