**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | |
| | ) | Civil Case No. 1:21-cv-00262-DRC |
| Plaintiff, | ) | |
| | ) | Judge Douglas R. Cole |
| v. | ) | |
| | ) | |
| Fifth Third Bank, National Association, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF BUREAU OF CONSUMER FINANCIAL PROTECTION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Congress defined abusive conduct to include where a bank or other "covered person" takes unreasonable advantage of a consumer's (A) lack of understanding of the material risks, costs, or conditions of a consumer-financial product or service; (B) inability to protect the consumer's interests in selecting or using a consumer-financial product or service; or (C) reasonable reliance on an offeror to act in the interests of the consumer. 12 U.S.C. § 5531(a), (d)(2). The Bureau's opening memorandum describes the facts *admitted* and *alleged by Fifth Third* that entitle the Bureau to a partial judgment under the abusiveness statute:

- Fifth Third knew that it had an unauthorized-accounts problem by 2010;
- the problem persisted to the point that Fifth Third received around 500 consumer complaints, Am. Answer, Doc. 82, PageID 340–341, ¶ 42, and contemporaneously identified, through manual processes, around 1,100 aggrieved consumers, Am. Answer, Doc. 82, PageID 342, ¶ 50 & PageID 331;

- after the Bureau filed suit in 2020, Fifth Third examined "suspicious" accounts that it had opened from 2010 to 2016, identified "red flag" accounts, and analyzed them to determine whether they were improperly opened;
- Fifth Third identified and remediated 800 additional consumers; and
- as a result, 800 consumers entitled to relief went unidentified and unremediated for more than three years.

Fifth Third tries to defend against this straightforward application of the statute by fabricating its own exceptions. In doing so, Fifth Third highlights the precise reasons why it should be held liable for abusive conduct.

## I. There is no exception to the CFPA's prohibition of abusive acts and practices based on a purported "high six-figure cost" of compliance.

As the district court held in *CFPB v. ITT Educ. Servs., Inc.*, a "reasonable reading of the [abusiveness] statutory language . . . is that it refers to oppressive circumstances—when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of the defendant." 219 F. Supp. 3d 878, 919 (S.D. Ind. 2015). Fifth Third does not—and cannot—dispute that it enjoys a "stronger position" relative to consumers. Fifth Third holds the relevant information to identify aggrieved consumers. Am. Answer, Doc. 82, PageID 365–66, ¶ 119. And Fifth Third has "more than $200 billion in total assets," Doc. 82, PageID 336 , ¶ 17—more than enough to absorb the "high six-figure cost" of the bank's belated review, Def.'s Mem. in Opp'n, Doc. 97, PageID 741.

Yet Fifth Third tries to insert a balancing test into the statute, such that it would need not protect consumers unable to protect themselves if the cost of its protection is "exponentially greater than the amount of [consumer] remediation." Doc. 97, PageID 741. Of course, Congress included no such balancing test in the abusiveness statute. Even where there is a balancing test,

in the Consumer Financial Protection Act's (CFPA's) *unfairness* statute, the balancing is of consumer injury and consumer benefit, 12 U.S.C. § 5531(c)(1)(B), not of consumer injury and the bank's cost to identify and prevent it.

Fifth Third's attempt to fabricate this balancing test is an example of—not a defense to—the bank's willingness to take advantage of its significantly stronger position relative to consumers by refusing to use information available to it to identify and remediate the consumers that it had mistreated. For example, Fifth Third claims that revenue of $10 million per year is "immaterial," Doc. 82, PageID 371, ¶ 138, while also claiming that a fraction of that amount to identify aggrieved consumers is too much for it to bear. And, lest we believe for a moment that Fifth Third eventually spent its money on a review for the benefit of aggrieved consumers, Fifth Third assures us that its motive was less magnanimous: "Fifth Third performed a lookback as part of its efforts *to persuade the Bureau that an enforcement action was unwarranted*." Doc. 97, Page ID 746 (emphasis added). In other words, identifying aggrieved consumers did not meet Fifth Third's cost/benefit analysis, as long as the costs were minimal—in Fifth Third's view—and were borne by consumers. Identifying aggrieved consumers only became worthwhile to Fifth Third when it was sued and wanted to make a point. *See* Doc. 97, PageID 746. Point taken: Fifth Third must be sued into compliance.

