## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | Civil Case No. 1:21-cv-00262 |
| Plaintiff, | |
| v. | Judge Douglas R. Cole |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | **JOINT PRE-CONFERENCE SUBMISSION** |
| Defendant. | |

 1.     Pursuant to Fed. R. Civ. P. 26(f), a meeting was held on July 13 and 14, 2021 and was attended by:

- Ryan Scarborough, counsel for Defendant Fifth Third Bank, N.A.;
- Lydia Cash, counsel for Defendant Fifth Third Bank, N.A.;
- Krysta Gumbiner, counsel for Defendant Fifth Third Bank, N.A.;
- David Painter, employee at Defendant Fifth Third Bank, N.A.;
- Barry Reiferson, counsel for Plaintiff Bureau of Consumer Financial Protection;
- Lane Powell, counsel for Plaintiff Bureau of Consumer Financial Protection (attended on day 1 only);
- Meghan Sherman Cater, counsel for Plaintiff Bureau of Consumer Financial Protection.

 The Parties held additional discussions between counsel and, on September 10, October 5, and October 12, 2021, held discussions between their respective experts with counsel.

 2.     The parties have provided the pre-discovery disclosures required by Fed. R. Civ. P. 26(a)(1).

 3.     The parties **do not** unanimously consent to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

4. Recommended cut-off date for filing of motions directed to the pleadings: The Parties previously agreed to a cut-off date of **August 13, 2021**, and agree that the cut-off date should not be extended**.**

5. Recommended cut-off date for filing any motion to amend the pleadings or to add additional parties: The Parties previously agreed to a cut-off date of **August 13, 2021**, and agree that the cut-off date should not be extended**.**

6. Recommended discovery plan:

    a. Describe the subjects on which discovery is to be sought and the nature, extent and scope of discovery that each party needs to: (i) make a settlement evaluation, (ii) prepare for case dispositive motions, and (iii) prepare for trial:

**Bureau of Consumer Financial Protection ("CFPB" or "Bureau")**

Broadly speaking, the Bureau alleges in its Amended Complaint (Doc. # 73) that Fifth Third engaged in abusive sales practices (Count 1), opened unauthorized accounts (Counts 2–11), and failed to take reasonable steps to identify affected consumers (Count 12).

The Bureau made a written settlement proposal on November 8, 2021, one week before the due date set by Court order. The Bureau does not require any discovery to evaluate settlement.

Count 12 is already the subject of the Bureau's motion for partial judgment on the pleadings (Doc. # 89).

In the absence of an early resolution by motion or settlement, the Bureau would require discovery of bank data for Counts 2–11 and more typical document discovery for all Counts to prepare for dispositive motions and trial.

The Bureau would require discovery on all matters relevant to the conduct alleged in the Amended Complaint and still at issue, including:

- data for the bank's consumer-financial products sold or issued through or credited to the bank's financial centers, including account-level, transaction-level, employee-level, and geographic-level (branch, region, affiliate, etc.) data;
  - At a high level, and as discussed during the October 18, 2021 status conference, the Bureau's methodology to narrow the scope of necessary discovery involves reviewing data from a pilot sample of 398 accounts for the purpose of eliminating the majority of accounts from further consideration and to generate a target population. In order to generate the population for the pilot sample, the Bureau requested from the bank certain preliminary data for review. The Bureau's request

was first provided in writing on October 7, 2021, and was narrowed on October 20, 2021. Fifth Third provided most but not all of the requested data. Fifth Third did not provide a data "flag indicating whether the account was at any point considered . . . 'suspicious' for the purpose of the EY review," nor did it provide a data flag indicating that an account was designated as "'potentially unauthorized' following any other review or investigation." Most recently, as recounted in the Bureau's November 8, 2021 email to the Court, Fifth Third refused to provide the data flag indicating which of the 1,450 "specified sales practice" accounts were marked by the bank as unauthorized or, using the bank's recent terminology, "potentially unauthorized."

- ▪ Once the Bureau and its experts complete their analyses of the pilot-sample data, the Bureau will provide exclusion criteria to the bank so that the bank can produce a list of remaining accounts (the target population) from which the Bureau will draw a sample. The Bureau may request certain identifying information for each account in the list so that the sample can be stratified. **The Bureau is mindful of the Court's comments on sample size and proportionality**; the Bureau is considering ways to use the data received *and forthcoming* to appropriately limit the sample size and to rely to the greatest extent possible on data. The Bureau will be prepared to discuss this and to answer any questions the Court has during the upcoming conference.

  - o Relatedly, and as described in the parties' last joint submission to the Court, the parties' efforts to limit discovery would be advanced by revisiting the population of the more than 1,100 accounts that the bank has repeatedly admitted are unauthorized but now recharacterizes for the Court as "potentially unauthorized." Indeed, the bank explicitly admitted non-authorization in formal responses to civil investigative demands, in SEC filings, on its website, and elsewhere. The bank's recent recharacterization of these 1,100 unauthorized accounts as "potentially unauthorized" affects the scope of discovery generally as well as the data analysis; the characteristics of these accounts are significant data points that experts can use to further their work.

