```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
2                   WESTERN DIVISION
                      -  -  -
3


4   BUREAU OF CONSUMER FINANCIAL    :  Case No. 1:21-cv-262
    PROTECTION,                     :
5                                   :  Telephone Status Conference
            Plaintiff,              :
6                                   :
            - v -                   :  Friday, March 25, 2022
7   FIFTH THIRD BANK, N.A.,         :  3:45 p.m.
                                    :
8           Defendant.              :  Cincinnati, Ohio
                      -  -  -
9                TRANSCRIPT OF PROCEEDINGS

10     BEFORE THE HONORABLE DOUGLAS R. COLE, DISTRICT JUDGE

11  For the Plaintiff:       BARRY REIFERSON, ESQ.
                             Consumer Financial Protection Bureau
12                           140 East 45th Street
                             New York, NY  10017
13                           MEGHAN S. CATER, ESQ.
                             JACOB SCHUNK, ESQ.
14                           Consumer Financial Protection Bureau
                             1700 G Street NW
15                           Washington, DC  20552

16  For the Defendant:       LAURIE A. WITEK, ESQ.
                             Dinsmore & Shohl, LLP
17                           255 East Fifth Street
                             Suite 1900
18                           Cincinnati, Ohio  45202
                             RYAN T. SCARBOROUGH, ESQ.
19                           Williams & Connolly
                             725 12th Street, NW
20                           Washington, DC  20005

21  Law Clerk:               Jacob T. Denz, Esq.

22  Courtroom Deputy:        Scott M. Lang

23  Court Reporter:          M. Sue Lopreato, RMR, CRR
                             Potter Stewart U.S. Courthouse
24                           Southern District of Ohio
                             100 East Fifth Street
25                           Cincinnati, Ohio  45202
                             513.564.7679
```

                    P R O C E E D I N G S

 2          (In open court via telephone at 3:52 p.m.)

 3                          -  -  -

 4          COURTROOM DEPUTY:  This is Scott Lang with Judge

 5   Cole's chambers.  We're here for a telephone status conference

 6   on case number 1:21-cv-262, Bureau of Consumer Financial

 7   Protection versus Fifth Third Bank.

 8      My apologies.  Apparently, I put in the wrong security

 9   code, and so people had trouble getting on so, hopefully,

10   everyone is on the call, but I'm going to take a roll.

11      Who do I have on the line for the plaintiff currently?

12          MR. SCHUNK:  Jacob Schunk, with the Consumer

13   Financial Protection Bureau, along with Ms. Sherman Cater and

14   Mr. Reiferson.

15          COURTROOM DEPUTY:  Is that everyone we should have on

16   there?

17          MR. SCHUNK:  We can certainly start with the three of

18   us.

19          COURTROOM DEPUTY:  What was your last name again?

20          MR. SCHUNK:  Jacob Schunk, S-c-h-u-n-k.

21          COURTROOM DEPUTY:  How about for defendant, Fifth

22   Third?

23          MR. SCARBOROUGH:  This is Ryan Scarborough.  I'm on,

24   along with my cocounsel, Laurie Witek, and we have Chris

25   Garvey and Aaron Stucky, who are both in-house lawyers at

1    Fifth Third on as well.

2         COURTROOM DEPUTY:  Okay.  And for you guys, is

3    everyone that we need on the call?

4         MR. SCARBOROUGH:  Yes.  Unfortunately, Mr. Villa is

5    unable to participate.  He tested positive for COVID today and

6    is feeling under the weather, to put it mildly.

7         COURTROOM DEPUTY:  Okay.  Sorry to hear that.  We'll

8    go ahead to get started.  We do have a court reporter, so we

9    are recording this.

10        Two quick things before we get started.  One, please mute

11   your phones when you're not speaking; and, two, please

12   identify yourselves before speaking.

13        Please hold for the Court.

14             THE COURT:  Good afternoon, counsel.

15             MR. SCARBOROUGH:  Good afternoon, Your Honor.

16             THE COURT:  Mr. Scarborough, I believe we're here at

17   your client's suggestion with regard to an emergency motion

18   that you filed that, as the Court understands, it is directed

19   at a survey that CFPB has sent out to some or all of the Fifth

20   Third customers.

21        It's not clear to the Court how the determined email

22   after [audio distortion] all those people, nor how widely the

23   survey had gone out, but I will allow you to explicate your

24   concerns more fully if you would like at this time.

