# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION, | Civil Case No. 1:21-cv-00262-DRC<br>Related Case No. 1:21-cv-00173-DRC |
|        Plaintiff, | |
| | Judge Douglas R. Cole |
| v. | |
| | **ORAL ARGUMENT REQUESTED** |
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | |
|        Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## <u>FIFTH THIRD BANK'S MOTION FOR JUDGMENT ON THE PLEADINGS</u>

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS**

Page

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE CFPB'S SELF-
      FUNDING MECHANISM VIOLATES THE SEPARATION OF POWERS ................... 4

The Bureau's self-funding mechanism violates the Appropriations clause, which specifies that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. Art. I, § 9, cl. 7.  As the Fifth Circuit has explained, "[t]he Appropriations Clause [] does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *Cmty. Fin. Servs. Ass'n of Am., Ltd. ("CFSA") v. CFPB*, 51 F.4th 616, 637 (5th Cir. 2022).  Congress abdicated its responsibility by exempting the CFPB from the appropriations process and the Court should therefore dismiss the CFPB's complaint because it is the product of an unconstitutional funding structure.

II.   THE BUREAU'S CLAIMS FACE INSURMOUNTABLE TIMING DEFENSES. .......... 9

      A.    The Bureau's Credit Card Claims Are Time-Barred. ............................... 9

            1.    The CFPA, FCRA, and TILA Claims Are Barred by the Statute of
                  Limitations. ................................................................................ 9

The Bureau's credit card claims are time-barred. Judgment on the pleadings should be granted, dismissing Count 3 (CFPA – credit cards), Count 8 (TILA – credit cards), Count 10 (FCRA – credit cards and other credit products), and Count 13 (to the extent it alleges violations of CFPA tied to credit cards) because those claims are time-barred, even accounting for tolling.  Congress limited the period in which the Bureau could bring CFPA claims to three years from "the date of discovery of the violation." *See* 12 U.S.C. § 5564(g)(1).

            2.    The FCRA Claim Is Also Barred by FCRA's Statute of Repose. ............. 11

Congress established a five-year statute of repose for FCRA violations. 15 U.S.C. §§ 1681p(1)-(2).  The Court at a minimum should dismiss alleged violations of FCRA that occurred five or more years before the Bureau filed its Complaint (i.e., before March 9, 2015).

      B.    The Bureau's Pre-Transfer Date Claims Are Foreclosed. .................................... 11

The Bureau is barred from challenging conduct that occurred before its enforcement authority began.  The statute creating the Bureau clearly states that its enforcement authority was to begin on a date certain: July 21, 2011, as established by the Secretary of the Treasury.  The CFPA did not take effect until July 21, 2011, and enforcement authority was not transferred from other agencies to the CFPB until that date.  *See* Dodd-Frank Wall Street Reform & Consumer Protection

Act, Pub. L. No. 111-203, § 1037, 124 Stat. 2011 (July 21, 2010). The Court should dismiss the Bureau's claims for conduct that pre-dates July 21, 2011.

C.   The Bureau's Pre-Transfer Date Abusiveness Claims Are Impermissibly Retroactive. ........................................................................................................13

The Bureau's "abusiveness" claims (Counts 1–7 and 12) purport to penalize pre-July 21, 2011 conduct for violating a legal standard of "abusiveness" that did not exist when the conduct occurred. This violates fundamental concepts of due process and fair notice because the practices were not recognized, let alone prohibited, until the CFPA became effective on July 21, 2011. "[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (citation omitted). Applying the new standard retroactively without Congress clearly manifesting an intent to do so, violates the presumption against retroactivity. Dismissal is warranted.

III.   COUNTS 4-7 SHOULD BE DISMISSED BECAUSE THE BUREAU FAILS TO PLEAD AN INJURY IN FACT. ....................................................................................15

The Bureau claims in Counts 4, 5, and 6 that giving customers free and highly desirable products and services that they were not required to use constituted "unfair" and "abusive" acts or practices that are "likely to cause substantial injury." The Bureau has not alleged facts which, if proven, show any actual injury to Fifth Third's customers in connection with these products and services. The Bureau has not alleged Article III standing for these claims and they therefore should be dismissed.

IV.   COUNT 12 FAILS TO STATE A CLAIM. ..................................................................18

Count 12 alleges that Fifth Third took "unreasonable advantage of consumers" by making statements that would cause consumers to believe that Fifth Third acts in their interests while declining to make reasonable efforts to identify and remediate additional affected consumers. Dkt. 73, Am. Compl. ¶¶ 217–24. Nowhere does the Bureau describe what "reasonable efforts" should have been taken, identify the additional consumers who were supposedly subjected to unauthorized financial products or services, or specify the allegedly misleading statements. The Bureau fails to identify a cognizable claim as it attempts to shift the burden on the Bank to establish the existence of unauthorized accounts. The Bureau's claim also sounds in fraud and fails to plead its claim with particularity under Federal Rule of Civil Procedure 9.

V.   COUNTS 1 AND 11 SHOULD BE DISMISSED AS DUPLICATIVE. ..........................20

Counts 1 and 11 are catch-all claims that simply repackage Counts 2 through 7 with less specificity and should be dismissed as duplicative. For example, Count 1 is inextricably linked to unauthorized account openings and the Bureau's attempt to recast it contravenes the allegations in the complaint itself (which are tied to unauthorized account openings), as well as the statute of limitations (because the tolling agreements only applied to investigation of unauthorized account openings) and the fact that bank employees do not act in a fiduciary capacity when they guide customers to the financial product or service that best suits their needs.