In Fifth Third's Form 8-K filed with the SEC, Fifth Third wrote that this "civil suit . . . is unnecessary and unwarranted" because the bank had already taken "decisive action" in response to the "fewer than 1,100" "unauthorized accounts" that it had identified. *See* Form 8-K, Ex. 99.1, available at https://sec.report/Document/0001193125-20-067236/ (last visited Sept. 16, 2021).[1]

[1] The Bureau recognizes that a public record may only be considered on a motion for judgment on the pleadings if it is "referred to in the complaint and [is] central to the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). Accordingly, the Bureau avers that

To at least the 800 consumers that Fifth Third identified and remediated later, this suit was necessary.

## II. There is no abusiveness exception for "non-systemic" conduct.

Even assuming, as we must at this stage of the litigation, that Fifth Third's post-suit review was reasonably thorough and that no other consumers are entitled to remediation, Fifth Third cannot escape that it denied remediation to 800 consumers for more than three years. These 800 consumers were entitled to relief under the bank's own procedures, which included the bank red-flagging the accounts and determining that there was enough evidence of non-authorization to justify a belated remediation; the bank's procedures did not require each consumer to prove non-authorization in court. *See*, *e.g*., Am. Answer, Doc. 82, PageID 363, ¶ 111. And yet the bank did not provide remediation to these 800 consumers for more than three years—an abusive practice under the law.

Fifth Third tries again to create an exception to the abusiveness prohibition, this time because the misconduct that led to the remediation was supposedly not "systemic" or "widespread." Fifth Third does not define these terms, and they do not appear in the CFPA's abusiveness prohibition. *See* 12 U.S.C. § 5531(d). Where Congress wanted the Bureau and the judiciary to consider volume, it codified the considerations as "mitigating factors" in the CFPA's penalty section for already-established liability. *See* 12 U.S.C. § 5565(c)(3)(B), (C), (E) ("the gravity of the violation," "the severity of the risks to or losses of the consumer," and "such other matters as justice may require"). This motion is aimed at Fifth Third's *liability* for its abusive practice of taking unreasonable advantage of 800 consumers for three years. Consideration of

Fifth Third's public statements should only be considered to counter any of Fifth Third's extra-pleading assertions in its opposition that are not excluded.

any mitigating factors that Fifth Third asserts would be for another time—in connection with determining an appropriate civil money penalty—and does not affect a determination of liability.

Nowhere does the CFPA base abusiveness liability on the ratio of aggrieved to unaggrieved consumers. Eight hundred consumers from whom Fifth Third withheld remediation for three years is a significant number. And 500 complaints from individuals—each of whom noticed an issue and were concerned enough to take time to contact the bank about the underlying conduct—is a significant number. And 1,100 consumers contemporaneously identified as victims of unauthorized accounts is a significant number. At some point, Fifth Third must stop referring to its unauthorized account openings as isolated incidents, especially when they appeared more isolated by virtue of Fifth Third's refusal to look for them before this lawsuit.

**III. There is no fair-notice issue.**

Fifth Third's argument that it lacked notice of the requirements of the CFPA's abusiveness prohibition is unsupported by law or fact. Perhaps Congress will pass a statute that says explicitly that when a bank knows that its employees opened a significant number of unauthorized consumer-accounts and the bank has exclusive access to information that could be used to identify aggrieved consumers, it is abusive to fail to take reasonable steps to do so. In the meantime, courts routinely interpret whether specific conduct falls within the prohibitions of a statute; that application of a statute to particular conduct involves such interpretation does not render its prohibitions unenforceable. *See*, *e.g*., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253–54 (3d Cir. 2015) ("The relevant question is not whether Wyndham had fair notice of the FTC's *interpretation* of the statute, but whether Wyndham had fair notice of what the *statute itself* requires."). Indeed, "most statutes must deal with untold and unforeseen variations in factual situations, and [] practical necessities . . . inevitably limit the specificity with which

legislators can spell out prohibitions." *Boyce Motor Lines, Inc*., 342 U.S. 337, 340 (1952), *quoted in United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 568 (6th Cir. 2001); *see also*, *e.g*., *CFPB v. ITT Educ. Servs.,* 219 F. Supp. 3d 878, 904 (S.D. Ind. 2015) (evaluating the CFPA's prohibitions on unfair and abusive conduct and recognizing that "Congress's charter for an agency could not, and should not, use descriptions so precise that they foreclose any interpretive uncertainty"). As described in the Bureau's opening memorandum, Fifth Third's conduct falls squarely within each of the three independent parts of the CFPA's abusiveness prohibition. The CFPA is explicit in its prohibition of abusive acts or practices, and the statute sets forth the elements of abusive conduct. Fifth Third has had notice of the elements of its prohibited conduct since at least July 21, 2010, the date that the CFPA became law.