- the bank's consumer-financial-product sales, issuance, opening, and enrollment (hereinafter sales) acts and practices, including sales-related statements to consumers, and other sales-related information, policies, and procedures;
- the bank's consumer-financial-product sales goals, incentive programs, quotas, including credit given to or consequences for employees, branches, regions, and affiliates for the sales;
- the bank's consumer-financial-product-sales financial information;
- the terms, conditions, characteristics, costs, risks, harms, and potential harms relating to the bank's consumer-financial products;
- the bank's acts or practices of: selling consumer-financial-products without consumer knowledge and consent; changing without consumer consent the types of accounts or services in which consumers were enrolled; making false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in them; using or obtaining consumers' credit reports without an authorized purpose; and, without consumer authorization, assigning personal-

identification numbers or falsifying consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers;

- efforts that the bank took or failed to reasonably take to detect and prevent sales misconduct, and to identify and remediate consumers subjected to it, and the reasons for the bank's efforts or lack of efforts;
- information relevant to any valid affirmative and other defenses; and
- information relevant to testifying expert witnesses and their submissions upon which the bank may rely.

Fifth Third has again used a joint report to make false allegations against the Bureau, inserting these allegations, many of them couched as statements of fact, after 11:00 p.m. on the eve of filing. Fifth Third's allegations should not obscure the state of affairs.

The Bureau's sampling methodology was described in detail during the October 18, 2021 conference, and the Bureau was working earnestly even before then. The Bureau described that it would attempt to exclude most accounts from the target population, as most accounts bear indicia of *authorization*. The Court approved the Bureau's proposed approach at the October 18 conference, and the Bureau has nearly completed its analysis of the pilot data, but Fifth Third is frustrating (if not sabotaging) the Bureau's efforts to complete that work by refusing to provide the last piece of information that the Bureau requested in order to complete this phase and proceed to the next. The Bureau described to the Court that, for the current phase, it would likely rely heavily on transaction data to indicate authorization. But the pilot data showed that some of the accounts flagged by the bank as subject to a Specified Sales Practice (SSP) show transactions, including, for example, a sales draft with a specific retailer. That is why the Bureau asked the bank to provide readily available information about its SSP flags. Fifth Third chose to spend days refusing to provide that information instead of minutes providing it. What was Fifth Third's rationale for refusing? "We believe this goes beyond the scope of our informal discussions – which are focused on how the Bank keeps its data in the normal course, identifying indicia of non-authorization, and selecting a sample – and invades privilege. We therefore decline to provide this information."

Fifth Third provided the initial SSP information in 2017, long before its current counsel was involved. Fifth Third explained then that its interrogatory response was based on facts it had gathered from and determinations it had made during its contemporaneous investigations. The Bureau continues to believe that the bank's current counsel misunderstands the information, and the Bureau would welcome a forum to get to the bottom of the important issues of the SSPs, the bank's admissions, and the bank's retractions in pleadings and elsewhere. But that need not happen now; all that is necessary now—or at least very helpful if the goal is to reduce the sample size and the scope of discovery—is for the bank to provide account numbers and to indicate which of those accounts were unauthorized (or called that at one point). The bank has that purely factual information at its fingertips.

All to limit the size of a target population and necessary sample size, the Bureau has expended significant resources to identify indicia of authorization so as to be able to cull from Fifth Third's entire account population those accounts which, for purposes of its expert review, the Bureau will not argue are unauthorized. From the remaining pool of accounts (the target

population), the Bureau intends to draw a random sample, which it may stratify, from which it can then extrapolate to the target population (but not to Fifth Third's entire account population).

Now that one of the most burdensome aspects of this process is nearly complete—identifying the target population—Fifth Third obfuscates and asks the Court to start over and to order the Bureau instead to use samples drawn from a population of Fifth Third's choosing. The Bureau should be allowed to complete the process already begun (and almost completed). In this report and in the upcoming conference, the Bureau will further describe the sampling methodology that it discussed before and that it has been pursuing for weeks. As it does so, it is important to highlight what the unauthorized-account claims are about.

One of the primary issues is how large of gap there is between, on the one hand, the number of unauthorized accounts that have been identified and affected consumers remediated, and, on the other hand, the number that have yet to be identified and remediated using available information. Count 12 addresses this issue, and the related motion for partial judgment on the pleadings describes the undisputed fact that the bank's multi-year failure to look at available information deprived at least 800 consumers of timely remediation.

These consumers are not just numbers; they are real people who had their credit affected, who were charged unwarranted fees, who had their personal information exposed, and often who were unaware of any of this because the bank deemed them and their problems insignificant. Even where the consumers became aware of the bank's misconduct, they were forced to call or travel to a branch to try to get accounts closed. Whatever the bank thinks of this case, it is a significant issue for every one of the affected consumers and for law enforcement.

A litigant resisting discovery should show unwarranted burden and not just proclaim it. And a litigant should show its expert's work and not just proclaim that it carries the day. Notably, even EY has not come forward to say that it found all or even most "potentially unauthorized accounts." If Fifth Third cooperates, there will soon be a data-driven estimate of the scope of unauthorized-account openings. We understood that to be a shared goal.