25             MR. SCARBOROUGH:  Thank you, Your Honor.  I

1    appreciate that.  Let me start by saying I'm truly sorry to

2    bother the Court, particularly on a Friday afternoon, but we

3    filed this motion, given the serious nature of the bureau's

4    actions and the impact that it's having on Fifth Third's

5    customers.

6         Yesterday afternoon, starting about late in the

7    afternoon, around 3:00 or 4:00, the bank started receiving

8    inquiries from customers who were receiving an email survey.

9    They were confused by it.  They didn't know if it was

10   legitimate, or if it was coming from Fifth Third, and they

11   clearly were uncertain as to what to do.

12        We took steps to assess what the situation was, and I

13   reached out to Mr. Reiferson and the other counsel who had

14   entered an appearance here for the bureau yesterday evening,

15   shortly after 9:00, to ask them what was going on, and ask

16   them if they could either confer with me that night or as

17   early as possible this morning.

18        Ms. Witek and I followed up with calls to them this

19   morning and didn't receive a call back.  Did receive an email

20   from Mr. Reiferson, of which followed a series of email

21   exchanges, but he was unable or unwilling to get on with us

22   and talk today.

23        The issue that we're dealing with, Your Honor, this

24   really stems back to the August 2021 status conference where,

25   if you will recall, the parties had disagreed over the scope

1    of discovery in this case.

2        At that time, the bureau had floated the idea --

3    Mr. Reiferson had floated the idea of going beyond the data

4    for suspect accounts and actually contacting customers with

5    indicia of non-authorization.  That would have been hundreds

6    of thousands of the bank's customers.

7        And Mr. Villa objected and said that doing so, that he

8    couldn't imagine something that would be more prejudicial to

9    the bank's relationships with its customers than an

10   indiscriminate mailing to them.

11       After hearing further argument about how the Court should

12   approach discovery, Your Honor indicated that the parties

13   should proceed with sampling, and that that would set the

14   stage for determining any additional discovery needs for this

15   case.

16       And we came away from that conference with the

17   understanding that the bureau was going to pick a sample, and

18   that there wouldn't be a mass communication to the bank's

19   customers without first consulting with the bank or the Court.

20       We tried to litigate this case on the merits, and to

21   reach the merits, we filed our motion for judgment on the

22   pleading.  And over the past seven months, we've been giving

23   the bureau information that they need to pick their sample.

24   Seven months later, we're still waiting for the bureau to pick

25   its sample.

1      The bureau, from our perspective, Your Honor, has been

2  slow rolling the sampling process, while at the same time,

3  evidently, now they've been planning an elaborate survey that

4  bears all the hallmarks of a massive email campaign.

5      I don't know, at this point, Your Honor, how many people

6  received the email.  I don't know where they got the

7  informa- -- the addresses to contact these customers.

8      I have a suspicion that what they have done is they made

9  a request back in 2018 as part of their civil investigative

10  demand to the bank that it provide contact information for

11  millions of bank customers.  The bank obviously had no choice

12  but to comply with that at the time.

13      I suspect, but I don't know, that they utilized the

14  contact information from that to make this -- to make what

15  appears to be a mass mailing.

16      I don't know how many customers received the survey.  I

17  don't know what criteria was used to determine the recipients

18  of the survey.  I don't know where they got the customer

19  information, much less how long the bureau has been developing

20  this survey, how long the bureau's counsel has known about

21  this survey, or why they didn't alert the Court or consult

22  with us before putting out such a prejudicial survey.

23      At this point, Your Honor, we certainly would have been

24  willing to postpone this hearing until Monday if the bureau

25  would have disabled the survey and taken it down to at least

1    try to mitigate the harm that has occurred; but, barring that,

2    we needed to go forward today because we believe that there

3    needs to be immediate steps taken to try to rectify this.