CONCLUSION....................................................................................................................22

## **TABLE OF AUTHORITIES**

### **CASES**

Page(s)

*Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021)..........................................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................3, 18

*Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010)....................................................................19

*Buchholz v. Meyer Njus Tanick*, 946 F.3d 855 (6th Cir. 2020) ..............................................16, 17

*Burks v. Little Caesar Enters., Inc.*, 89 F.3d 832 (6th Cir. 1996)..................................................17

*Campbell v. Nationstar Mortg.*, 611 F. App'x 288 (6th Cir. 2015)................................................14

*CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342 (N.D. Ga. 2015)................12

*CFPB v. Future Income Payments, LLC*, No. CV 8:19-2950-BHH-KFM, 2020 WL
        6162947 (D.S.C. May 21, 2020)........................................................................................12

*CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015) .................................10, 15

*CFPB v. Mortg. Law Grp.*, LLP, 420 F. Supp. 3d 848 (W.D. Wis. 2019) ....................................12

*CFPB. v. TCF Nat'l Bank*, No. 17-cv-166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017)............12

*CFPB v. TransUnion*, 2022 WL 17082529 (N.D. Ill. Nov. 18, 2022) ............................................7

*CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*, 2018 WL 1709408 (N.D. Ohio Apr. 9,
        2018) ...................................................................................................................................12

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ....................................................................17

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ......................5, 6, 7, 8

*CTS Corp. v. Waldburger*, 573 U.S. 1 (2014)...............................................................................10

*Dudek v. Thomas & Thomas Att'ys & Counselors at Law, LLC*, 702 F. Supp. 2d 826
        (N.D. Ohio 2010) ..................................................................................................................4

*E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850 (6th Cir. 2001) .................................................3

*Gay v. Sullivan*, 966 F.2d 1124 (7th Cir. 1992)............................................................................14

*Gordon v. B. Braun Med. Inc.*, 2020 WL 1491378 (S.D. Ohio Mar. 27, 2020)...........................20

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ....................................................................7

*Harris v. Bruister,* No., 2013 WL 6805155 (S.D. Miss. Dec. 20, 2013) .....................................11

*Hayden v. Ford Motor Co.*, 497 F.2d 1292 (6th Cir. 1974).........................................................11

*Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997) ..............................13

*Illinois v. Alta Colls., Inc.*, 2014 WL 4377579 (N.D. Ill. Sept. 4, 2014)....................................14

*Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018) .............................................13

*JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577 (6th Cir. 2007)..........................................3

*Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015)............................................................................14

*Krottner v. Starbucks Corp.*, 406 F. App'x 129 (9th Cir. 2010)..................................................17

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)...............................................................13, 14

*Logan v. MGM Grand Detroit Casino*, 939 F.3d 824 (6th Cir. 2019)...........................................11

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ..........................................................................9

*Molosky v. Washington Mut., Inc.*, 664 F.3d 109 (6th Cir. 2011) ...............................................14

*Nat'l Credit Union Admin. Bd. v. Barclays Cap. Inc.*, 785 F.3d 387 (10th Cir. 2015) ................11

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007) ....................................................16

*Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ..................................................................11

*Rocheleau v. Elder Living Constr.*, LLC, 814 F.3d 398 (6th Cir. 2016) ...................................9, 10

*Roe v. Amazon.com*, 170 F. Supp. 3d 1028 (S.D. Ohio 2016).......................................................4

*Roth v. Guzman*, 650 F.3d 603 (6th Cir. 2011).............................................................................4

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) .........................................................................7

*Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016).............................13

*Smith v. Bank of Am. Corp.*, 485 F. App'x 749 (6th Cir. 2012) ..................................................18

*Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378 (6th Cir. 2013) .................................................3

*Talmer Bank & Tr. v. Malek*, 651 F. App'x 438 (6th Cir. 2016).....................................................4

*Thompson v. Bank of Am., N.A.*, 773 F.3d 741 (6th Cir. 2014) ..................................................18

*TransUnion LLC v. Ramirez*, 2021 WL 2599472 (U.S. June 25, 2021)........................................15

*United States v. FedEx*, 2016 WL 107065 (N.D. Cal. March 18, 2016)…………………………....21

*White v. Erdos*, 2020 WL 7698351 (S.D. Ohio Dec. 28, 2020) ....................................................20

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. CONST. Art. I, § 9, cl. 7............................................................................................... *passim*

12 U.S.C. § 243 ....................................................................................................................5

12 U.S.C. § 5497(a)(2)(C) ...................................................................................................5

12 U.S.C. § 5531 ............................................................................................................11, 15

12 U.S.C. § 5564(g)(1) .........................................................................................................8

15 U.S.C. § 45 ....................................................................................................................13

15 U.S.C. § 1640(e) ..............................................................................................................9

15 U.S.C. §§ 1681p.........................................................................................................9, 10

Ohio Rev. Code Ann. § 1109.151.......................................................................................21

Pub. L. No. 111-203, § 1037, 124 Stat. ..............................................................................12

## OTHER AUTHORITIES

Designated Transfer Date, 75 Fed. Reg. 57,252, 57,253 (Sept. 20, 2010) ......................................12

Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203, §
    1037, 124 Stat. 2011 (July 21, 2010) ........................................................................................12

Fed. R. Civ. P. 8 ..........................................................................................................18, 19

Fed. R. Civ. P. 9 ..........................................................................................................18, 19

Fed. R. Civ. P. 12 ..................................................................................................................3

5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1368 (3d ed.) ................3

## INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB" or "Bureau") has brought claims against Fifth Third Bank, N.A. ("Fifth Third" or the "Bank") that are foreclosed as a matter of law for multiple reasons.[1] Deciding these legal questions now based on the pleadings may end this case entirely, and at a minimum will narrow the case in a way that will streamline discovery.

First, the CFPB's case must be dismissed in its entirety because the Bureau' perpetual self-funding mechanism violates the Appropriations Clause, and therefore circumvents the Constitution's checks-and-balances.

Second, several claims are untimely and therefore barred because they were brought outside statutory limitations periods. The credit card claims—Counts 3 (CFPA), 8 (TILA), and 10 (FCRA) and their corresponding Consumer Financial Protection Act ("CFPA") counterparts in Count 13—are barred because Fifth Third disclosed unauthorized credit card accounts during the Bureau's examination in 2015. ███████████████████████████████ ████████████████████████████████ The written communications establish the Bureau's actual—not just constructive—notice of its claim for unauthorized credit card accounts. Even accounting for tolling agreements, the CFPB failed to file its lawsuit within one year of the date it was informed of the operative facts as required by the Truth In Lending Act ("TILA"), or within two years as required by the Fair Credit Reporting Act ("FCRA"), or within the three-year

---

[1] Although not a ground for dismissal on this motion, the CFPB's case is also factually unsupported: unauthorized accounts at Fifth Third amount to the proverbial needle in a haystack, not a haystack of needles. As explained in Fifth Third's Second Amended Answer [Dkt. 119], the Bureau identifies various criteria that it brands as "indicia of non-authorization" and then alleges large numbers of accounts that have those criteria, all to suggest a systemic problem. These accounts are not unauthorized, and the Bureau's superficial data analyses mistake ordinary consumer behaviors for nefarious activity. Multiple account-level reviews by experts, including most recently a review of 3,875 accounts randomly selected by the CFPB from a target population of accounts with indicia of non-authorization, consistently have found no evidence of systemic or widespread unauthorized openings of accounts or services.

limitations period set by the CFPA, or even within the five-year repose period established by FCRA. The Court should reject the Bureau's belated attempt to bring a series of expired claims to inflate what is already a very narrow case.