Fifth Third's reference to a January 2020 Bureau policy statement (*Statement of Policy Regarding Prohibition on Abusive Acts or Practices* (available at https://files.consumerfinance.gov/f/documents/cfpb_abusiveness-enforcement-policy_statement.pdf , last visited Sept. 16, 2021) is misguided and reveals Fifth Third's misreading of that statement. In it, Director Kraninger described the Bureau's intention to facilitate the development of common law on the abusiveness standard by avoiding challenges to "conduct as abusive that rel[y] on all or nearly all of the same facts that the Bureau alleges are unfair or deceptive." *Id*. at 10. Here, Count 12 relates to Fifth Third's conduct that is alleged to be abusive; there is no dual pleading. And the policy statement was issued in response to industry-participant comments suggesting that the lack of abusiveness caselaw was stifling financial-services innovation. *See id.* at 6–9. Fifth Third cannot argue that its identification of aggrieved consumers who were entitled to remediation would have stifled innovation.

In the end, the abusiveness statute requires no more of Fifth Third here than Fifth Third acknowledges as appropriate conduct. According to the bank's September 25, 2017 Form 8-K filed with the SEC, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000035527/841e00b6-72d9-4798-be35-8ef16793c678.pdf (last visited Sept. 16, 2021), "opening accounts without customer authorization" is "unethical" or "fraudulent," the bank "is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed . . . unfair, deceptive or abusive," and the "[f]ailure to report [this type of] activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties." *Id*. at 14–15, §§ 2.1, 2.3. Fifth Third understands its responsibilities—including its responsibility to uncover and report unauthorized accounts—but it seeks not to hold itself to the standards it espouses.

**IV. Count 12 is timely.**

Fifth Third erroneously claims that the Bureau is not entitled to judgment on Count 12 because several of the accounts for which Fifth Third eventually provided remediation in 2020 and 2021 may have been wrongfully opened before the date that enforcement authority for violations transferred to the Bureau (the Transfer Date, July 21, 2011) and, in any event, outside of the alleged applicable statute of limitations for abusiveness claims under the CFPA. For the reasons discussed in the CFPB's response to Fifth Third's Rule 12(c) motion, Fifth Third's timeliness arguments are flawed. *See generally* Pl.'s Opp'n, Doc. 88, PageID 511–12. Moreover, Fifth Third misapprehends the basis for its Count 12 liability.

On March 8, 2020, the day before the Bureau filed the Complaint commencing this action, Fifth Third had in its possession all of the information to identify aggrieved consumers. Yet it was not until faced with a publicly filed enforcement action that Fifth Third sought to do

what it could have done that day and each day from at least January 1, 2017 forward: taken steps to identify and remediate consumers entitled to remediation. Accordingly, even if Fifth Third opened some of the unauthorized accounts before the applicable statutory period or the Transfer Date, Fifth Third engaged in an abusive practice that continued each day that the bank took unreasonable advantage of consumers. And there is no dispute, factual or legal, that every claim based on Fifth Third's actions or failures to act since October 7, 2015, is timely. *See* Doc. 88, PageID 511.

## CONCLUSION

Fifth Third's admitted multi-year failure to identify and remediate 800 consumers who were entitled to remediation—a conclusion that is unmistakable from the pleadings—is abusive under the CFPA. Judgment should therefore be entered in the Bureau's favor on Count 12 of the Amended Complaint.

Dated: September 17, 2021

Respectfully Submitted,

Cara M. Petersen
*Acting Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

/s/ Barry E. Reiferson
BARRY E. REIFERSON, NY Reg. #24343893 (Trial Attorney)
Email: barry.reiferson@cfpb.gov
LANE C. POWELL, MI Bar #P79432
Email: lane.powell@cfpb.gov
MEGHAN SHERMAN CATER, NY Reg. #4473120
Email: meghan.sherman@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Telephone: (212) 328-7020; Facsimile: (202) 435-5477
Attorneys for the Bureau of Consumer Financial Protection

**Certificate of Service**

I certify that, on September 17, 2021, the foregoing PLAINTIFF BUREAU OF CONSUMER FINANCIAL PROTECTION'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS was filed electronically using the Court's CM/ECF system, and notice of this filing will be sent to attorneys of record who are registered users of the system.

/s/ Barry E. Reiferson