### Fifth Third Bank, N.A. ("Fifth Third" or "Bank")[1]

Fifth Third is baffled by the Bureau's rhetoric, which accuses the Bank of making "false allegations"—without identifying any specific falsehood—and even goes so far as to suggest the Bank is "sabotaging" the Bureau's efforts.[2] We want to preface our comments with the observation that we have done everything we can conceive professionally to facilitate this informal process. We have responded promptly and cooperatively to an ever-expanding litany of requests from the

---

[1] To facilitate the Court's review, Fifth Third has deleted content from prior versions that were submitted to the Court.

[2] The Bureau also implies the Bank sandbagged the Bureau with its submission. Not so. As evidenced by the email chain forwarded to the Court by counsel yesterday evening, the Bank provided its portion of the submission to the Bureau within 24 hours of receiving the Bureau's section (which was not sent until just before midnight on Wednesday, November 10, 2021).

Bureau, drawing the line only when those requests invade attorney work product or have nothing to do with the Bureau's task of identifying indicia of non-authorization or developing its sampling methodology. Our good faith, professional efforts are rewarded with *ad hominem* accusations. As the following narrative will reveal, we do not know what else we can reasonably do; the Bureau has moved the goal posts so far that we no longer seem to be on the same field.

The Bank has gone to great lengths to facilitate the Bureau's efforts to identify indicia of non-authorization and develop a sampling methodology that tests the Bureau's hypothesis. It has made key employees available to answer questions from the Bureau's experts and provided massive amounts of information and data, both as to a population of more than 20 million accounts as well as additional information related to the Bureau's pilot sample. Despite these efforts, the Bureau now blames its failure to identify indicia on the lack of so-called "Specified Sales Practices" data. The details of that dispute are addressed further below, but even on its face, it cannot be that information that was not important enough to merit inclusion on the Bureau's original list of data requested for the pilot sample, much less mentioned during the last status conference, is now suddenly of such importance that the Bureau cannot identify its indicia or develop a sampling methodology without it.

The Bureau has alleged that "[t]here are hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization." Am. Compl. ¶ 99. Nearly three months into the informal process the Court established to ascertain the scope of discovery, the Bureau still has not revealed the indicia that supposedly underlie the allegations in its amended complaint, much less proposed a reasonable and proportional sampling methodology that would test the Bureau's central hypothesis of widespread and systemic misconduct. A process that was meant to streamline discovery has now itself taken nearly three months, without any apparent progress by the Bureau to identify (or at least disclose) its indicia, much less its proposed sampling methodology.

The Bureau's core statement in this submission is that its "sampling methodology was described in detail during the October 18, 2021 conference." Fortunately, we have a transcript of that hearing. The Court can examine the transcript to test the accuracy of the Bureau's core statement. Nowhere is there any detailed description of a sampling methodology, much less disclosure of indicia of non-authorization that would be used to identify the population of accounts from which the sample would be drawn. A vague discussion of an intent to use sampling, without key details like the indicia used to create the target population, the sample size, or the expected rate and tolerance, cannot fairly be described as a "detail[ed]" description. Indeed, at the October 18 conference, the Bureau could not even articulate how many accounts it needed for its "pilot sample," let alone for the subsequent sampling exercise. And as recently as this past week, the Bureau refused to provide any methodology or indicia when directly asked. There simply is no support for the Bureau's core statement.

As promised during the October 18 hearing, Fifth Third provided the pilot sample data outlined in the CFPB's October 7 request on October 27. This was one week after the Bureau finally specified a 398-account "pilot" population on October 20. Having not heard from the Bureau in nearly two weeks, the Bank's counsel inquired earlier this week about when the Bureau would identify its indicia of non-authorization and propose a sampling methodology, and suggested scheduling a call with both parties' sampling experts to see if the parties could reach

agreement on a sampling approach (or at least narrow areas of dispute). The Bureau's counsel declined to answer directly, insisting that counsel "seem[s] to misunderstands the sampling process." Two days later, the Bureau's counsel again declined to identify indicia or methodology and stated that the Bank's counsel were operating under a "collective misunderstanding of the sampling process."

The Bank's counsel understood that the provision of the pilot sample data outlined in the October 7 request was the last step needed before the Bureau could identify its indicia and discuss sampling. We thought this was the Court's expectation as well. Instead, we are met with another cycle of requests and steadfast refusals to commit the Bureau to any indicia. If it was not already apparent before, it is clear now that the Bureau will not commit itself to indicia until forced to do so. This reluctance, we submit, is because the Bureau knows that the indicia are massively overbroad and any targeted indicia will confirm the Bank's position that unauthorized accounts were limited, historical, and remediated.

Fifth Third has participated in this informal process in good faith, but every response by the Bank is met with yet another request by the Bureau. For example, Fifth Third provided the data and information requested in the Bureau's October 7 specification. The Bank disclosed the accounts that met the filters used in the EY review, and also identified the accounts within that population that were deemed to be potentially unauthorized (there was no flag for "suspicious" accounts, as we previously told the Bureau's counsel). Separately, Fifth Third disclosed accounts referenced in the Bank Protection investigation files. Fifth Third gleaned this information by manually reviewing the Bank Protection investigation files, which is something the Bureau could have done as well given that it has possessed investigation files since the early days of its investigation. Now the Bureau suggests that the Bank has refused to provide information in response to "narrowed" requests. Not true. On October 20, the Bureau accompanied its list of pilot sample accounts with a broader request. It now insists that it needs to know which "Specified Sales Practice" ("SSP") is associated with each account that was involved in an internal Bank Protection investigation over the past decade. This was not specified in the Bureau's October 7 email listing the data it requested, nor was it mentioned during the October 18 status conference or any point before October 20.