4         And I understand that with it having already been sent

5    out, it's difficult to un-ring a bell like that, but this is

6    incredibly prejudicial.  Everything from the way the questions

7    were framed to the way it was set up, it's incredibly

8    prejudicial.

9         And to do it knowing full well that we had objected to

10   this in August of last year, and had established that this

11   case was going to go forward with sampling before any other

12   scope of discovery issues were going to be addressed, and to

13   then see the bureau slow roll the sampling and take these

14   steps has been not only incredibly disappointing but

15   incredibly unfair.

16        All we want to do is litigate this case on the merits,

17   and we have not been able to do that yet because of the

18   actions that the bureau has taken.

19             THE COURT:  Thank you, Mr. Scarborough.  I don't know

20   who is going to speak on CFPB's behalf, but I'd be interested

21   in hearing your view on it now.

22             MR. SCHUNK:  Thank you, Your Honor.  And this is

23   Jacob Schunk for the CFPB.  The bureau takes issue with

24   several of the premises underlying what Mr. Scarborough has

25   just identified.

1     So I think, for present purposes, though, it's sufficient

2 to focus on one, which is that the bureau had told the Court

3 and Fifth Third that it was going to do this.

4     Specifically, in a joint status report from October 15th,

5 the bureau said, "The bureau also intends to conduct extensive

6 informal outreach to former employees and consumers during and

7 without affecting the discovery period."

8     As Fifth Third is well aware, we've been contacting

9 former employees.  We know Fifth Third knows that because we

10 gave them a list of former employees that we were going to

11 contact, and they started contacting them.

12     So the fact that we were engaged in the same conduct that

13 we said we were going to do, and they took no issue -- this is

14 in October, so after August.  They asked no questions.  They

15 didn't say we want a brief appearance.  Nothing.

16     And now I think it's likely forgot about that, and is now

17 coming to the Court with this urgency trying to get the Court

18 to stop an agency, the federal government, from talking to

19 consumers in an effort to prove its case.

20     It's unfounded.  It's also -- the urgency is not on us,

21 Your Honor.  The urgency is on Fifth Third for not asking more

22 questions then.

23          THE COURT:  Do you have a docket entry for that,

24 Mr. Schunk?

25          MR. SCHUNK:  I don't have a docket entry, Your Honor.

1   I think it was emailed from -- Mr. Scarborough signed it on

2   October 15, 2021.  The certificate of service was from Krysta

3   Gumbiner, Your Honor.

4          THE COURT:  Do you know the documents about which

5   he's speaking, Mr. Scarborough?

6          MR. SCARBOROUGH:  Your Honor, I assume what he's

7   referring to is some sort of a joint status report, that's

8   what he's described, but I have no specific -- at this time, I

9   don't have it in front of me.

10         THE COURT:  Mr. Schunk, could you email what you just

11  were referring to?

12         MR. SCHUNK:  Excuse me, Your Honor?

13         THE COURT:  Could you email the document to which you

14  were referring to the Court and to Mr. Scarborough?

15         MR. SCHUNK:  Yes, Your Honor.  Your Honor, I've

16  located the October status report that was filed.

17         THE COURT:  To what page are you referring to,

18  Mr. Schunk?

19         MR. SCHUNK:  Page 15, Your Honor.

20         THE COURT:  If someone could forward it to the Court

21  too so I could take a look at it, I'd appreciate it.

22      Do you see the reference he's making, Mr. Scarborough?

23         MR. SCARBOROUGH:  I'm still looking, Your Honor.

24         THE COURT:  Scott, can you forward it to me as soon

25  as it comes into chambers?

1        COURTROOM DEPUTY:  Yes, Your Honor.

2        MR. SCARBOROUGH:  I have it in front of me, Your

3   Honor.  I've read it now.

4        THE COURT:  I still don't have it in front of me, so

5   I don't know who was going to email it to chambers, but I

6   don't have it yet.

7        MR. SCHUNK:  Sorry, Your Honor.  This is Jacob

8   Schunk.  I sent a copy to Mr. Lang and cc'd Mr. Scarborough.

9        THE COURT:  Okay.  Remind me, you said page 15,

10  Mr. Schunk?

11       MR. SCHUNK:  Yes, Your Honor.  The full paragraph

12  right after the bureau heading.