Third, significant portions of the Bureau's claims must be dismissed because the CFPB lacks authority to assert jurisdiction over and seek penalties for alleged conduct that predates the July 21, 2011 Transfer Date, when the CFPB was granted enforcement authority. Congress did not give the Bureau legal authority over conduct that occurred before the Transfer Date. This issue is of considerable importance because a good deal of the activity that the Bureau focuses upon predates its authority.

Fourth, the Bureau cannot retroactively impose "abusiveness" claims that did not exist prior to the Transfer Date. Congress did not manifest an intent for the CFPA's abusiveness standard to apply retroactively. To the contrary, by establishing a Transfer Date in the future, Congress unambiguously signaled that this new standard would only apply prospectively.

Fifth, the Bureau asserts claims for allegedly "unfair" and "abusive" conduct concerning certain products and services—such as online banking, Early Access, and Overdraft Protection— even though the Amended Complaint alleges no facts that, if proven, would establish that customers were charged a fee of any kind or that customers were harmed *in any way*. No court has found that customers who received free products or services, especially those widely sought by consumers, that did not actually harm them were treated unfairly or abusively. The Bureau attempts to camouflage this flaw with conclusory allegations that these free benefits are "***likely to cause*** substantial injury," but Article III requires more than a hypothetical risk, much less wildly speculative risks. After many years of investigation, the Bureau has not alleged—and cannot allege—facts that these free products or services actually cause injury. Because an actual injury

2

is required to state a claim for abusiveness or unfairness under the CFPA, Counts 4 through 7 are foreclosed.

Finally, other counts should be dismissed because they either try to convert the failure to remedy alleged violations into a standalone violation (Count 12), or are too vague or duplicative of other counts to stand on their own (Counts 1 and 11).

## LEGAL STANDARD

A party may move for judgment on the pleadings after the pleadings are closed. Fed. R. Civ. P. 12(c). The standard for a motion for judgment on the pleadings is the same as that applicable to a motion to dismiss under Rule 12(b)(6). *E.E.O.C. v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir. 2001). "Judgment on the pleadings is proper 'when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Anders v. Cuevas*, 984 F.3d 1166, 1174 (6th Cir. 2021). A material issue of fact occurs when there is an "express conflict on a particular point between the parties' respective pleadings." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1368 (3d ed.). Absent such a conflict, the Court may grant the motion. *See Anders*, 984 F.3d at 1174.

To survive a motion for judgment on the pleadings, however, a plaintiff must plead factual allegations sufficient to "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "For purposes of [the] motion . . . all well-pleaded material allegations of the pleadings of the opposing party must be taken as true . . . [b]ut [the Court] need not accept as true legal conclusions or unwarranted factual inferences." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007) (citation and internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 400 (6th Cir. 2013) (alteration and citation omitted).

3

"In considering a motion for judgment on the pleadings, a court considers the pleadings, which consist of the complaint, the answer, and any written instruments attached as exhibits." *Roe v. Amazon.com*, 170 F. Supp. 3d 1028, 1032 (S.D. Ohio 2016); *Talmer Bank & Tr. v. Malek*, 651 F. App'x 438, 441 (6th Cir. 2016) ("An answer, like [defendant's] Amended Answer, is a pleading . . . [and] [w]e also treat copies of written instruments attached to a pleading as part of the pleading itself.") (alteration and quotation marks omitted); *Roth v. Guzman*, 650 F.3d 603, 608 (6th Cir. 2011) (stating "documents attached to defendants' Answer, [were] therefore properly considered as part of the pleading for all purposes" in reviewing lower court's denial of motion for judgment on the pleadings); *Dudek v. Thomas & Thomas Att'ys & Counselors at Law, LLC*, 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010) (stating that the court can consider "any documents attached to, incorporated by, or referred to in the pleadings").

## ARGUMENT

### I. THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE CFPB'S SELF-FUNDING MECHANISM VIOLATES THE SEPARATION OF POWERS.[2]

The Bureau's self-funding mechanism violates the Appropriations clause, which specifies that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. Art. I, § 9, cl. 7. Contrary to this separation-of-powers requirement, the Bureau's funding is completely insulated from congressional oversight. It is not funded by periodic congressional appropriations. Rather, the Bureau has an evergreen self-funding mechanism outside the annual appropriations process that allows it to withdraw funds from the Federal Reserve every quarter. Upon request, the Bureau receives from the Federal Reserve up to twelve percent of the Federal Reserve System's annual operating budget, which "shall not be

---

[2] Pursuant to the Court's Order granting the Bank's Motion to for Leave to Amend its Answer, the Bank provides this briefing on the Appropriations Clause issue. Dkt. 118.

subject to review by the Committees on Appropriations of the House of Representatives and the Senate." 12 U.S.C. § 5497(a)(2)(C).[3]  The Federal Reserve itself is independently funded by fees assessed on banks, *see* 12 U.S.C. § 243; *see also Cmty. Fin. Servs. Ass'n of Am., Ltd.* *("CFSA") v. CFPB*, 51 F.4th 616, 624 (5th Cir. 2022) (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020)) (the CFPB "receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments"), meaning there is not even *indirect* congressional oversight of the Bureau's funding.[4]  This unconstitutional structure violates the separation of powers and invalidates the Bureau's ability to bring and maintain this lawsuit.

The Fifth Circuit agrees.  It recently invalidated the CFPB's authority in the rulemaking context on the ground that the CFPB's funding structure violates the Appropriations Clause and contravenes the Constitution's separation of powers.[5]  *CFSA*, 51 F.4th at 635.  The Fifth Circuit explained that Appropriations Clause makes clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."  *Id.* at 637.  That reservation of congressional control is completely absent here.  The Fifth Circuit described five features of the Bureau's self-

---

[3] This is a staggering figure.  The Bureau could demand up to "$734 million" in fiscal year 2022. *CFSA*, 51 F.4th at 635 n.12.