SSP is a term that has no legal basis but was coined and used as a defined term by the Bureau in its April 2017 CID. Since this term was invented by the Bureau during its pre-suit investigatory phase, it is not tied to the legal definitions of the claims at issue in this lawsuit. It is also not a metric the Bank maintains in the ordinary course of business, and it only exists for a small number of accounts (most of which are not even part of the pilot sample). The Bureau insisted in its CID that the Bank categorize its internal investigations into one of several buckets based on SSP status. The Bank reported on the number of investigations in each bucket and explained its approach for doing so (both in the CID response and in responding the Bureau's recent Requests for Admission), but never produced its underlying work product. Nowhere does the Bureau explain why knowing SSP status matters to determining whether an account is unauthorized, when the Bank has already disclosed the accounts that were included in Bank Protection investigation files and in the EY Review.

Even apart from the delays this has introduced and the potential for disputes around attorney work product, SSP status is not a useful metric for analyzing the pilot sample. The Bank undertook the exercise of categorizing its investigations in order to respond to the CID, but these broad categorizations do not indicate whether a given account was, in fact unauthorized or potentially unauthorized.

The Bureau says it needs SSP status to reconcile discrepancies in the accounts subject to Bank Protection investigations. SSP status is useless for this purpose, as it was assigned based on each investigation (which can encompass multiple accounts), not based on each account. This simply reflects the Bureau's misapprehension of the investigative process used by Bank Protection, and its misunderstanding of the Bank's public statements. Investigations sometimes compare suspect accounts with other accounts opened by an employee; those comparator accounts are not themselves necessarily unauthorized, but they are reflected in the investigation file. That is why Fifth Third has used language like "fewer than" when describing this population, because it knows that not every account referenced in a substantiated or partially substantiated investigation is actually unauthorized. As Fifth Third explained both in response to the CID and again in response to the Bureau's Request for Admission, its "methodology for responding to Interrogatory 1 [relating to SSPs] was designed to be overinclusive," and its response was not based on "a comprehensive, account-level review to determine if any of the products and services were opened without the knowledge and consent of a consumer."

This is borne out by an additional review that EY did earlier this year, at the direction of counsel. The Bureau's insistence that it is entitled at this stage to this work product, which was undertaken at the direction of counsel, is unwarranted. EY reviewed accounts that were included within Bank Protection Investigation files likely to relate to unauthorized account openings. To avoid confusing it with the broader EY Review discussed above, we will refer to this separate review as the "EY Bank Protection Review." This review, which used a similar methodology, shows only about half of the accounts referenced in Bank Protection Investigation files are even potentially unauthorized, and approximately two-thirds of those pre-date the July 2011 Transfer Date which demarcates the Bureau's enforcement authority. Thus, a large proportion of the accounts categorized with an SSP could not shed any light on the indicia associated with an unauthorized account. And the small remaining population reinforces the critical point we have made from the outset: this is a needle-in-a-haystack exercise involving a small number of accounts which the Bank has already remediated.

We have asked the Bureau repeatedly to propose a sampling methodology using the indicia of non-authorization referenced in the Amended Complaint (¶¶ 57, 62, 75, 76, 84, and 93), or whatever other criteria it chooses, but it has not done so. Given the Bureau's position in its Motion for Judgment on the Pleadings that the Bank should have identified and remediated potentially unauthorized accounts sooner, it is perplexing why the Bureau will not identify the criteria which should inform the identification of such accounts. It is also telling that the centerpiece justification for the Bureau's Motion revolves around fewer than 800 *potentially* unauthorized accounts opened between 2010 and 2016 that collectively accounted for less than $2,600 in fees, which were refunded promptly. These accounts were identified based upon discussions with the Bureau after this lawsuit was filed in the spring of 2020, and utilized criteria: (a) which the Bureau now

apparently disavows, but (b) cannot or will not say why or how, and (c) had an extremely large false positive rate.

Discovery is conducted, as with all proceedings before the Court, "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Bureau has made serious allegations in and to the Court for which it seems doubtful that there was an evidentiary basis and which it refuses to explain or test. To entertain continued seriatim requests from the Bureau would further delay this proceeding and violate Rule 1 by imposing increasing discovery burdens on a party that has spent five years responding to CFPB demands and now provided data on more than 20 million accounts going back over a decade—a staggering burden where the amount of consumer harm so far identified by either party is less than $50,000—which was long ago remediated. Instead, we ask the Court to move the case forward by ordering discovery to proceed consistent with our proposed sampling methodology. This approach will give the Court far more information than it has now, and will help ensure reasonable and proportionate discovery geared to the allegations in the Bureau's Amended Complaint.

We therefore ask the Court to direct a sample based on the indicia referenced in the amended complaint; alternatively, we ask the Court to order the Bureau to disclose its indicia and proposed methodology by November 22.

We have consulted with Fifth Third's sampling expert, Dr. Charles Cowan, and asked him to develop a reasonable sampling methodology based on criteria gleaned from the amended complaint, if the Court is inclined to direct a sample. His proposed approach is set forth below, and includes the basic—but essential—details that the Bureau has refused to provide. To inform the scoping of discovery, it focuses on the most significant products at issue in this case: deposit accounts and credit card accounts.