13       THE COURT:  Well, Mr. Scarborough, I see a sentence

14  that says it "still intends to conduct extensive informal

15  outreach to former employees and consumers during and without

16  affecting the discovery period."  Do you see that?

17       MR. SCARBOROUGH:  Yes.  I'm looking at that, Your

18  Honor.  Can I address that?

19       THE COURT:  Yes, you may.

20       MR. SCARBOROUGH:  Thank you, Your Honor.  Your Honor,

21  this is the height of what I would call the fine print defense

22  here.

23     This is a 26-page status report that was submitted by the

24  parties.  This was submitted after the bureau already knew

25  that Fifth Third objected, and had lodged its objection to any

1    sort of -- any sort of mass communication to customers.

2        And to point to this as a justification six months

3    after -- five to six months after the fact is the height of

4    fine print.

5        The bureau is an agency that's focused on preventing

6    unfair, deceptive, abusive conduct.  And they quite commonly

7    point to fine print-type defenses as being unfair or deceptive

8    or abusive, and that's exactly what's happening here.

9        Your Honor, the whole focus of our informal conferences

10   over the past six or seven months has been on picking a

11   sample; that the Court has made it clear that the sample was

12   going to dictate and guide any additional scope of discovery

13   that would be determined.

14       And so for it -- and the bureau pushed for far more

15   accounts, far more than the 3,875 accounts that the Court

16   ultimately indicated that the parties should proceed with.

17       So for the bureau to turn around -- the rest of discovery

18   is stayed at this point.  For the bureau to turn around and

19   say we're working on a sample for 3,875, but we're going to

20   send a mass email -- and, again, I don't know how many of

21   these customers they sent the email to because they haven't

22   told us, but it has all the hallmarks of a mass email.

23       And to turn around, after the Court has limited them to

24   3,875 accounts on a sample, and to send a survey like this to,

25   I don't know if it's thousands, tens of thousands, hundreds of

1    thousands or more, because we gave them millions of customer

2    contact information as part of their CI- -- in response to

3    their CID.  For them to turn around and do this, knowing that

4    we had objected and say, aha, but you never objected a second

5    time.

6         Your Honor, we don't have to object twice.  We objected

7    the first time it came up.  And so then to come around and

8    say, aha, but you didn't see it in the fine print, you didn't

9    catch us because you were responding and focusing on the

10   thrust of the discussions at the time, which was what is the

11   scope of discovery with sampling, what is the period that

12   should -- the case management schedule that should govern this

13   case, and you didn't see and object to a one-sentence

14   reference in a 26-page document, and that's the hook.  That's

15   a --

16        THE COURT:  Well, Mr. Scarborough --

17        [Indiscernible crosstalk.]

18        MR. SCARBOROUGH:  -- Your Honor, and that should not

19   be.

20        THE COURT:  Mr. Scarborough --

21        MR. SCARBOROUGH:  That should not be.  Yes, Your

22   Honor.

23        THE COURT:  Mr. Scarborough, I appreciate what you're

24   saying.  It seems to me it would have a little bit more

25   persuasive effect if you didn't have the one paragraph

1    response to that very sentence, just to a different portion of

2    it.

3         I mean, the sentence talks about informal outreach to

4    former employees and consumers.  I see your response -- the

5    entire second paragraph of your response is, in fact, directed

6    to that sentence, but it's just directed to the employee part.

7    Am I missing something?

8              MR. SCARBOROUGH:  It is directed to the employee

9    part, Your Honor, because at that time, we were exchanging

10   correspondence with Mr. Reiferson, who was indicating

11   specifically that there were former employees that they wanted

12   to contact.

13        And we were working with Mr. Reiferson to ensure that he

14   could contact those folks without implicating any sort of

15   privilege issues.  There was no communication at that time

16   from Mr. Reiferson that they were going to be contacting

17   customers.

18        There was no -- the letters that were being exchanged

19   were focused solely and exclusively on former employees.  So

20   that was the backdrop to this submission that was being made,

21   because the letters that were being exchanged between

22   Mr. Reiferson and my partner, Mr. Villa, were about former

23   employees.