[4] The Bureau's own statements confirm its understanding that it receives its funding outside of the appropriations process.  The Financial Report of the CFPB posted on the CFPB's website states "The Dodd-Frank Act explicitly provides that Bureau funds obtained by or transferred to the CFPB are not government funds or appropriated funds." CFPB Financial Report, November 15, 2022, at 45, available at https://www.consumerfinance.gov/data-research/research-reports/financial-report-cfpb-fiscal-year-2022/.  The Court can and should take judicial notice of this fact under Rule 201(b)(2). *See* Fed. R. Civ. P. 201(b)(2) (court can take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[5] On November 14, 2022, the Solicitor General of the United States, on behalf of the Bureau and its Director, filed with the Supreme Court a petition for a *writ of certiorari* to review the Fifth Circuit's decision.

funding mechanism that rendered it unconstitutional: (1) the CFPB's funding occurs outside Congress' annual appropriations process; (2) there is no legislative discretion to fund the CFPB at lower-than-requested levels because the Federal Reserve *must* grant the Bureau's request for funds as long as it does not exceed 12% of the Federal Reserve's total operating expenses; (3) the Federal Reserve itself is outside the appropriations process; (4) the Bureau maintains a separate fund from the Treasury that is under the control of the Director, and the monies on deposit are permanently available to him without any further act of Congress; and (5) the not-too-subtle mandate that the funds obtained by the CFPB "shall not be construed to be Government funds or appropriated monies" and shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." *Id.* at 639–40.

Thus, the Fifth Circuit held, the "Bureau's perpetual insulation from Congress's appropriations power, including the express exemption from congressional review of its funding, renders the Bureau no longer dependent and, as a result, no longer accountable to Congress and, ultimately, to the people." *Id.* at 639 (internal quotation marks and citation omitted). "By abandoning its 'most complete and effectual' check on 'the overgrown prerogatives of the other branches of the government'—indeed, by enabling them in the Bureau's case—Congress ran afoul of the separation of powers embodied in the Appropriations Clause." *Id.* at 639-40 (quoting The Federalist No. 58 (J. Madison)).

The separation of powers is not some abstract principle. It matters greatly as a check on agency excess. The exercise of unchecked power leads to abuses and encourages agencies to adopt extreme positions. We see that clearly in this case, where the Bureau is attempting to take a limited, historic, and remediated issue where the amount of consumer harm is less than the copying costs in this case, and claims that it is something far more widespread, without ever identifying a

single unauthorized account that Fifth Third had not already detected, investigated, and remediated. Agency overreach is also apparent from the Bureau's efforts to expand its already vast investigation and enforcement authority by reaching back to claims that pre-date the July 21, 2011 Transfer Date (*discussed infra*), or to maintain claims that clearly fall outside the statute of limitations. An agency that veers to such extremes, rather than charting a centrist course, does so without fear or consequence precisely because it is "double-insulated from Congress's purse strings [and] especially exempt from budgetary review." *Id.* at 640.

To be sure there are other self-funded agencies, but the Bureau's double-insulated structure stands alone as an unconstitutional anomaly by comparison.[6] No other agency "wields enforcement or regulatory authority remotely comparable to the authority the [Bureau] may exercise throughout the economy." *CFSA*, 51 F.4th at 641. The CFPB has "vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy," including the "authority to conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Seila Law*, 140 S. Ct. at 2191–93. The CFPB's expansive remit encompasses 18 separate statutes plus a catch-all consumer protection statute that encompasses all unfair, deceptive, or abusive acts or practices by

---

[6] The courts that have considered the funding issue prior to the Fifth Circuit's decision, have found it constitutional "largely on [this] one factor" ignoring the staggering differences between the CFPB and the few other agencies that are also self-funded. *CFSA*, 51 F.4th at 641 n.15. (listing cases). There is only one case to address the issue after *CFSA* was decided, and it held that the structure was constitutional solely because the "Bureau receives its funding pursuant to a statute passed by Congress." *CFPB v. TransUnion*, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022). This nonbinding authority—which essentially equates an act of Congress with an appropriation— ignores the actual text of the Clause which requires any spending to be done "in Consequence of Appropriations made by Law" not merely pursuant to an act of Congress. Furthermore, "Congress … may not transfer to another branch powers which are strictly and exclusively legislative," even by statute. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation omitted). Congress cannot cede its discretion in the appropriations process by legislating that role to the CFPB.

covered persons, which is a far cry from prudential bank regulators who are charged with maintaining institutional safety and soundness. Unlike nearly every other administrative agency, Congress has put this "staggering amalgam of legislative, judicial, and executive power in the hands of a single director" rather than a multi-member board. *CFSA*, 51 F.4th at 639. When you take these unique features and add to them the fact that the "Bureau's self-determined funding [is] drawn from a source that is itself outside the appropriations process," you have "a double insulation from Congress's purse strings that is '***unprecedented***' across the government." *Id.* (emphasis added).

As the Fifth Circuit has explained, "[t]he Appropriations Clause [] does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *CFSA,* 51 F.4th at 637. Congress abdicated its responsibility by exempting the CFPB from the appropriations process and the Court should therefore find that the Bureau's funding structure is unconstitutional.

The proper remedy is dismissal. As in *CFSA*, the Bureau lacked authority to engage in any of its prescribed functions—here, to conduct investigations or prosecute civil actions in federal court—"via constitutionally appropriated funds." *CFSA*, 51 F.4th at 643. In other words, without its unconstitutional funding, the Bureau would not have another means to investigate and bring this action against Fifth Third. The Bank was thus "harmed by the Bureau's improper use of unappropriated funds" to engage in the enforcement action at issue. *Id.* Dismissal is warranted.