## 1. Indicia of Non-Authorization Derived from Amended Complaint

   a. **Deposit Accounts:**
      i. Accounts funded with $100 or less from an existing Fifth Third account that had no activity other than the subsequent transfer, within 90 days of those funds back to the original account (¶ 55), or
      ii. Accounts funded with $100 or less and defunded to a zero balance within 90 days (¶ 57).

   b. **Credit Card Accounts:**
      i. Credit cards issued but never activated or used for consumer-initiated transactions (¶ 75).

2. **Date Range:** All deposit and credit card accounts opened between July 21, 2011 (which is the Transfer Date established by Congress for the CFPB to assume enforcement authority) to the present that meet the criteria specified above.[3]

3. **Sample Size:** 425 accounts.

4. **Rate:** 10%, but results will inform rates below that threshold.

5. **Tolerance:** 2.5% upper bound tolerance. Even if the unauthorized rate is less than 10%, with a sample size of 425 it is still possible to obtain very precise estimates. The following table presents the 95% upper confidence limits for unauthorized rates between 1% and 10%, based on a sample of 425 accounts. These upper confidence limits represent the highest value one could expect to observe in the population based on the sample of 425 accounts and sample results between 1% and 10%.

| If Unauthorized Rate in the Sample Equals: | 95% Upper Bound on Unauthorized Rate Observed in the Sample |
|---|---|
| 0.0% | 0.0% |
| 1.0% | 1.8% |
| 2.0% | 3.1% |
| 3.0% | 4.4% |
| 4.0% | 5.6% |
| 5.0% | 6.7% |
| 6.0% | 7.9% |
| 7.0% | 9.0% |
| 8.0% | 10.2% |
| 9.0% | 11.3% |
| 10.0% | 12.4% |

Fifth Third will seek discovery regarding the following subjects:

- When the CFPB first learned of alleged unauthorized accounts, and any internal supervisory discussions concerning preliminary findings regarding the alleged unauthorized accounts;
- The bases for the CFPB's allegations in the Amended Complaint;
- The accounts which CFPB claims are unauthorized;
- The CFPB's theory or methodology for identifying unauthorized accounts; and

---

[3] If the Court grants Fifth Third's Motion for Judgment on the Pleadings regarding the statute of limitations applicable to the Bureau's credit card claims, then we would adjust the period to exclude credit card accounts opened on or before October 7, 2015.

- The nature and extent of any customer harm alleged;
- The nature and extent of any damages alleged;
- The CFPB's communications with any third-party regarding any allegations in the Complaint;
- Analyses, studies, reports, and data in the CFPB's possession regarding consumer behavior related to opening, funding, or usage of accounts.
- The CFPB's "indicia of non-authorization," including data or documents in the CFPB's possession that show that "indicia of non-authorization" occur at similar (or greater) frequencies at other financial institutions and reflect ordinary consumer behaviors rather than widespread or systemic misconduct.

Fifth Third will need fact and expert discovery and intends to notice depositions pursuant to Fed. R. Civ. P. 30(b)(6).

      **b.**    What changes should be made, if any, in the limitations on discovery imposed under the Federal Rules of Civil Procedure or the local rules of this Court?

**CFPB Proposed Changes**

The CFPB proposes increasing its deposition limit from 10 to 20. Fifth Third's conduct is at issue in this case, and hundreds or thousands of its current and former employees have relevant information. Fifth Third's initial disclosures identify forty lay witnesses on whom *Fifth Third* may rely and another four from whom *Fifth Third* has received written or recorded statements. To the extent that the Bureau wishes to speak with current bank employees, the Bureau may deem it necessary to go through Fifth Third's counsel and may need to depose the employees, particularly if the employees elect not to speak voluntarily with the Bureau.

The Bureau may also need to depose many of the former bank employees with whom it wishes to speak. The Bureau and the bank were engaged in extensive discussions about the Bureau's intention to speak informally with former and some current bank employees and about the bank's stated concerns that even low-level former employees may have privileged information such that the bank must vet them first. At the bank's insistence, the Bureau provided a non-exhaustive list of approximately 500 employees, both former and current, the Bureau may contact as part of this litigation. Fifth Third initially agreed to identify which were current and which were former and, as to both groups, to "vet" as many as 10 at a time to ensure that the individuals did not possess privileged information before the Bureau sought to contact them. Specifically, Fifth Third asked the Bureau to "prioritize the first ten you would like to interview." Upon receipt of that list, Fifth Third represented that it would "try to get back to you promptly . . . [and] then proceed to the next ten and so on." Inexplicably, Fifth Third then did a complete turnaround, asserting instead that it would only identify which individuals were former and which were current but would not do any "pre-clear[ing]" of prospective interviewees until the parties were "in discovery." Fifth Third has also recently indicated that it would not provide any contact information for former employees until the parties were in discovery, wanting instead for the Bureau to expend countless hours trying to find contact information for former employees through other sources when Fifth Third has the information readily available.