24        We had already objected -- in August, Your Honor, we had

25   already objected to contacting customers on a mass basis like

1    this.

2             THE COURT:  I see.  All right.  Well, so independent

3    of any of this, I'm a little disappointed that CFPB would send

4    out what appears to be a mass emailing without at least

5    coordinating and giving -- I can only imagine that the folks

6    at CFPB understood that this may result in a -- I don't know

7    if deluge is the right word, but at least a substantial number

8    of customer outreaches to Fifth Third.

9        To just kind of receive an email survey like this that's,

10   you know, frankly got a lot of the hallmarks of spam, or

11   phishing expeditions, or other things, so I'm a little

12   surprised that CFPB would think it was a good idea to just

13   reach out.

14       I am interested in knowing, Mr. Schunk, how many of these

15   emails did you send out to Fifth Third clients?

16             MR. SCHUNK:  Thanks, Your Honor.  At this time, given

17   the expedited nature of this, I'm just not able to answer

18   questions regarding the work product of attorneys, which is

19   what this is, Your Honor.  We would need to go up the chain

20   quite a ways to determine to what extent we're able to answer

21   those questions.

22       I do have some reaction to Mr. Scarborough, if the Court

23   would like to hear some of that, though, Your Honor?

24             THE COURT:  Well, I'd first like an explanation as to

25   why you can't answer the question I just asked.

1        MR. SCHUNK:  Again, Your Honor, given the expedient

2   time frame of this, we've not had the time yet to talk to our

3   supervisors regarding the extent to which we are able and

4   willing to disclose information regarding the government's

5   litigation positions.

6        THE COURT:  I see.  Okay.  What else would you like

7   to say, Mr. Schunk?

8        MR. SCHUNK:  Just very briefly, Your Honor.  And,

9   again, I won't belabor this, other than to say that we would

10  disagree with, if not everything, but most everything

11  Mr. Scarborough says.

12     Focus on the pertinent points, though.  It is not the

13  bureau's position that we are entitled to do this because of

14  what we put in the status report.

15     We're entitled to do this because we're the Consumer

16  Financial Protection Bureau litigating a case against an

17  entity, and we are able to talk to consumers as part of that

18  effort.  And the cases cited here are all distinguishable for

19  multiple reasons.

20     But the reason the sentence is important is because it

21  demonstrates that there's no urgency to this.  Fifth Third had

22  noticed that we were going to do this but, to be clear, we

23  don't rely on the sentence for doing it, "the right."  We have

24  the right.

25     The point of bringing the [audio distortion] to the

1    Court's attention that perhaps Fifth Third take an issue with

2    this, they could have and should have done it before now, Your

3    Honor.  That's all.

4              THE COURT:  I see.  Well --

5              MR. SCARBOROUGH:  Your Honor --

6              THE COURT:  No, Mr. Scarborough.

7         Let me be clear.  I will give CFPB an opportunity to

8    respond to the motion that's been filed; but, in the interim,

9    I am ordering that no further emails go out, and that the link

10   be disabled so that people cannot answer the survey in the

11   intervening time until the Court's got a better sense of what

12   CFPB is willing to show the Court about its outreach effort

13   here, and how broadly this may be impacting Fifth Third's

14   relationships with its client.

15        I think it was a poor choice to reach out in a manner

16   that looks to the Court to be designed to create a wedge

17   between Fifth Third and its customers, without having at least

18   discussed with Fifth Third how such a survey could be done,

19   who might be appropriate recipients, and various other aspects

20   of the survey.

21        You know, this is litigation, but I understand there's,

22   you know, team A and team B, but that doesn't mean that

23   parties can't work together collectively during the discovery

24   process to avoid surprises like the types of surprises coming

25   up as a result of this what may be or may not be mass email

1    and, apparently, I'm not entitled to know the answer to that

2    question.

3        But, you know, I just want to be very clear I want it to

4    stop until the Court's had an opportunity to review whatever

5    additional information CFPB sees fit to provide.

6        Any questions about that, Mr. Schunk?

7        MR. REIFERSON:  Your Honor, this is Barry Reiferson.

8    I'm sorry, a little background noise.  I'm about to board a

9    plane.