## II. THE BUREAU'S CLAIMS FACE INSURMOUNTABLE TIMING DEFENSES.

### A. The Bureau's Credit Card Claims Are Time-Barred.

#### 1. The CFPA, FCRA, and TILA Claims Are Barred by the Statute of Limitations.

Governmental agencies, like other litigants, are required to bring their claims within the time periods prescribed by law. Judgment on the pleadings should be granted, dismissing Count 3 (CFPA – credit cards), Count 8 (TILA – credit cards), Count 10 (FCRA – credit cards and other credit products), and Count 13 (to the extent it alleges violations of CFPA tied to credit cards) because those claims are time-barred. Congress limited the period in which the Bureau could bring CFPA claims to three years from "the date of discovery of the violation." *See* 12 U.S.C. § 5564(g)(1). The "discovery of the violation" that triggers the limitations period includes not only actual knowledge of a violation, but also "the hypothetical discovery of facts a reasonably diligent plaintiff would know." *Merck & Co. v. Reynolds*, 559 U.S. 633, 645 (2010). FCRA provides for a two-year statute of limitations from the date of discovery of the violation and a five-year statute of repose. *See* 15 U.S.C. § 1681p. In the Sixth Circuit, the FCRA "'limitations period begins to run when a claimant discovers the facts that give rise to a claim and not when a claimant discovers that those facts constitute a legal violation.'" *Rocheleau v. Elder Living Constr.*, LLC, 814 F.3d 398, 401 (6th Cir. 2016) (citation omitted). TILA has an even shorter period, limiting claims to "one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

The Bureau has known about unauthorized Fifth Third credit card accounts for much longer than three years before March 9, 2020, when this action was filed. Seven and a half years ago. ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



Now, over half a decade later, the Bureau belatedly brings this enforcement action based on the same issue. That impermissible delay forecloses the Bureau's constellation of credit card claims.

The Bureau missed the deadlines despite the parties' eight tolling agreements.[7] The tolling agreements accounted for 520 days of tolling, which means that the Bureau would have had to file its lawsuit by November 4, 2019—three years plus 520 days after

Instead, it waited until March 9, 2020 to file a complaint. The Bureau missed its three-year deadline by 125 days.

Because more than three years elapsed between the Bureau's discovery of alleged unauthorized credit cards and the filing of this lawsuit, the Bureau's credit card-related CFPA claims are time barred. *A fortiori*, the Bureau also missed the shorter limitations period established under TILA (one year) and FCRA (two years), and thus Counts 8 and 10 are also foreclosed (as are those portions of Count 13 premised on unauthorized credit card accounts). *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015) (holding that TILA's one-year

---

[7] *See* Dkt. 119-3 – 119-10, Second Am. Answer, Exs. 3 (First Tolling Agreement) – 10 (Eighth Tolling Agreement).

limitations period applies to actions brought by the Bureau); *see also Rocheleau*, 814 F.3d at 401 (affirming dismissal of FCRA claim that fell outside the two-year limitations period).

### 2. The FCRA Claim Is Also Barred by FCRA's Statute of Repose.

In addition to a two-year statute of limitations, Congress established a five-year statute of repose for FCRA violations. 15 U.S.C. §§ 1681p(1)-(2). A statute of repose creates "an absolute bar on a defendant's temporal liability," *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (alteration and quotation marks omitted). A statute of repose is not subject to tolling, equitable or otherwise. *See, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051 (2017) ("[T]he Court repeatedly has stated in broad terms that statutes of repose are not subject to equitable tolling."); *Nat'l Credit Union Admin. Bd. v. Barclays Cap. Inc.*, 785 F.3d 387, 390 (10th Cir. 2015) (explaining the inapplicability of tolling agreements to a "statute of repose, which, of course, is not waivable"); *Harris v. Bruister*, No. 4:10cv77-DPJ-FKB, 2013 WL 6805155, at *6 (S.D. Miss. Dec. 20, 2013) (a statute of repose "is a jurisdictional prerequisite to suit that cannot be waived or tolled") (citations omitted); *see also Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 831 (6th Cir. 2019) ("In situations where the limitation period was within the statute, such as the FLSA and the EPA, we have found it to be a non-waivable substantive right."); *Hayden v. Ford Motor Co.*, 497 F.2d 1292, 1294 (6th Cir. 1974) (stating that a statutory provision that is "jurisdictional, or goes to the right of action," may not be waived). Although the FCRA claims must be dismissed because of the two-year statute of limitations, if the Court disagrees, it should at a minimum dismiss alleged violations of FCRA that occurred five or more years before the Bureau filed its Complaint (*i.e.*, before March 9, 2015).

### B. The Bureau's Pre-Transfer Date Claims Are Foreclosed.

The Bureau overreaches by asserting jurisdiction over alleged conduct that occurred before July 21, 2011, when Congress gave enforcement authority to the CFPB. All of the Bureau's claims

reach back "at least" to 2010—and some as far back as 2008.  Dkt. 73, Am. Compl. ¶¶ 5, 29, 32, 37, 43, 44, 55, 57, 62, 75, 76, 84, 88, 89, 92, 117, 210.  The Bureau is barred from challenging conduct that occurred before its enforcement authority began.

The statute creating the Bureau clearly states that its enforcement authority was to begin on a date certain: July 21, 2011, as established by the Secretary of the Treasury.  The Bureau was created by the CFPA, enacted as Title X of the Dodd-Frank Act of 2010.  *See* 12 U.S.C. §§ 5331.  The CFPA did not take effect until July 21, 2011, and enforcement authority was not transferred from other agencies to the CFPB until that date.  *See* Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. L. No. 111-203, § 1037, 124 Stat. 2011 (July 21, 2010) ("This subtitle ["Specific Bureau Authorities"] shall take effect on the designated transfer date."); Designated Transfer Date, 75 Fed. Reg. 57,252, 57,253 (Sept. 20, 2010) (setting designated transfer date as July 21, 2011).  Although Congress made other provisions of the Dodd-Frank Act effective immediately, it specifically set the effective date of the CFPA on the Transfer Date.  *Compare* Pub. L. No. 111-203, § 1037, 124 Stat. at 2011 ("This subtitle shall take effect on the designated transfer date."), *with id.* at 1390 ("Except as otherwise specifically provided . . . this Act and such amendments shall take effect 1 day after the date of enactment of this Act.").  Congress therefore deliberately chose not to vest the Bureau with enforcement authority sooner.