11

Although the reasons for Fifth Third changing position and unnecessarily delaying the interview process are unclear, Fifth Third has expressed displeasure and disbelief at the Bureau wanting to interview as many as 500 current or former employees. But this number should not be a surprise to Fifth Third. The vast majority of these names came from Fifth Third's prior identification of employees who were either directly accused of opening unauthorized accounts or who supervised employees who were accused of opening unauthorized accounts. Given the breadth of Fifth Third's prior identification of the alleged wrongdoing, the relevant information most of these individuals possess, and the likelihood that not all will consent to interviews, the Bureau needs to start with a large list of prospective interviewees. At all events, that the list is longer than Fifth Third would like should mean that Fifth Third would start its demanded vetting process sooner, not that Fifth Third would cause further delays and make the informal interview process more difficult.

Fifth Third also disclosed that it has retained more than one testifying expert, and the Bureau must depose them. As for interrogatories, the Bureau does not believe that the bank should be given leave to propound additional interrogatories. This issue was raised with the Court by email first by the bank on August 26, 2021, and then by the Bureau in response on August 27, 2021.

## **Fifth Third Proposed Changes**

Fifth Third believes the Federal Rules of Civil Procedure and this Court's local rules provide the appropriate amount of discovery and therefore has no proposed changes to the usual limitations on discovery, provided that the Bureau drops its unfounded objections to counting interrogatories and reconsiders its refusal to provide any interrogatory responses. If the Bureau persists in its position, then we would ask that the Court permit the parties to ask up to 50 interrogatories. Fifth Third notes that the Bureau has already taken extensive discovery in the investigation preceding this litigation, including requests for documents, interrogatories, testimony, and written reports. It also has the benefit of ongoing examination by the Bureau of Fifth Third's operations including on the issues involved here. Fifth Third will reproduce in this case the tens of thousands of pages of documents, the nearly half-billion data points, the myriad interrogatory and written report responses and the transcripts of the three Fifth Third witnesses already questioned by the Bureau. These documents are and have been in the Bureau's possession for many years already.

*Deposition Limits*

The Bureau's effort to enlarge the number of depositions beyond the limits established by the Federal Rules is premature, at best. This decision should await the results of the sample, which will inform whether there is a widespread and systemic problem (which might warrant an increase from 10 to 20 depositions), or an isolated and limited issue (which would not necessitate an increase). Moreover, the Bureau always has the ability to informally contact former employees, subject only to the need to avoid eliciting privileged information. The Bank disclosed the employment status for nearly 500 employees identified by the Bureau (even though this has nothing to do with the selection of a sample) to assist the Bureau in complying with its ethical obligations.

As with the informal data discussions, the Bureau's mounting demands regarding employees have become unreasonable. The Bureau started with 5 former employees, which the Bank "pre-cleared" as not presenting privilege concerns, and—at the Bureau's request—informed the employees that any confidentiality agreements with the Bank did not preclude them from speaking with the Bureau. After months of silence, the Bureau massively expanded its approach, sending the Bank a list of 500 employees. As the Bank explained in its October 6, 2021 response, that would "impose a wholly unwarranted burden on the Bank and its lawyers of finding and speaking to nearly 500 current or former employees," including locating contact information for these people. The Bureau's submission takes the Bank's offer to vet a smaller number of employees out of context. It omits the qualifier that came just before the suggestion of vetting employees in groups of 10—the Bank asked the Bureau first to "provide us a more targeted list of employees" consistent with the concept that "discovery should be designed with proportionality in mind." When the Bureau maintained its request for hundreds of employees and demanded that the Bank pre-clear "dozens" of former employees per week, the Bank concluded that was not a reasonable scope for an informal exchange outside of discovery. Discovery—informal or otherwise—is not supposed to be a one-way street.

As Fifth Third explained at the time, it is willing in discovery to provide the last known contact information for and pre-clear employees the Bureau realistically intends to contact. That is surely a fraction of the more than 400 employees on the Bureau's list. The Bank has expended significant time and resources to cooperate with an informal exchange of data related to sampling during the stay, and now is being asked to expand that significantly—all during a period when discovery is stayed and the Bureau has refused to answer a single interrogatory. The Bureau's latest requests have nothing to do with identifying indicia of non-authorization, much less selecting a sample of accounts for review. Because they go far beyond the informal data exchange envisioned by the Court, Fifth Third will address them if they are reasonable in scope once discovery restarts. The Bureau can seek such information once the Court lifts the discovery stay—at which point the Bank will also be able to participate in the discovery process as well.

*Interrogatory Limits*

Fifth Third served an interrogatory a few weeks after the amended complaint was filed in which it asked the Bureau to describe what it claims "constitutes 'indicia of non-authorization,' as referenced in paragraph 99 of the Complaint." Claiming that Fifth Third served too many interrogatories, the Bureau refused to allow the Bank to withdraw any of them and on that basis has claimed it need not answer a single interrogatory, including identifying the basis for the allegations it has made in and to this Court. The current status is that the Bureau has made allegations but is adamant that it will not explain the basis for them. All objective criteria strongly indicate that the Bureau's claims were without evidentiary support when made and are without evidentiary support now. The Bureau should not be allowed to whipsaw the Bank, refusing to answer a single interrogatory while simultaneously complaining about the Bank not providing contact information or not contacting hundreds of employees while discovery is stayed. That is why the Court should either require the Bureau to answer the interrogatories (minus the one that Fifth Third withdrew), or expand the number of interrogatories. Either way, the Bureau should answer and be held to account for its allegations.