10        I did want to respond a little bit.  I don't want the

11    Court to come away with the idea that we're not willing to

12    answer the Court's questions, as Mr. Schunk described.

13        What we're being asked to disclose is attorney work

14    product, and it's difficult for any party, including a

15    government agency, to do that without authorization to do

16    that.

17        And, you know, when Mr. Scarborough says this was

18    discussed and they objected, you may recall that it was

19    objected to in the context of the joint effort.

20        We said -- we had asked in, you know, pre-litigation

21    discussions if Fifth Third would be willing to join the bureau

22    and reach out to hundreds of thousands of consumers in a joint

23    effort to find the facts.  They said no.  But that doesn't

24    mean that the bureau can't do its job in preparing for

25    litigation without Fifth Third's help.  And that's where we

1    are.

2       I take the Court's point that, you know, it's always best

3    if the parties speak repeatedly, and we do speak repeatedly;

4    but, you know, Fifth Third has indicated it's not willing to

5    work with us.

6       We've asked Fifth Third for phone numbers of employees or

7    former employees that we could contact.  They've refused to

8    give us phone numbers to allow us to do our job.  So they

9    don't work with us, and so we're left to do the job on our

10    own, without its help.

11       In hindsight, perhaps it would have been better to make

12    one last effort, but we didn't do that and this is where we

13    are.

14       I can say the outreach scope or volume was, so far,

15    significantly lower than the hundreds of thousands that we

16    spoke about as far as a potential joint effort.

17          THE COURT:  I'm pleased to hear that, Mr. Reiferson.

18    I mean, I'm a little bit surprised to hear Mr. Schunk's

19    apparent view that, I think he said we're the CFPB so,

20    essentially, we can do whatever we want.

21       I assume, Mr. Reiferson, that you wouldn't contend that

22    the CFPB could just pick some bank that it wanted to destroy

23    all the customer relationships with and just send out mass

24    mailings to that bank's customers encouraging them to move

25    elsewhere, right?  I assume --

1        MR. REIFERSON:  I would agree that the bureau would

2   not -- the bureau would not attempt to simply pick a bank and

3   destroy its customer relationship, and we haven't done that

4   here.

5        THE COURT:  Well, but I didn't hear a lot of

6   boundaries around Mr. Schunk's claim that we're the CFPB so we

7   can do what we want to.

8        That may well be the case.  It's not going to be the case

9   in this litigation so, you know, I would encourage everybody

10  to be a little more careful with regard to things like this.

11       I mean, put yourself, Mr. Reiferson, in the position of

12  the bank, who all of a sudden has got a bunch of customers

13  calling about what looks like -- honestly, when I look at

14  these emails, they look like phishing emails of some kind, and

15  asking questions about emails that they know nothing about.

16       I mean, certainly you can understand that may not be a

17  very comfortable position for the bank's officer to be in.

18       MR. REIFERSON:  I understand, Your Honor.  As I said,

19  in hindsight, we may have done it differently.  You know, Your

20  Honor touched on something the last time we spoke, and that

21  is, you know, the parties, including the attorneys, have

22  drifted apart and have kind of become, you know, perhaps

23  overly adversarial.

24       That was not our goal here; but, you know, we do have a

25  history with this bank in this litigation.  As I said, we

1　　asked them just give us phone numbers of people you've already

2　　spoken with, and they won't do that so, you know, we have to

3　　have -- we have to go find phone numbers.

4　　　　So we don't -- the parties have drifted apart.  The

5　　lawyers have become adversarial, and that's regrettable, and I

6　　regret it, and I'll try to do better to avoid it in the

7　　future.  But that's the context in which this was done, and it

8　　was not intended to --

9　　　　THE COURT:  Well, to the extent you've got concerns

10　　and are getting into a tit-for-tat mode, you know, raise your

11　　concerns with the Court.  I don't like this either direction.

12　　　　If Fifth Third is making you incur a lot of costs to get

13　　data that they could easily provide you, I'm going to be not

14　　particularly favorably disposed towards that either, but I

15　　don't think that taking matters into your own hands is really

16　　the way to go about litigation, and it's unlikely to bring the

17　　parties more closely together.