The Bureau ordinarily acknowledges this reality.  *See, e.g.*, *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1380, 1375 n.20 (N.D. Ga. 2015) ("The Bureau has clarified that it does not seek to enforce the CFPA as to conduct that occurred before July 21, 2011."); *CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17 CV 817, 2018 WL 1709408, at *1 (N.D. Ohio Apr. 9, 2018) (limiting allegations in complaint to conduct that began on July 21, 2011); *CFPB v. Mortg. Law Grp.*, LLP, 420 F. Supp. 3d 848, 858 (W.D. Wis. 2019) (estimating damages

based on allegations that defendants engaged in violations "between July 21, 2011 (the effective date of the statute) and August 1, 2013"). When, however, the Bureau has refused to do so, courts have dismissed any claims that relate to conduct that occurred before the Transfer Date. *See, e.g.*, *CFPB. v. TCF Nat'l Bank*, No. 17-cv-166, 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017) ("[T]he Bureau cannot assert claims under the statute arising before July 21, 2011, the CFPA's effective date."); *CFPB v. Future Income Payments, LLC*, No. CV 8:19-2950-BHH-KFM, 2020 WL 6162947, at *8 (D.S.C. May 21, 2020) (limiting penalty calculation to the post-Transfer Date period). The same result is appropriate here: The Court should dismiss the Bureau's claims for conduct that pre-dates July 21, 2011.

## C. The Bureau's Pre-Transfer Date Abusiveness Claims Are Impermissibly Retroactive.

The Bureau's "abusiveness" claims (Counts 1–7 and 12) purport to penalize pre-July 21, 2011 conduct for violating a legal standard of "abusiveness" that did not exist when the conduct occurred. This violates fundamental concepts of due process and fair notice. The Court need not reach this constitutional issue for two independent reasons: first, as discussed *supra* in Part II.B., the Transfer Date forecloses any claims—including abusiveness claims—that pre-date July 21, 2011; and second, the statutory rules clearly evidence Congress' intent that the abusiveness standard would apply only on a prospective basis. *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 676 (6th Cir. 2018) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.") (citation omitted).

Unlike "unfair" or "deceptive" acts or practices, which were already prohibited by the Federal Trade Commission Act before the CFPA was enacted, 15 U.S.C. § 45, the legal concept of "abusive" acts or practices was not recognized, let alone prohibited, until the CFPA became

effective on July 21, 2011. "[T]he legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (citation omitted). Accordingly, courts apply the time-honored presumption against retroactivity "unless Congress has clearly manifested its intent to the contrary." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997); *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 892 (6th Cir. 2016) ("[C]ourts should not construe congressional enactments and administrative rules to have retroactive effect unless their language requires this result.") (citation omitted).

Here, nothing manifests an intent for the newly-minted "abusiveness" prohibition to apply retroactively to penalize conduct that occurred before its enactment. On the contrary, "[a] statement that a statute will become effective on a certain date," as with the CFPA, "does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf*, 511 U.S. at 257; *see also Molosky v. Washington Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011) ("There is no explicit statement from Congress that [provisions in the CFPA] are meant to be retroactive, suggesting no retroactivity."); *Gay v. Sullivan*, 966 F.2d 1124, 1128 (7th Cir. 1992) ("[A] provision for a future effective date [is] strong evidence of a congressional rejection of retroactivity."). As such, the CFPA may not be enforced retroactively. *See Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 296–98 (6th Cir. 2015) (affirming the district court's decision not to apply a CFPB regulation promulgated under the Dodd–Frank Act and the Real Estate Settlement Procedures Act retroactively, agreeing that an "effective date reflects an intent not to apply it to conduct occurring prior to that date"); *Illinois v. Alta Colls., Inc.*, No. 14-cv-3786, 2014 WL 4377579, at *2 (N.D. Ill. Sept. 4, 2014) ("plaintiff concedes[] it cannot recover for violations of the CFPA that occurred before the statute went in[to] effect on July 21, 2011"); *cf. Koch v. SEC*,

14

793 F.3d 147, 157–58 (D.C. Cir. 2015) (finding that the SEC may not use the remedial provisions of the Dodd–Frank Act to punish Koch for his conduct in 2009).

## III.  COUNTS 4-7 SHOULD BE DISMISSED BECAUSE THE BUREAU FAILS TO PLEAD AN INJURY IN FACT.

The Bureau claims in Counts 4, 5, and 6 that giving customers **_free_** and highly desirable products and services that they were not required to use—online access to their bank accounts, Early Access ("EAX") to direct deposits, and Overdraft Protection—constituted "unfair" and "abusive" acts or practices that are "likely to cause substantial injury." [8] Dkt. 73, Am. Compl. ¶¶ 164, 171, 179.  Likewise, the Bureau crafts a catch-all claim for "other consumer-financial products" (Count 7) that suffers from the same lack of non-speculative injury. *Id*. ¶ 187.  Despite a three-year investigation resulting in the production of nearly a half billion data points, thousands of documents, and several depositions, the Bureau has not alleged facts which, if proven, show any actual injury to Fifth Third's customers in connection with these products and services.

The Bureau has not alleged Article III standing for these claims.  As the Supreme Court recently explained, "Article III standing requires a concrete injury even in the context of a statutory violation. . . . [U]nder Article III, an injury in law is not an injury in fact."  *TransUnion LLC v. Ramirez*, No. 20-297, 2021 WL 2599472, at *8 (U.S. June 25, 2021) (internal citations and quotation marks omitted).  This warrants dismissal.[9]

_____

[8] This formulation itself has been rebranded—but not substantively altered—from the Bureau's original Complaint, which alleged that these benefits "exposed consumers to the risk of harm." Dkt. 1, Compl.  ¶¶ 30, 34.

[9] The statute itself also demands an actual injury.  Under the CFPA's unfairness provision, the injury requirement is expressly referenced, and it must be a "substantial" one.  *See* 12 U.S.C. § 5531(c)(1)(A)-(B).  Under the abusiveness provision, the injury requirement is implicit but equally undeniable.  *See* 12 U.S.C. § 5531(d).  Inherent in the concept of "taking advantage" is obtaining a benefit at the consumer's expense.  *See ITT Educ. Servs.*, 219 F. Supp. 3d at 918 ("The ordinary meaning of 'to take advantage of' is 'to make use of for one's own benefit,' to 'use to advantage,' or to 'profit by.'" (internal citation omitted)).  Likewise, material interference with consumers'