      **c.**      Additional recommended limitations on discovery: None.

      **d.**      Recommended date for the disclosure of lay witnesses:  See stipulated chart.

      **e.**      Describe the areas in which expert testimony is expected and indicate whether each expert had been or will be specifically retained within the meaning of Fed. R. Civ. P. 26(a)(2).

**CFPB Expert Testimony**

The Bureau expects to present expert testimony on the issue of unauthorized consumer-financial-product sales within the meaning of Fed. R. Civ. P. 26(a)(2), including expert analysis of Fifth Third's electronically stored information.

**Fifth Third Expert Testimony**

Fifth Third anticipates presenting expert testimony on the following topics:

- Consumer behavior regarding opening and use of deposit accounts, credit cards, and other relevant products and services;
- Account-level analyses of Fifth Third accounts;
- Statistical analysis of the CFPB's "suspicious" criteria;
- Credit reporting;
- Data/information security;
- Economic analysis of alleged customer harm;
- Damages; and
- Any topics necessary to rebut the CFPB's expert reports.

Fifth Third has retained experts within the meaning of Fed. R. Civ. P. 26(a)(2).

      **f.**      Recommended date for disclosure and report of Plaintiff's expert(s):  See stipulated chart.

      **g.**      Recommended date for disclosure and report of Defendant's expert(s):  See stipulated chart.

      **h.**      Recommended date for disclosure and report of rebuttal expert(s):  See stipulated chart.

      **i.**      Discovery of Electronically Stored Information: The parties have discussed disclosure, discovery, and preservation of electronically stored information, including the form or forms in which it should be produced.

        __X__ Yes
        _____ No

       **i.**      The parties have electronically stored information in the following formats:

**CFPB**

Discoverable Bureau ESI is primarily in the formats in which it was produced by Fifth Third, including PST, Word, Excel, and PowerPoint. To the Bureau's knowledge, the "data points" Fifth Third says it produced during the preliminary investigation were pulled from Fifth Third systems and provided in Excel spreadsheets. As an investigative agency, the Bureau collected some other relevant ESI in the course of its investigation, such as investigational-hearing transcripts. Relevant ESI that the Bureau has identified to date is stored on Relativity, SharePoint online, or on individual drives hosted on a Microsoft cloud service. The Bureau can produce ESI in the format described in its Document Submission Standards for discovery.

**Fifth Third**

Fifth Third has "ESI" in the following formats:

- PST (Outlook) files
- MS Word
- MS Excel
- CSV files
- MS PowerPoint
- PDF
- XML (Extensible Markup Language)
- HTML
- JPG
- Data from various systems that house account-level and transaction-level information about the products and services at issue

Fifth Third's responses to the CFPB's six CIDs served between 2016 and 2018 included enterprise system diagrams, systems architecture diagrams, and network diagrams for systems that house account and transaction data for credit cards and deposit accounts, among other products, and it provided written responses to a multi-part interrogatory about each system. Fifth Third also produced nearly half a billion data points for millions of accounts, which were pulled from multiple databases, mainframe systems, data warehouses, and legacy systems and aggregated in an accessible format specified by the Bureau. Fifth Third supplied numerous written reports that applied various filters specified by the CFPB to Fifth Third's account population. And, as discussed above, Fifth Third has made its data and sampling experts available to the Bureau on three separate occasions for extended and detailed questioning and provided significant data.

       **ii.**     The case presents the following issues relating to disclosure, discovery or preservation of electronically stored information, including the form or forms in which it should be produced:

15

The parties agree to produce documents in a manner consistent with the CFPB's Discovery Requests Document Submission Standards.

**CFPB:** The Bureau's claims relate to Fifth Third's sales acts and practices generally. The claims include, but are not limited to, claims about consumer-financial products and services (products) that were opened without consumer knowledge and consent (Counts 2–11). Some of those unauthorized-product claims would be supported by data discovery to determine the scope of unauthorized-product openings, the primary effects of the data discovery being the determination of appropriate relief to the Bureau and identification of consumers entitled to remediation. Should the litigation not be resolved on other claims, the claims supported by the identification of unauthorized Fifth Third products would require discovery of certain account-level, transaction-level, employee-level, and geographic-level (branch, region, affiliate, etc.) data.

**Fifth Third:**

Discovery should be tailored around a reasonable sample of accounts. Sampling has the virtue of focusing on the critical issues, and doing so in a way that minimizes the costs and burden of collecting, reviewing, and producing what otherwise would be vast quantities of data. By agreeing that discovery should be conducted based on a sample (rather than every account and every product for every customer over more than a decade), Fifth Third is not waiving any rights to object to the evidence on any appropriate grounds, including admissibility and specifically reserves all rights.

A decision on Fifth Third's Motion for Judgment on the Pleadings will materially advance the case, as it will establish the appropriate time period for the sample (e.g., deciding the Transfer Date issue will determine whether the sample starts in January 2010 or July 2011, which would reduce the number of potentially unauthorized accounts that were the subject of Bank Protection investigations by nearly two-thirds). Another substantial reduction would occur if the Court were to rule that credit card accounts opened on or before October 7, 2015 are barred by the statute of limitations, or if free products or services that did not injure customers (such as Early Access enrollment or online banking) were excluded. Such a ruling would also inform the parties' respective positions going into any mediation or other alternative dispute resolution process.