18　　　　You know, feel free, when you have disputes, to reach out

19　　to the Court, and the Court will try to do its best to try and

20　　help.  But I don't want this to go on until I've got a lot

21　　more information about it, and so I want the effort shut down

22　　for now.

23　　　　MR. REIFERSON:  Understood, Your Honor.  Your Honor,

24　　of course, you know, if the order the Court deems appropriate,

25　　the bureau would voluntarily, however, break the link,

1    essentially. So my understanding is an email with a link to a

2    survey, we can replace that for those that have already been

3    sent out with a sentence, or something along the lines of,

4    "This survey is closed. Thank you for your time." And we're

5    willing to do that without a Court order.

6          THE COURT: Mr. Scarborough, is that acceptable?

7          MR. SCARBOROUGH: Your Honor, when would this happen?

8    Because I'd want to make sure that this gets done as soon as

9    possible.

10         MR. REIFERSON: I believe the answer is as soon as

11    possible.

12     [Indiscernible crosstalk.]

13         MR. REIFERSON: Within minutes, I believe.

14         THE COURT: Okay. Go ahead, Mr. Scarborough.

15         MR. SCARBOROUGH: And, Your Honor, I do think it

16    should be memorialized in an order in some fashion to note

17    that this is -- because, again, we're going to have -- after

18    the bureau responds, we're going to have to deal with this

19    more broadly in terms of any future outreach that is -- that

20    the bureau intends to make. And, Your Honor, I did want --

21         THE COURT: Mr. Scarborough, I would --

22         MR. SCARBOROUGH: -- to --

23         THE COURT: -- encourage you not to --

24     [Indiscernible crosstalk.]

25         MR. SCARBOROUGH: I'm sorry. That's fine,

1    Your Honor.  I appreciate it.  I appreciate you taking the

2    time and making the time for us on a Friday afternoon.

3        I know, from when I clerked, that I was never fond of

4    getting emergency motions on a Friday afternoon.

5            THE COURT:  The Court's always available, so that's

6    not the problem.  My point is just I think Mr. Reiferson has

7    made a fairly reasonable offer to replace the link on the

8    survey within, I believe he said minutes, with something that

9    said, you know, "This survey is closed.  Thank you."  I think

10   that's actually a pretty good resolution.

11       It will be reflected in the transcript from this call, a

12   version of it will probably be reflected in the minute entry,

13   but I don't know what you're trying to get through this order

14   thing, but maybe you could help me understand it more fully.

15           MR. SCARBOROUGH:  That's fine, Your Honor.  I

16   appreciate the time.

17           THE COURT:  All right.  So I think we've got it

18   resolved.  Mr. Reiferson, as I understand it, Mr. Scarborough

19   has accepted your offer to have the link sort of, to use your

20   phrase, broken.  And are you anticipating responding,

21   Mr. Reiferson, to the motion itself?

22           MR. REIFERSON:  Yes, Your Honor.

23           THE COURT:  Okay.  Well, I will take the matter back

24   up, then, once we have a response to the motion.  Of course,

25   Mr. Scarborough, you will have an opportunity to reply as

1    well.

2       Anything else I can do at this juncture, Mr. Scarborough?

3          MR. SCARBOROUGH:  No, Your Honor.  Thank you very

4    much.

5          THE COURT:  Thank you.  Mr. Reiferson?

6          MR. REIFERSON:  No, Your Honor.  Thank you for your

7    patience.

8          THE COURT:  Yeah.  And apologies for getting you at

9    the airport, Mr. Reiferson.  I know that's probably not what

10    you had planned for the afternoon, but --

11          MR. REIFERSON:  I appreciate you making time.

12          THE COURT:  Very good.  Everybody have a good

13    weekend.  Bye.

14          (Proceedings concluded at 4:25 p.m.)

15               - - -

16           C E R T I F I C A T E

17               - - -

18      I, M. SUE LOPREATO, RMR, CRR, certify that the foregoing
is a correct transcript from the record of proceedings in the

19    above-entitled matter.

20

    /s/ M. Sue Lopreato_____            April 1, 2022_____

21    M. SUE LOPREATO, RMR, CRR
    Official Court Reporter

22

23               - - -

24

25