The Amended Complaint does not allege that any fees were incurred in connection with these free products or services, nor does it allege that Fifth Third reported such enrollment information to credit reporting agencies. The reason for this is clear: enrollment in online banking, Overdraft Protection, and Early Access is free. The customer pays absolutely nothing for access to these products and services. Online banking, which was essential for many customers during the pandemic, simply gives customers another way to access their accounts, on top of options like visiting a branch, using an ATM, or calling the Bank. Dkt. 119, Second Am. Answer ¶ 164; Dkt., 120 Affidavit of Ben Mendelsohn ("Mendelsohn Aff.") ¶ 4. Enrollment in and use of online banking is completely free. *Id.* Overdraft Protection is a service available for checking accounts that uses funds from linked accounts to pay reduced fees, and possibly avoid fees altogether, when a transaction overdraws an account. Dkt. 120, Mendelsohn Aff. ¶¶ 7, 8. Enrolling in Overdraft Protection and Early Access is completely free and has no impact on a customer's credit. *Id.* at ¶¶ 5, 8. Early Access gives customers who receive direct deposits the option of taking an advance on their direct deposits. *Id*. at ¶ 5. No fee is assessed unless and until a customer actually initiates an advance, which requires a separate, affirmative request from the customer and a separate agreement to the key terms and conditions—including the exact fee and repayment terms—which were re-disclosed to customers when an Early Access request was made. *Id.* at ¶¶ 5–6 & Ex. A at 3–5. These products and services benefited customers by giving them options—in how they

---

ability to understand a term or condition is premised on consumers being harmed by their lack of understanding. Every case in which the Bureau has argued that an act or practice was abusive concerned a financial product or service that was alleged to have actually injured customers, such as by charging them fees or affecting their credit report. That accords with common sense—there is nothing material to consumers about the terms of products or services they do not have to pay for or use and that do not affect their credit report.

accessed their accounts, offering early access to direct deposits, or protection from (higher) fees in the event of an overdraft—with no cost to enroll.

Understanding all this, the Bureau tries to camouflage its failure to allege actual harm by alleging that the products and services are "likely to cause substantial injury." *See, e.g.*, Dkt. 73 ¶ 187. That assertion is entirely speculative and insufficient to manufacture Article III standing. *Buchholz*, 946 F.3d at 865 ("[T]he Supreme Court has explained that the fear of a future harm is not an injury in fact unless the future harm is certainly impending."); *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 639 (7th Cir. 2007) (risk of future identify theft insufficient to support cause of action); *see also Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th Cir. 2010) (allegations insufficient to plead an unauthorized attempt to open a bank account because there was no actual loss, only "the mere danger of future harm, unaccompanied by present damage") (citation omitted).

For online banking, the Amended Complaint alleges an "***increased risk*** of data theft, money theft, and improper personal-data use," Dkt. 73, Am. Compl. ¶ 161, even though allegations of increased risk of future injury are insufficient to state a claim.[10] *Buchholz v. Meyer Njus Tanick*, 946 F.3d 855, 865 (6th Cir. 2020). For EAX and Overdraft Protection, the Amended Complaint alleges that enrollment is "***likely*** to cause substantial injury in the form of negative effects on consumers' credit profiles," Dkt. 73, Am. Compl. ¶¶ 171, 179. That is implausible speculation

---

[10] The argument is also logically fanciful. Giving a consumer a free car results in an "increased risk" of an accident; giving somebody a free meal results in an "increased risk" of choking on food. Such wildly speculative imaginings are not adequate to establish an actual injury. In addition, these imagined risks concern speculation about possible crimes that unrelated third parties might commit, not harms inflicted by Fifth Third. There is no duty, absent a fiduciary relationship, to prevent unforeseen harms by third parties. *See Burks v. Little Caesar Enters., Inc.*, 89 F.3d 832 (6th Cir. 1996) (affirming summary judgment in favor of defendant when harm to plaintiff by third party was not foreseeable).

because the Bureau does not allege that enrollments in these products are reported to credit reporting agencies. They are not. Dkt. 119, Second Am. Answer ¶ 87, 179; Dkt. 120, Mendelsohn Aff. ¶¶ 5, 8. And for all these products, including the "other consumer financial products" referenced in Count 7, the Bureau asserts a catch-all allegation of injury concerning the "*likely*" "expenditure of consumer time and effort," *see*, *e.g.*, Dkt. 73, Am. Compl. ¶¶ 164, 171, 181, 187, even though "[a] plaintiff cannot create an injury by taking precautionary measures against a speculative fear." *Buchholz,* 946 F.3d at 865; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (no injury occurs when a plaintiff engages in "costly and burdensome measures to protect" against some unrealized harm).

The Bureau has had years to determine whether any actual harm occurred. That it has alleged none speaks volumes. Because the Bureau cannot establish unfairness or abusiveness without actual harm, and instead only alleges increased risks and likelihoods, Counts 4 – 7 should be dismissed.

## IV. COUNT 12 FAILS TO STATE A CLAIM.

Count 12 alleges that Fifth Third took "unreasonable advantage of consumers" by making statements that would cause consumers to believe that Fifth Third acts in their interests while declining to make reasonable efforts to identify and remediate additional affected consumers. Dkt. 73, Am. Compl. ¶¶ 217–24. Nowhere does the Bureau describe what "reasonable efforts" should have been taken, identify the additional consumers who were supposedly subjected to unauthorized financial products or services, or specify the allegedly misleading statements. This count should be dismissed for two independent reasons.

First, the Bureau has not alleged a cognizable claim. It bears the burden of establishing the existence of unauthorized accounts (not just potentially unauthorized accounts) and cannot shift

that burden to Fifth Third simply by alleging that it is abusive for Fifth Third not to have identified and remediated additional affected consumers.

Second, this claim sounds in fraud, yet fails to meet the heightened particularity requirements of Rule 9(b), much less the Rule 8 plausibility standard established by *Iqbal* and *Twombly*. *See Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 755 (6th Cir. 2014) ("If BOA was intentionally training its employees to intentionally defraud its customers, this theory sounds in fraud, not negligence."); *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 753 (6th Cir. 2012) (a claim that alleges a bank engages in a unified course of fraudulent conduct that results in misstatements to consumers sounds in fraud). Under Rule 9(b), the plaintiff is required to allege "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010). Count 12 does none of that. It does not specify what "reasonable methods" were available (beyond those already in place to detect, investigate, and remediate unauthorized activity), nor does it identify when Fifth Third declined to take such reasonable action, or who declined to do so. Dkt. 73, Am. Compl. ¶ 218. It alleges that Fifth Third refrained from acting because it feared "reputational and other harm," without providing any factual support for an utterly conclusory allegation. *Id.* ¶ 219.