**j.** Claims of Privilege or Protection. The parties have discussed issues regarding the protection of information by privilege or the work-product doctrine, including whether the parties agree to a procedure to assert these claims after production or have any other agreements under Fed. R. Evid. 502.

__x__ Yes

_____ No

      **i.** The case presents the following issues relating to claims of privilege or of protection as trial preparation materials:

- Some of the materials contain Confidential Supervisory Information that is protected from disclosure by regulation. 12 C.F.R. § 1070.41. The parties may request permission to redact or seal such materials on a case-by-case basis.

- The parties intend to request a Stipulated Protective Order in this matter.

- The parties agree to follow Fed. R. Civ. P. 26 and the local rules of this District and Court with respect to the assertion of privilege. The parties intend to jointly request a Fed. R. Evid. 502(d) order from the Court to protect the parties in the event of a disclosure of attorney-client privileged or work-product-protected material.

7.    Recommended discovery cut-off date:  See stipulated chart.

8.    Recommended dispositive motion date:  See stipulated chart.

9.    Recommended date for status conference (if any): **No recommendation from either party at this time.**

10.   Suggestions as to type and timing of efforts at Alternative Dispute Resolutions: **On November 8, 2021, the Bureau submitted a written settlement demand to Fifth Third in accordance with the Court's July 8, 2021 Minute-Entry order.  The Bureau believes that engagement of a neutral may facilitate settlement.  Fifth Third will respond to the Bureau's revised settlement demand by November 22, 2021.**

11.   Recommended date of final pretrial conference:  See stipulated chart.

12.   Has a settlement demand been made?  **Yes**  A response?  **Yes**

      Date by which renewed settlement demand will be made:  **Made on November 8, 2021.**

      Date by which a response can be made:  **November 22, 2021.**

13.   Other matters pertinent to scheduling or management of this litigation:

**CFPB:**  In the absence of an early resolution by motion or settlement, the Bureau would require discovery of bank data for Counts 2–11, and more typical document discovery for all Counts. To date, the bank has given no indication of how long it will take it to produce documents. The Bureau also intends to conduct extensive informal outreach to former employees and consumers. The Parties reached an agreement on a scheduling proposal, but the discovery periods are aggressive. The likelihood that the Parties stay on track would be increased if Fifth Third would cooperate in informal discovery by, for example, providing readily available contact information for former

employees and timely "vetting" those former and current employees that it insists on vetting before the Bureau speaks with them.

**Fifth Third:**

Fifth Third has already produced the vast majority of responsive documents and data to the Bureau in response to the CFPB's lengthy investigation, which dates back to 2016.  To the extent the Bureau presses claims beyond early 2017, then Fifth Third will promptly expand its production. Fifth Third rejects the Bureau's allegations of widespread and systemic unauthorized account activity, as well as any suggestion that the Bureau can prove such claims based solely on data analyses.

**Joint Proposal**.

Pursuant to the Court's direction at the October 18, 2021 Status Conference, the parties have met and conferred regarding the case deadlines, and hereby stipulate, subject to the Court's approval, to the following deadlines:

| Event | Deadline |
|---|---|
| Close of Fact Discovery | Friday, May 27, 2022 |
| Pl. Expert Reports | Friday, August 5, 2022 |
| Def. Expert Reports | Friday, October 21, 2022 |
| Pl. Rebuttal Expert Reports | Tuesday, December 20, 2022 |
| Close of Expert Discovery | Friday, January 20, 2023 |
| Dispositive motions | Motion due Friday, February 10, 2023; Opposition due Friday, March 3, 2023; Reply due Friday, March 17, 2023. |
| Final Pretrial Conference | Monday, May 22, 2023 |

Dated: November 13, 2021                         Respectfully submitted,

/s/Barry Reiferson

BARRY E. REIFERSON (Trial Attorney)
NY Reg. #24343893
Email: barry.reiferson@cfpb.gov
LEANNE E. HARTMANN
CA Bar #264787
Email: leanne.hartmann@cfpb.gov
LANE C. POWELL
MI Bar #P79432
Email: lane.powell@cfpb.gov
MEGHAN SHERMAN CATER
 NY Reg. #4473120
Email: meghan.sherman@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Telephone: (212) 328-7020
Facsimile: (202) 435-5477
*Attorneys for the Bureau of Consumer
Financial Protection*

/s/ Ryan Scarborough

WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac vice*)
Enu Mainigi (*pro hac vice*)
Ryan Scarborough (*pro hac vice*)
725 12th Street, N.W.
Washington, DC 20005
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com

DINSMORE & SHOHL LLP
Laurie A. Witek (0083955)
Michael Ferrara (0097584)
Katherine Rasmussen (0093928)
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
513-977-8648
Laurie.Witek@Dinsmore.com
Michael.Ferrara@Dinsmore.com
Katherine.Rasmussen@Dinsmore.com
*Attorneys for Defendant Fifth Third Bank, N.A.*

19

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Joint Rule 26(f) Conference Report was filed with the Court via ECF and circulated to all counsel of record via the same.

/s/ Krysta K. Gumbiner