But even under Rule 8, the Bureau must still plausibly allege facts—not conclusions—that would establish liability. Here, the Bureau claims that Fifth Third "declined to make reasonable efforts" to identify additional affected consumers and misrepresented to its customers that it "acts in their interests and has identified and remediated all consumers that it subjected to unauthorized financial products or services" when it has not done so. *Id.* ¶¶ 218, 221. Nowhere does the Bureau articulate what Fifth Third should have done (or failed to do), explain why its existing controls

were inadequate, or identify consumers who supposedly were affected by an unauthorized (as opposed to a potentially unauthorized) financial product or service but not remediated. And the Amended Complaint is silent when it comes to articulating the supposed misrepresentations to customers. This claim satisfies neither Rule 8 nor Rule 9(b) and therefore should be dismissed.[11]

## V.    COUNTS 1 AND 11 SHOULD BE DISMISSED AS DUPLICATIVE.

Counts 1 and 11 are catch-all claims that simply repackage Counts 2 through 7 with less specificity and in ways that try to disassociate those counts from having to prove unauthorized accounts. Counts 1 and 11, abusive and unfair sales practices respectively, do not identify any particular product or service or distinguish the "sales practice" conduct at issue in these counts from the alleged conduct at issue in the other counts. For example, Count 1 alleges abusive sales practices led to the issuance of unauthorized financial products or services; Counts 2 – 7 apply the abusiveness concept to specific products or services, such as deposit accounts (Count 2), credit cards (Count 3), online banking (Count 4), Early Access (Count 5), Overdraft Protection (Count 6), and "other consumer financial products," (Count 7). Likewise, Count 11 alleges that unfair sales practices led to the issuance of unauthorized financial products or services, but Counts 2 – 7 do the real work because they apply the concept of unfairness to the specific products or services recited above. The Court should dismiss Counts 1 and 11 as vague and duplicative of the more specific allegations concerning particular products or services in Counts 2 – 7. *See White v. Erdos*, No. 1:19-cv-1007, 2020 WL 7698351, at *2 (S.D. Ohio Dec. 28, 2020), report and recommendation adopted, No. 1:19cv1007, 2021 WL 516457 (S.D. Ohio Feb. 11, 2021)

---

[11] Particularly when placed against the allegations in the Amended Answer that Fifth Third engaged a globally recognized consulting firm to analyze high-risk accounts identified using factors discussed with the CFPB, and fully remediated the small number of accounts deemed to be potentially unauthorized, this claim rings hollow.

(dismissing vague claims); *Gordon v. B. Braun Med. Inc.*, No. 1:19-cv-121, 2020 WL 1491378, at *5 (S.D. Ohio Mar. 27, 2020) (dismissing duplicative claims).

Apparently recognizing the duplicative nature of its Complaint, the Bureau has taken the position, at various status conferences, that Count 1 (and presumably Count 11) do not require it to prove a single unauthorized account because its focus is on abusive (or unfair, for Count 11) sales practices apart from unauthorized account openings. The Bureau's attempt to recast this claim(s) fails for three reasons. First, Count 1 itself alleges that abusive sales practices led to unauthorized account openings. Am. Compl. ¶ 142. Likewise, Count 11 focused on conduct causing "unauthorized accounts [and] applications" and failing to "close known loopholes in its collection of proof of consumer authorization." *Id.* ¶ 211. Second, both claims are time-barred because the tolling agreements only paused the limitations period for the Bureau's investigation into unauthorized account openings, not for generalized sales practices. *See* Dkt. 119-3 – 119-10, Second Am. Answer, Exs. 3 (First Tolling Agreement) – 10 (Eighth Tolling Agreement) (tolling limited to "Investigation…of Fifth Third to determine whether, in connection with unauthorized consumer bank, credit card, and other accounts, there were violations . . . ."). Tolling agreements are strictly construed since they alter the ordinary legal framework. *Cf. United States v. FedEx*, 2016 WL 107065 (N.D. Cal. March 18, 2016) (strictly construing tolling agreement against government). And third, the other examples the Bureau offers in Count 1 for abusive acts or practices are not illegal—e.g., it is black-letter law in Ohio that bank employees do not act in a fiduciary capacity when they guide customers to the financial product or service that best suits their needs. Ohio Rev. Code Ann. § 1109.151 ("Unless otherwise expressly agreed to in writing by the bank, the relationship between a bank and its obligor, or a bank and its customer, creates no fiduciary or other relationship between the parties or any special duty on the part of the bank to

21

the customer or any other party."). The same applies for Count 11, because incentive compensation and sales goals are not, by themselves, unfair sales practices. Were it otherwise, then most every business in the United States would stand accused of unfair sales practices. The Court should reject the Bureau's ad-hoc rationalization and its attempt to re-write its Complaint to address these fatal flaws in Counts 1 and 11.

## CONCLUSION

For the foregoing reasons, Fifth Third respectfully requests this Court to enter judgment on the pleadings dismissing all counts in this action as unconstitutional, and dismissing claims related to unauthorized credit card accounts (Counts 3, 8, 10, and 13) as barred by the statute of limitations; dismissing Counts 4–7 for failing to plead an actual injury; dismissing Count 12 as non-cognizable and lacking plausibility or particularity; dismissing Counts 1 and 11 as vague, duplicative, and time-barred; and narrowing any surviving claims to conduct that occurred after the July 21, 2011 Transfer Date.

Due to the public importance of this case and the complexities of the legal issues presented, Fifth Third respectfully requests oral argument on this motion.

Dated: January 25, 2023

Respectfully submitted,

/s/ *Ryan Scarborough*

WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac vice*)
Enu Mainigi (*pro hac vice*)
Ryan Scarborough (*pro hac vice*)
680 Maine Ave. S.W.
Washington, DC 20024
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com

DINSMORE & SHOHL LLP
Laurie A. Witek (0083955)
Michael Ferrara (0097584)
Katherine Rasmussen (0093928)
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
513-977-8648
Laurie.Witek@Dinsmore.com
Michael.Ferrara@Dinsmore.com
Katherine.Rasmussen@Dinsmore.com

Attorneys for Defendant Fifth Third Bank, N.A.

Krysta K. Gumbiner
Dinsmore & Shohl LLP
222 W. Adams, Suite 3400
Chicago, IL 60606
(312) 775-1743
krysta.gumbiner@dinsmore.com

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Motion for Judgment on the Pleadings was electronically filed with the Clerk of the Court by utilizing the CM/ECF System on January 25, 2023, which will provide electronic notification to all counsel of record.

/s/*Krysta Gumbiner*