**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | |
| | ) | Case No. 1:21-cv-262-DRC |
| Plaintiff, | ) | |
| | ) | Judge Douglas R. Cole |
| v. | ) | |
| | ) | |
| Fifth Third Bank, National Association, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF BUREAU OF CONSUMER FINANCIAL PROTECTION'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS** ........................................ i

**TABLE OF AUTHORITIES** ........................................ x

**INTRODUCTION** ........................................ 1

**LEGAL STANDARD** ........................................ 2

**ARGUMENT** ........................................ 2

**I. The Bureau's statutory funding mechanism is constitutional and provides no grounds for dismissal.** ........................................ 2

**A. Congress satisfied the Appropriations Clause when it passed a statute to fund the Bureau's operations.** ........................................ 3

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." U.S. Const. Art. I, § 9, cl. 7. The statutory mechanism to fund the CFPB, 12 U.S.C. § 5497, satisfies the Clause's "straightforward and explicit command"—that "'no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). It is also consistent with the centuries-old congressional practice of funding important government functions through sources other than annual spending bills. *See PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). Unsurprisingly, until recently, no court had ever held that Congress violated the Constitution by passing a statute authorizing spending; rather, the Appropriations Clause has long been understood as a restriction on the disbursing agency. This Court should join that consensus.

**B. Fifth Third's arguments to the contrary are wrong.** ........................................ 4

Fifth Third's constitutional challenge rests entirely on a single outlier, out-of-circuit decision, which this Court should reject as unpersuasive. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635–43 (5th Cir. 2022) ("*CFSA*"), *petition for cert. pending*, No. 22-448. The Fifth Circuit's reasoning in *CFSA* ignored constitutional text, historical practice, and the commonplace nature of many of the supposed flaws it identified in the Bureau's funding scheme. If anything, Congress has reserved far more oversight and control over the Bureau's funding than it has over several other financial regulators.

**C. Any purported constitutional problem with the Bureau's statutory funding mechanism would not justify the remedy of dismissal.** ........................................ 9

Finally, dismissal would not be the proper remedy even if the Court finds the constitutional challenge to the Bureau's funding mechanism meritorious. Fifth Third's remedial analysis rests

entirely on *CFSA*, but the court there failed to conduct a severability analysis, misunderstood the required showing of harm under *Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021), and crafted a remedy inconsistent with accepted fixes for unauthorized Executive spending.

**II. There is no basis to consider Fifth Third's statute-of-limitations or repose arguments. .......... 10**

**A. None of the Bureau's claims are subject to full or partial judgment based on the CFPA's statute of limitations .......... 11**

Judgment on the pleadings in a defendant's favor on statute-of-limitations grounds is proper "[o]nly if it is apparent on the face of the complaint" that the suit is time-barred. *Hollis v. Erdos*, 480 F. Supp. 3d 823, 829 (S.D. Ohio 2020) (Cole, J.). There is nothing on the face of the Amended Complaint to suggest that the Bureau discovered any of Fifth Third's violations before 2017, which is well within the statutory period. Fifth Third relies on its own attachments to its Second Amended Answer, but those attachments cannot be considered on Fifth Third's motion. *See*, *e.g.*, *Day v. DeLong*, No. 3:16-cv-00437, 2017 WL 5903761, at *6–7 (S.D. Ohio Nov. 30, 2017).

Even if Fifth Third's extra-pleading attachments could be considered, no claim would be foreclosed based on Fifth Third's allegations. In similar circumstances, courts considering the Bureau's discovery of defendants' illegal acts or practices have declined dismissal because there would be no practical effect on the course of litigation. *See*, *e.g.*, *CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17 CV 817, 2017 WL 4348916, at *7 (N.D. Ohio Sept. 28, 2017) (reserving a decision on statute of limitations where "no claim . . . [would] be completely foreclosed on statute of limitations grounds and all claims are based on the same conduct and thus support the same discovery"); *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1380–81 (N.D. Ga. 2015) (same).

Finally, the limited information contained in the bank's exhibit plainly does not establish that any violations of law were discovered under the CFPA.

**B. The CFPA's three-year limitations period also applies to the Bureau's claims relating to TILA and FCRA violations. .......... 15**

Fifth Third's attempts to apply shorter limitations periods to the Bureau's claims relating to the Truth in Lending Act (TILA) (Count 8) and the Fair Credit Reporting Act (FCRA) (Count 10) are unavailing, and, in any event, would not change the result. The TILA and FCRA counts are subject to the CFPA's three-year statute of limitations and not to any other limitations or repose period applicable to private-plaintiff suits under TILA or FCRA.

Fifth Third incorrectly argues that the one-year statute of limitations found in TILA, at 15 U.S.C. § 1640(e), applies here. That section of TILA provides that "any action under *this section*" may be brought within one year. "This section"—§ 1640—authorizes actions by individual private plaintiffs and class actions, as well as actions by state attorneys general, but makes no mention of the Bureau. The Bureau's authority to enforce TILA is set out in a separate section of TILA, 15 U.S.C. § 1607(a)(6). That section provides that, "[s]ubject to subtitle B of the [CFPA], compliance with the requirements imposed under this subchapter shall be enforced under . . . subtitle E of the [CFPA], by the Bureau, with respect to any person subject to this subchapter." 15

U.S.C. § 1607(a)(6). The Bureau's authority to obtain relief for violations of TILA is independent of § 1640, and Count 8 (and, of course, Count 13—"Fifth Third's Additional Violations of the CFPA") is not brought "under" § 1640. Further, § 1607(b) provides that, in instances in which the Bureau enforces TILA, "a violation of any requirement imposed under [TILA] shall be deemed to be a violation of a requirement imposed under" the CFPA. 15 U.S.C. § 1607(b). By providing that a violation of TILA "shall be deemed" a violation of the CFPA, § 1607(b) provides that a violation should be treated as if it were a violation of the CFPA. By virtue of this "deeming" provision in TILA, the Bureau's claims enforcing TILA are subject to the same statute of limitations that applies to CFPA claims.

Fifth Third also errs in arguing that the time limits set forth in § 1681p of FCRA apply to the Bureau. That provision sets time limits on any action "to enforce any liability created under [FCRA]." 15 U.S.C. § 1681p (FCRA). When the Bureau enforces FCRA, it is not enforcing *a liability created* by FCRA. Rather, the defendant's liability to the Bureau is created not by FCRA, but by the CFPA—in particular, by 12 U.S.C. § 5565, which authorizes the Bureau to obtain "any appropriate legal or equitable relief" for violations of law including FCRA. And similar to TILA, FCRA provides that a violation of that law "shall be deemed to be a violation" of the CFPA. 15 U.S.C. § 1681s(d). This "deeming" language makes the Bureau's FCRA claim subject to the CFPA's three-year statute of limitations.

**C. The Transfer Date does not preclude any Bureau claims. ................................ 17**

The Bureau has authority to bring claims for violations of enumerated consumer laws, including TILA, FCRA, and the Truth in Savings Act (TISA), that occurred before the Transfer Date. Those laws all took effect long before the Transfer Date. *See* Pub. L. No. 91-508, § 503(1) (1970) (establishing October 26, 1970 as effective date of relevant TILA provision, 15 U.S.C. § 1642, added by Pub. L. No. 91-508, § 502(a)); Pub. L. No. 104-208, § 2420(a) (1996) (establishing "365 days after" September 30, 1996 as effective date of relevant FCRA provision, 15 U.S.C. § 1681b(f), added by Pub. L No. 104-208, § 2404(b)); 57 Fed. Reg. 43,337, 43,378-79 (Sept. 21, 1992) (adopting relevant regulation implementing TISA and establishing March 21, 1993 as mandatory compliance date). Fifth Third has been subject to those laws since they took effect, and Fifth Third offers no argument suggesting otherwise. As of the Transfer Date, the Bureau gained authority to bring actions to address violations of the laws that it is charged with administering, regardless of when those violations occurred.

**III. The Bureau cannot be treated as a private plaintiff for Article III standing purposes. ........................................................................................................ 18**

The Supreme Court recently reaffirmed decades of jurisprudence providing that injury-in-fact is an Article III standing concept that ensures that, in private suits, the plaintiff has "a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). But the United States, as sovereign, is not a private plaintiff. As the Federal Circuit has explained, applying Supreme Court precedent: "From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'" *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) (quoting *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)); *see also*, *e.g.*, *EEOC v. Crothall Servs. Grp., Inc.*, No. 15-CV-3812, 2016 WL 3519710, at *3 (E.D. Pa. June 28, 2016) ("EEOC need not identify a specific individual who has been injured by [the defendant's]

alleged recordkeeping violation in order to demonstrate standing because 'a violation of a statute inherently constitutes an injury to the United States.'") (quoting *Stauffer*, 619 F.3d at 1325) (internal brackets omitted)).

Although not relevant to Article III standing, the Bureau does plead the requisite injury or likelihood of injury to consumers for the unfairness claims that require that showing under the governing statute, 12 U.S.C. § 5531(c)(1)(a).

**IV. The Bureau states a claim for relief in Count 12, alleging that Fifth Third engaged in abusive conduct by failing to identify and remediate affected consumers. ........ 21**

Count 12 is a straightforward application of the relevant part of the abusiveness prohibition described in the Amended Complaint. The Bureau alleges facts, some of which Fifth Third admits, about how Fifth Third takes unreasonable advantage of consumers' lack of understanding, inability to protect themselves, and reasonable reliance on Fifth Third.

Fifth Third is on notice of what the CFPA requires and of the Bureau's claim in Count 12. "[T]he United States Supreme Court has consistently cautioned against extending [Rule 9(b)'s] heightened pleading standard beyond claims for fraud or mistake." *Frederick J. Hanna & Assocs*., 114 F. Supp. 3d at 1372 (citing *Leatherman v. Tarrant Cnty. Narcotics Intel*. *& Coordination Unit*, 507 U.S. 163, 164 (1997)). By its terms, Rule 9(b) only applies to claims for "fraud or mistake," and, as several courts have held, "consumer protection claims [under the CFPA] are not claims of fraud, even if there is a deceptive dimension to them." *Id.*; *Ocwen Fin. Corp*., 2019 U.S. Dist. LEXIS 152336, at *38; *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 769–70 (S.D.N.Y. 2018), *rev'd on other grounds*, 828 F. App'x 68 (2nd Cir. 2020); *CFPB v. Navient Corp*., No. 3:17-CV-101, 2017 WL 3380530, at *24–25 (M.D. Pa. Aug. 4, 2017). Imposing a heightened pleading standard is "not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1371–73. Assuming, for the sake of argument, that Fifth Third could show that Count 12 should not be treated as an abusiveness claim but should instead be treated as a private claim that sounds in fraud, the Amended Complaint would only need to put Fifth Third "on notice as to the time, place, and content of the alleged misrepresentations." *Smith v. Bank of Am. Corp*., 485 F. App'x 749, 753 (6th Cir. 2012). The Bureau's Amended Complaint meets this standard.

**V. Counts 1 and 11 are clear, not duplicative, and should not be dismissed. ............. 24**

There is no basis to dismiss either Count 1 or Count 11. Rule 8 allows for alternative statements of a claim, whereby a party "may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones." Fed. R. Civ. P. 8(d)(2). Count 1 is an abusiveness claim, while Count 11 is an unfairness claim, and those are separate legal bases for liability under the CFPA. *See* 12 U.S.C. § 5531(c), (d). Even if the counts were otherwise duplicative, they would be appropriate under Rule 8. And in no instance would the remedy for two duplicative claims be dismissal of both, as Fifth Third requests. Rule 8 is clear that "[i]f a party

makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

And the claims are neither duplicative nor vague, as Fifth Third alleges. Count 1 alleges abusive sales practices under three independent parts of the CFPA's abusiveness subsection, 12 U.S.C. § 5531(d), that are clearly delineated in Count 1. First, under § 5531(d)(2)(C), conduct is abusive if it "takes unreasonable advantage of . . . the reasonable reliance by the consumer on a covered person [(Fifth Third in this case)] to act in the interests of the consumer." The Bureau alleges that (i) Fifth Third told consumers, both directly and publicly, that the bank was acting in the consumers' best interests; (ii) Fifth Third acted in its own financial interests, including by incentivizing sales based on value to the bank and not to the consumer; and (iii) thousands of Fifth Third employees could not meet their sales goals and were therefore subject to discipline or termination. The Bureau further alleges that these sales practices led to a list of discrete types of other bank misconduct—acts, if you will—affecting consumers. Some of those acts relate to unauthorized accounts, and some do not. (Some of these discrete acts are the bases for the claims in Counts 4 through 7 concerning unauthorized products.) Given these facts, including that Fifth Third untruthfully told consumers that it was acting in the consumers' interests, it is not a leap to allege the legal violation that Fifth Third took unreasonable advantage of consumers' reasonable reliance on Fifth Third to act in the consumers' interests.

Separately, under 12 U.S.C. § 5531(d)(2)(A) and (B), conduct is abusive if it takes unreasonable advantage of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." These second and third bases for finding Fifth Third's sales practices abusive are addressed in Amended Complaint ¶ 144 and relate to the opening or changing of accounts without consumer authorization because these are the accounts where Fifth Third materially interferes with consumers' ability to understand the terms or conditions.

Count 11 is equally clear, but addresses a different legal violation. Count 11 is an unfairness claim that Fifth Third knew of the consequences but continued "to foster sales practices that were likely to cause unauthorized products and services and applications therefor." And that conduct violates the CFPA's unfairness prohibition, with unfairness defined as an "act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers." 12 U.S.C. § 5531(d)(2)(C).

The Bureau properly cites each of Fifth Third's violations under the applicable statutory provision, such that neither Count 1 alleging abusiveness nor Count 11 alleging unfairness is subject to dismissal.

**CONCLUSION ........................................................................................................ 27**

## TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) .......... 13
*Barnard v. Lackawanna County*,
194 F. Supp 3d 337 (M.D. Pa. 2016).......... 13
*BP Am. Prod Co. v. Burton.*,
549 U.S. 84 (2006) .......... 10
*CFPB v. Citizens Bank, N.A.*,
504 F. Supp. 3d 39 (D.R.I. 2020) .......... 4, 16
*CFPB v. Ctr. for Excellence in Higher Educ.*,
No. 2:19-cv-00877, 2022 WL 4182301 (D. Utah Sept. 13, 2022) .......... 4
*CFPB v. D&D Mktg., Inc.,*
No. 2:15-cv-9692-PSG, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) .......... 4
*CFPB v. Fair Collections & Outsourcing, Inc.*,
No. 8:19-cv-2817, 2020 WL 7043847 (D. Md. Nov. 30, 2020).......... 4
*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015).......... 14, 23
*CFPB v. ITT Educ. Servs., Inc*.,
219 F. Supp. 3d 878 (S.D. Ind. 2015).......... 16
*CFPB v. Morgan Drexen, Inc.*
60 F. Supp. 3d 1082 (C.D. Cal. 2014) .......... 4
*CFPB v. Navient Corp*.,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017).......... 23
*CFPB v. Ocwen Fin. Corp*.,
No. 17-80495, 2019 U.S. Dist. LEXIS 152336 (S.D. Fla. Sept. 5, 2019) .......... 17, 23
*CFPB v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018).......... 23
*CFPB v. TransUnion*,
No. 1:22-cv-1880, 2022 WL 17082529 (N.D. Ill. Nov. 18, 2022).......... 4
*CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*,
No. 1:17 CV 817, 2017 WL 4348916 (N.D. Ohio Sept. 28, 2017).......... 15
*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937) .......... 3
*Clinton v. City of New York*,
524 U.S. 417 (1998) .......... 6, 10
*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) .......... 5, 7, 10, 11
*Collins. v. Yellen*,
141 S. Ct. 1761 (2021).......... 8, 11
*Day v. DeLong*,
No. 3:16-cv-00437, 2017 WL 5903761 (S.D. Ohio Nov. 30, 2017).......... 13

*EEOC v. Crothall Servs. Grp., Inc.*,
No. 15-CV-3812, 2016 WL 3519710 (E.D. Pa. June 28, 2016)............................................ 19
*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ............................................................................................................ 10
*FTC v. Amazon.com, Inc*.,
No. C14-1038, 2016 WL 10654030 (W.D. Wash. July 22, 2016) .......................................... 21
*FTC v. Kennedy*,
574 F. Supp. 2d 714 (S.D. Tex. 2008).................................................................................. 21
*Gordon v. B. Braun Med. Inc*.,
1:19-cv-121, 2020 WL 1491378 (S.D. Ohio Mar. 27, 2020) ................................................ 26
*Gundy v. United States*,
139 S. Ct. 2116 (2019)............................................................................................................. 9
*Hollis v. Erdos*,
480 F. Supp. 3d 823 (S.D. Ohio 2020) ................................................................................. 12
*Hy Cite Corp. v. Regal Ware, Inc.*,
No. 10-CV-168, 2011 WL 1206768 (W.D. Wis. Mar. 15, 2011) .......................................... 19
*In re Integrity Advance, LLC*,
No. 2015-CFPB-0029, slip op. (Jan. 24, 2020) .................................................................... 17
*JPMorgan Chase Bank, N.A. v. Winget*,
510 F. 3d 577 (6th Cir. 2007) ................................................................................................. 2
*LaGuardia v. Designer Brands, Inc.*,
2:20-cv-2311, 2020 WL 6280910 (S.D. Ohio 2020)............................................................. 12
*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
507 U.S. 163 (1997) ............................................................................................................. 23
*Manigault v. Ohio Dep't of Rehab. & Corr*.,
No. 4:14cv585, 2014 U.S. Dist. LEXIS 132033 (N.D. Ohio Sept. 19, 2014).......................... 13
*Ohio Nat'l Life Ins. Co. v. Cetera Advisor Networks, LLC*,
No. 4:14cv585, 2021 WL 2819838 (S.D. Ohio July 7, 2021)................................................ 21
*OPM v. Richmond,*
496 U.S. 414 (1990) ............................................................................................................... 3
*Paskvan v. City of Cleveland Civil Serv. Comm'n,*
946 F.2d 1233 (6th Cir. 1991) ........................................................................................ 2, 13
*Patterson v. Novartis Pharms. Corp.,*
451 F. App'x 495 (6th Cir. 2011)........................................................................................... 13
*PHH Corp. v. CFPB,*
881 F.3d 75 (D.C. Cir. 2018)............................................................................................. 4, 7
*Pugh v. Bank of Am*.,
No. 13-2020, 2013 WL 3349649 (W.D. Tenn. July 2, 2013)................................................. 23
*Raines v. Byrd*
521 U.S. 811 (1997) ............................................................................................................. 19
*Rondigo, L.L.C. v. Twp. of Richmond*,
641 F.3d 673 (3rd Cir. 1989)................................................................................................ 12
*Rose. v. Bartle*,
871 F.2d 331 (6th Cir. 2011) ................................................................................................ 21
*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020)............................................................................................................ 4

*Smith v. Bank of Am. Corp.*,
485 F. App'x 749 (6th Cir. 2012) .......... 23, 24
*Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc,*,
479 F.2d 478 (6th Cir. 1973) .......... 2
*Stauffer v. Brooks Bros., Inc.*,
619 F.3d 1321 (Fed. Cir. 2010) .......... 19
*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .......... 19, 20
*United States v. Johnson*,
440 F.3d 832 (6th Cir. 2006) .......... 9
*U.S. Dep's of the Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir 2012) .......... 9
*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) .......... 19
*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 10

Statutes

1 Stat. 95 (1789) .......... 6
1 Stat. 232 (1792) .......... 3
12 U.S.C. § 16 .......... 4, 6
12 U.S.C. § 243 .......... 4, 6
12 U.S.C. § 248 .......... 9
12 U.S.C. § 1755 .......... 4
12 U.S.C. § 1815(d) .......... 4
12 U.S.C. § 1820(e) .......... 4
12 U.S.C. § 4516 .......... 4
12 U.S.C. § 5481 .......... 18
12 U.S.C. § 5491 .......... 20
12 U.S.C. § 5496 .......... 8
12 U.S.C. § 5497 .......... 3,7, 8, 10
12 U.S.C. § 5531 .......... 20, 21, 25, 26
12 U.S.C. § 5564 .......... 12, 15, 16
12 U.S.C. § 5565 .......... 17
12 U.S.C. § 5581 .......... 9
15 U.S.C. § 1607 .......... 16
15 U.S.C. § 1640 .......... 16
15 U.S.C. § 1681b .......... 18
15 U.S.C. § 1681p .......... 17
15 U.S.C. § 1681s .......... 17
31 U.S.C. § 1349 .......... 11
31 U.S.C. § 1350 .......... 11
U.S. Const. Art. I, § 9, cl.7 .......... 3
U.S. Const. Art. I, § 8, cl.12 .......... 5, 7

Rules

Fed. R. Civ. P. 8(d)(2) .......... 25
Fed. R. Civ. P. 9(b) .......... 23, 24
Fed. R. Civ. P. 12(d) .......... 20

Regulations

57 Fed. Reg. 43,337 (Sept. 21, 1992) .......... 18
75 Fed. Reg. 57,252 (Sept. 20, 2010) .......... 18
76 Fed. Reg. 43,569 (July 21, 2011) .......... 18
76 Fed. Reg. 79,275 (Dec. 21, 2011) .......... 18
76 Fed. Reg. 79,767 (Dec. 22, 2011) .......... 18

Other Authorities

5C Wright & Miller, *Federal Practice and Procedure* § 1368 (3d ed. 2022 update) .......... 13
Black's Law Dictionary (11th ed. 2019) .......... 12, 16
Bd. of Governors of the Fed. Reserve Sys., *108th Annual Report of the Board of Governors of the Federal Reserve System* 154 (2021), https://www. federalreserve.gov/publications/files/2021-annual-report.pdf .......... 6
Congressional Budget Office, *The Accuracy of CBO's Budget Projections for Fiscal Year 2021* (Jan. 2022) .......... 5
FDIC, *2021 Annual Report* 123, https://www.fdic.gov/about/financial-reports/reports/2021annualreport/2021-arfinal.pdf .......... 6
J Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 62 (2017) .......... 5
OCC, *2022 Annual Report* 43, https://occ.gov/publications-and-resources/publications/ annual-report/files/2022-annual-report.html) .......... 6
*Principles of Federal Appropriations Law*, 2-22 (4th ed. Rev. 2016) .......... 5, 7
Pub. L. No. 91-508, 84 Stat. 1114 (1970) .......... 17
Pub. L. No. 104-208, 110 Stat. 3009 (1996) .......... 17
S. Rep. No. 111-176 (2010) .......... 6

## INTRODUCTION

The Bureau of Consumer Financial Protection brings this case to hold Fifth Third Bank, National Association ("Fifth Third") liable for a variety of egregious sales misconduct including, *inter alia,* claiming to act in consumers' best interests while incentivizing the sale of consumer-financial products based on the revenue those products generate for Fifth Third, opening consumer-financial products in consumers' names without their consent, and failing to take reasonable steps to identify and remediate wronged consumers.

In its attempt to escape liability for its unlawful conduct, Fifth Third first claims that the Bureau's funding mechanism is unconstitutional—an argument that lacks support in the Constitution, ignores historical precedent, and contradicts the holdings from all but one court to have considered the issue. Moreover, even if this Court found a constitutional infirmity in the Bureau's Congressionally mandated funding mechanism, Fifth Third cannot show that dismissal of this action would be the appropriate remedy.

The remainder of Fifth Third's arguments are similarly unavailing. First, the bank claims that it is entitled to judgment by relying on its own allegations in and attachments to its Second Amended Answer, including allegations about the dates, discovery, and scope of violations. This is improper under Federal Rule of Civil Procedure 12(d), and Fifth Third's allegation-based support for its motion should be excluded. This is fatal to the bank's argument that some claims concerning unauthorized credit cards—Counts 3, 8, 10, and part of 13—are time-barred. Second, the bank argues that product-specific claims relating to online banking and early-access lines of credit (EAX)—Counts 4 through 7—fail because the Bureau allegedly must and does not plead an injury in fact for these unauthorized but self-described "highly desirable" products. But it is axiomatic that a government agency enforcing the law, like the Bureau, does not need to assert an injury in fact to have Article III standing. Third, the bank argues that the Bureau fails to state an abusiveness claim where the Bureau alleges that Fifth Third unlawfully takes unreasonable advantage of consumers by failing to identify and remediate those who it subjected to

unauthorized consumer-financial products. This is plainly wrong; the Amended Complaint clearly describes the abusiveness standard and how Fifth Third's conduct meets the elements of this cause of action. Finally, the bank argues that two of the Bureau's sales-practices-related claims—including that Fifth Third says that it acts in consumers' best interests while incentivizing sales based on bank-revenue generation—are duplicative of unauthorized-product-opening claims. But the claims are not duplicative, and even if they were, the fact that the bank's conduct violated multiple CFPA provisions is not a reason to dismiss any of the instant causes of action.

## LEGAL STANDARD

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)). Much like reviewing a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a defendant's motion may be granted only "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Id.* (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

## ARGUMENT

### I. The Bureau's statutory funding mechanism is constitutional and provides no grounds for dismissal.

Fifth Third first argues that this enforcement action must be dismissed because the statute Congress passed to fund the Bureau "violates the Appropriations Clause, and therefore circumvents the Constitution's checks-and-balances." Def's Mem., Doc. 131, PageID 1453. This

challenge to the Bureau's statutory funding mechanism is without merit, and any purported constitutional defect would offer no reason to dismiss this action in any event.

### A. Congress satisfied the Appropriations Clause when it passed a statute to fund the Bureau's operations.

When it established the Bureau, Congress chose to fund the agency's operations through an authorization in the Bureau's organic statute rather than through annual spending bills, just as Congress has done for numerous other agencies and programs. The Consumer Financial Protection Act (CFPA) authorizes the Bureau Director to request a transfer "from the combined earnings of the Federal Reserve System" of an "amount," up to an inflation-adjusted cap, that the Director "determine[s] . . . to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1), (2).

This statutory funding authorization is wholly consistent with the text of the Appropriations Clause, Supreme Court precedent interpreting the Clause, and historical practice. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." U.S. Const. Art. I, § 9, cl. 7. As the Supreme Court has long emphasized, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Id.* In the CFPA, Congress provided just that authorization for the Bureau to draw and spend money to fund its operations—including pursuing enforcement actions like the one here. *See* 12 U.S.C. § 5497(a), (c).

Historical practice confirms that Congress's choice to fund the Bureau through a standing appropriation in the Bureau's organic statute is constitutional. Since the Founding Era, Congress has chosen to fund important programs through sources other than annual spending bills. *See, e.g.*, An act to establish the Post-Office and Post Roads within the United States, 1 Stat. 232 (1792) (funding the Post Office through postage rates); An act for the better

government of the Navy of the United States, 2 Stat. 45, 52–53 (1800) (funding "the payment of pensions and half pay" to sailors through proceeds from captured enemy vessels). Congress has also long "create[d] governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process," and courts have recognized that such mechanisms are "consistent with the Appropriations Clause." *PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated in part on other grounds by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). Today, there are numerous such agencies. *See, e.g.*, 12 U.S.C. § 16 (Office of Comptroller of Currency); *id.* § 243 (Federal Reserve Board); *id.* § 1755 (National Credit Union Administration); *id.* §§ 1815(d), 1820(e) (Federal Deposit Insurance Corporation); *id.* § 4516 (Federal Housing Finance Agency). The Bureau's funding is, if anything, *more* constrained than that of these other agencies because it is statutorily capped, whereas other agencies are empowered to set the amount of the fees they collect. *See PHH Corp*., 881 F.3d at 95.

Given this longstanding precedent and historical practice, it is unsurprising that courts have uniformly—save one—held that that Congress didn't violate the Appropriations Clause when it passed a statute that authorized the Bureau to spend money from a specified source for specified purposes. *See, e.g.*, *PHH Corp.*, 881 F.3d at 95–96; *CFPB v. TransUnion*, No. 1:22-cv-1880, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022); *CFPB v. Ctr. for Excellence in Higher Educ.*, No. 2:19-cv-00877, 2022 WL 4182301, at *6 (D. Utah Sept. 13, 2022); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7–9 (D. Md. Nov. 30, 2020); *CFPB v. D & D Mktg., Inc.*, No. 2:15-cv-9692-PSG, 2016 WL 8849698, at *5 (C.D. Cal. Nov. 17, 2016); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014).

**B. Fifth Third's arguments to the contrary are wrong.**

Fifth Third's efforts to evade this weight of authority rest entirely on the reasoning of the single out-of-circuit decision reaching the opposite conclusion. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 635–43 (5th Cir. 2022) ("*CFSA*"), *petition for cert. pending*,

No. 22-448. But the Fifth Circuit's decision in *CFSA* was badly mistaken, as are Fifth Third's arguments based on its reasoning.

*First*, Fifth Third complains that "the CFPB's funding occurs outside Congress'[s] annual appropriations process." Def.'s Mem. 6, Doc. 131, PageID 1458. But nothing in the Constitution requires that authorizations for Executive spending be limited to a single year. *Cf.* U.S. Const. Art. I, § 8, cl. 12 (limiting appropriations for the Army—but not for any other purpose—to no more than two years). In fact, a large portion of the federal budget now consists of mandatory spending that "does not require annual appropriations." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 62 (2017). In fiscal year 2021, Congress authorized approximately $4.8 trillion in such mandatory spending (out of approximately $7 trillion in total spending). *See* Congressional Budget Office, *The Accuracy of CBO's Budget Projections for Fiscal Year 2021*, at 6–7 (Jan. 2022). There is likewise no basis in constitutional text or historical practice for Fifth Third's assertion that the statute funding the Bureau somehow does not constitute "an appropriation." *See* Mot. at 7 n.6. Neither the Defendant here nor the Fifth Circuit in *CFSA* attempted to define what they think constitutes an "appropriation." Under the long-accepted understanding of that term, the Bureau's funding statute indisputably qualifies: It is a law that "specifies the manner in which a Federal entity shall be funded and makes such funds available for obligation and expenditure." *Principles of Federal Appropriations Law*, 2-22 (4th ed. Rev. 2016) ("GAO Redbook").

*Second*, Fifth Third suggests that Congress did not properly "reserv[e] congressional control" over the Bureau's funding because it has no "discretion to fund the CFPB at lower-than-requested levels," up to the statutory cap. Mot. at 5–6. But since the Founding, congressional appropriations statutes have often given the Executive Branch broad discretion in how to spend appropriated funds up to a specified amount. *See, e.g.*, Act of Sept. 29, 1789, ch. 23, 1 Stat. 95 (providing lump sum "for defraying the expenses of the department of war"). The constitutionality of such "appropriations committed to the discretion of the" Executive "has never seriously been questioned." *Clinton v. City of New York*, 524 U.S. 417, 467 (1998) (Scalia,

J., concurring in part and dissenting in part). If anything, Congress reserved far more control over the Bureau's budget than it maintains over entities like the Federal Reserve Board and the Office of the Comptroller of the Currency (OCC), on which it imposed no funding cap. *See* 12 U.S.C. § 243; 12 U.S.C. § 16. While Fifth Third protests (at 5 n.3) that the Bureau's funding cap is a "staggering figure," Congress calibrated it to ensure that "the CFPB budget is modest" in comparison with the budgets of "other financial regulatory bodies." S. Rep. No. 111-176, at 163 (2010). Indeed, the operating expenditures of the OCC, Federal Reserve Board, and Federal Deposit Insurance Corporation (FDIC), for example, exceed the CFPB's cap.[1]

*Third*, Fifth Third notes that the Bureau is funded from the annual receipts of the Federal Reserve System, which, Fifth Third claims "itself is outside the appropriations process." Def.'s Mem., Doc. 131, PageID 1458. In *CFSA*, the Fifth Circuit looked at this same aspect of the funding mechanism and concluded that the Bureau is somehow "double-insulated" from congressional oversight. *CFSA*, 51 F.4th at 639. This double-insulation theory rests on a faulty premise. The Federal Reserve Board—the supposed intermediary between Congress and the Bureau—plays a purely ministerial role in the Bureau's funding. 12 U.S.C. § 5497(a)(1) (requiring Board to transfer requested amount). Congress is free to modify the Bureau's funding at any time by simply passing a statute, just as it would be if the statute instead directed the Secretary of the Treasury to transfer the same capped amount from the government's general

[1] *Compare* CFPB, *Annual Performance Plan and Report, and Budget Overview* 8 (2023), https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy23.pdf (last visited Feb. 21, 2023) (Bureau's funding cap was $734 million in FY2022) *with* OCC, *2022 Annual Report* 43, https://occ.gov/publications-and-resources/publications/annual-report/files/2022-annual-report.html (last visited Feb. 21, 2023) (OCC's FY2022 expenditures were approximately $1.1 billion); Bd. of Governors of the Fed. Reserve Sys., *108th Annual Report of the Board of Governors of the Federal Reserve System* 154 (2021), https://www. federalreserve.gov/publications/files/2021-annual-report.pdf (last visited Feb. 21, 2023) (Federal Reserve Board's FY2022 estimated operating expenses were approximately $970 million); FDIC, *2021 Annual Report* 123, https://www.fdic.gov/about/financial-reports/reports/2021annualreport/2021-arfinal.pdf (last visited Feb. 21, 2023) (FDIC's FY2021 operating expenditures were $1.8 billion).

funds. *See PHH*, 881 F.3d at 198 n.19 (Kavanaugh, J., dissenting) (recognizing that the Bureau's funding "is not an entrenched statute shielded from future congressional alteration, nor could it be").

*Fourth*, Fifth Third argues it is improper for the Bureau's funds to be held outside the Treasury and "remain available until expended." *See* Def.'s Mem., Doc. 131, PageID 1458 (discussing 12 U.S.C. § 5497(b)(1), (c)(1)). Fifth Third does not explain why the location of the account would alter either Congress's oversight powers or the broader Appropriations Clause analysis. Its skepticism of appropriations without time limits is likewise misplaced. This argument runs counter to the Constitution's text, which expressly limits the duration for appropriations only for efforts "[t]o raise and support Armies." U.S. Const. Art. I, § 8, cl. 12. And it ignores the commonplace nature of provisions allowing for expenditures without temporal limitation. *See* GAO Redbook at 5-7 to 5-9 (explaining that "to remain available until expended" is "standard language").

*Fifth*, Fifth Third focuses on two aspects of the CFPA that, in its view, take the Bureau's funds outside of normal oversight channels. It first focuses on a provision stating that the money the Bureau draws "shall not be construed to be Government funds or appropriated monies," 12 U.S.C. § 5497(c)(2), which Fifth Third takes as a self-defeating declaration that Section 5497 violates the Appropriations Clause. *See* Def.'s Mem., Doc. 131, PageID 1458; *see also id.* at PageID 1457 n.4 (quoting similar language in Bureau financial report). It is not. Section 5497(c) does not purport to describe the status of the Bureau's funds under the Constitution; instead, it merely exempts those funds from statutes that impose limitations on "the use of all appropriated amounts." GAO Redbook at 2-22, 2-25 to 2-26 & n.29. Defendant next focuses on the direction in the statute that the House and Senate Committees on Appropriations may not review the Bureau's funding. 12 U.S.C. § 5497(a)(2)(C). This provision simply allocates authority among different congressional bodies. The statute contains several other provisions that allow Congress to fully oversee the Bureau's spending. *See* 12 U.S.C. §§ 5496(a)–(b), (c)(2), 5497(a)(5), (e)(4) (requiring audits, reports, and appearances before Congress concerning Bureau spending).

In an effort to distinguish the Bureau's statutory funding mechanism from these obvious historical precedents, Fifth Third argues that the Bureau's statutory mission or authorities render it meaningfully different from other agencies that are similarly, and concededly constitutionally, funded. *See* Def.'s Mem., Doc. 131, PageID 1459–60. That comparison is irrelevant. The Appropriations Clause applies equally to all agencies; nothing in its text or history supports distinctions based on an agency's portfolio or scope of authority. The comparison is also incompatible with *Collins v. Yellen*, where the Supreme Court warned that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies." 141 S. Ct. 1761, 1785 (2021). Finally, the comparison is unpersuasive even on its own terms. The Federal Reserve Board, OCC, and FDIC have significant policymaking and enforcement authority over key segments of the financial industry. *See* 12 U.S.C. §§ 248, 1818, 1828. Indeed, the CFPB inherited most of its authorities from those agencies and others with similar funding structures. *See* 12 U.S.C. § 5581. In short, there is no way to accept Fifth Third's constitutional argument without calling into question the funding mechanism of numerous agencies of long standing.

Finally, having failed to identify any aspect of the Bureau's funding mechanism that violates the Appropriations Clause, Fifth Third tries to unmoor its objections from constitutional text and historical practice. It appears to suggest that the Bureau's funding mechanism is inconsistent with some broader separation-of-powers principle. *See* Def.'s Mem., Doc. 131, PageID 1458–59 (discussing general separation-of-powers concerns). But the Appropriations Clause is the relevant "bulwark of the Constitution's separation of powers" in the funding arena, as it "restrain[s]" "Executive Branch officers" from infringing on Congress's "absolute" "control over federal expenditures." *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347–48 (D.C. Cir. 2012) (Kavanaugh, J.) (citations omitted). Courts have no license to depart from the text and history of the constitutional provisions adopted by the Founders in pursuit of their own views about the proper structure and funding of administrative agencies. Fifth Third also gestures at a nondelegation argument, contending—in a footnote—that Congress improperly

"cede[d] its discretion in the appropriations process by legislating that role to the CFPB." Def.'s Mem., Doc. 131, PageID 1459 n.6 (citing *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019)). The court need not consider this "perfunctory" and undeveloped argument. *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). To the extent that the court does consider it, the Bureau's statutory funding is consistent with a long history of "permissive" appropriations that grant the Executive "wide discretion" in whether and how to spend money. *City of New York*, 524 U.S. at 446. And the statute provides at least as much guidance to the Director in his funding requests as the far broader delegations that the Supreme Court has repeatedly upheld. *Compare* 12 U.S.C. § 5497(a) (instructing Director to request the amount "reasonably necessary" to carry out the Bureau's authorities and responsibilities, as detailed elsewhere in the statute) *with, e.g., Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472–76 (2001) (approving direction to agency to set air quality standards "requisite to protect the public health").

### C. Any purported constitutional problem with the Bureau's statutory funding mechanism would not justify the remedy of dismissal.

Even if this court agreed with the *CFSA* decision that there is a constitutional defect in the Bureau's statutory funding mechanism—and disagreed with every other court to consider the question—that still wouldn't support dismissing this case, as Fifth Third requests. *See* Def.'s Mem., Doc. 131, PageID 1460. That's because *CFSA*'s remedial analysis, on which Fifth Third entirely relies, was badly mistaken.

To begin, the Fifth Circuit erred in failing to conduct a severability analysis assessing whether the core provision authorizing the Bureau to spend funds could remain intact even if the other features that the court found problematic were invalid. If, for instance, there were actually a constitutional problem with the provision that removes oversight responsibility from particular committees, 12 U.S.C. § 5497(a)(2)(C), the proper remedy would be to hold that provision unconstitutional while leaving the rest of the funding mechanism in place. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when

confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (quotation marks omitted)).

Nor is there any support for Fifth Third's claim to have somehow been harmed by the Bureau's method of funding. *See* Def.'s Mem., Doc. 131, PageID 1460 (citing *CFSA*, 51 F.4th at 643). Fifth Third has not shown that the Bureau would have acted differently had it been funded by (what Fifth Third would consider to be) a "valid" appropriation. *See Collins*, 141 S. Ct. at 1789 (holding that a party can obtain relief because of an agency official's unconstitutional insulation from removal if the party can show that the removal restriction itself "inflicted harm"); *id.* at 1801–02 (Kagan, J., concurring in part) ("agree[ing]" with the majority that a party must show that the unconstitutional provision actually "affected the complained-of decision").

Moreover, when Congress has established remedies for unauthorized Executive Branch spending, it has not authorized the unwinding of otherwise-valid government actions, as Fifth Third seeks here. *See* 31 U.S.C. §§ 1349(a), 1350. The only decision that Fifth Third can muster in support of its preferred remedy is *CFSA*. *See* Mot. at 8. That decision, however, failed to conduct a severability analysis or to consider the application of traditional remedial principles to the Appropriations Clause issue it described. This Court should not follow the badly flawed remedial analysis in that decision.

## II. There is no basis to consider Fifth Third's statute-of-limitations or repose arguments.

Fifth Third next raises several time-limitation theories in support of its motion, none of which withstand scrutiny. Only the CFPA's three-year statute of limitations applies to the Bureau's claims. And for each analysis of the theories raised by Fifth Third, the Supreme Court's general principle applies: "To the extent that any doubts remain" about whether these limitations provisions apply to the Bureau and other federal agencies, "they are erased by the rule that statutes of limitations are construed narrowly against the government." *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006). In no instance would the application of any of the limitations

argued by Fifth Third bar any claim, or portions of any claim, or materially affect the course of the litigation.

### A. None of the Bureau's claims are subject to full or partial judgment based on the CFPA's statute of limitations.

The relevant statute of limitations provides that the Bureau may not bring any action under the Consumer Financial Protection Act (CFPA) "more than 3 years after the date of discovery of the violation to which the action relates," "[e]xcept as otherwise permitted by law or equity." 12 U.S.C. § 5564(g). Before addressing this standard, it is important to note that the parties both acknowledge that they entered into a series of agreements[2] that tolled the running of the three-year statutory period for a total of 520 days. Def.'s Mem., Doc. 131, PageID 1462. Because this case commenced on March 9, 2020, there could be no statute-of-limitations bar for any violation that the Bureau discovered on or after October 7, 2015.

As this Court has held elsewhere, judgment on the pleadings in a defendant's favor on statute-of-limitations grounds is proper "[o]nly if it is apparent on the face of the complaint" that the suit is time-barred. *Hollis v. Erdos*, 480 F. Supp. 3d 823, 829 (S.D. Ohio 2020) (Cole, J.). There is nothing on the face of the Amended Complaint to suggest that the Bureau discovered any of Fifth Third's violations before October 7, 2015, or, for that matter, before 2017. *See* Am. Compl., Doc. 73, PageID 59, ¶ 5. The Bureau alleges that *Fifth Third* had discovered at least some unauthorized credit cards by 2010. *See id*. at 8, 12, 20, ¶¶ 45, 71, 117. The Bureau also alleges that Fifth Third admitted in 2017 that it had opened unauthorized consumer-financial products during each year from 2010 to 2016. *Id*. at 59, ¶ 5. But the Bureau does not allege that it—as opposed to Fifth Third—discovered *any* of the illegal acts or practices before 2017.

[2] Fifth Third attached these tolling agreements to its Second Amended Answer and relies on them here. The Bureau does not object to the submission of the tolling agreements as written instruments under Rule 10(c). As explained later in this memorandum, the same cannot be said of Fifth Third's other attachments to and related references in its Second Amended Answer; those may not be considered at this stage of the litigation.

Fifth Third's statute-of-limitations arguments rest entirely on two attachments to its Second Amended Answer: a document that, on its face, [redacted] yet Fifth Third asserts [redacted]; and a Fifth Third affidavit attempting to authenticate the first document [redacted] Def.'s Mem., Doc. 131, PageID 1462. But those attachments cannot be considered on Fifth Third's motion for judgment on the pleadings, and they should be excluded. There are very limited circumstances in which exhibits attached to an answer may properly be considered on a Rule 12(c) motion, and such circumstances are not present here. *See Day v. DeLong*, No. 3:16-cv-00437, 2017 WL 5903761, at *6–7 (S.D. Ohio Nov. 30, 2017) ("Defendants build their assertions of fact on evidence outside the pleadings—specifically, the materials they attach to their Answer . . . Rule 12 does not allow the use of such extra-pleading evidence."). Where documents attached to an answer offer "new and different facts" and do not "simply verify[] the factual allegations in [the] complaint," they "constitute materials outside the pleadings," and "[i]t would be error to consider such evidence without converting [a] Rule 12(c) [m]otion to [a] motion for summary judgment and providing a reasonable time for discovery." *Id.* at 7. A court in the Northern District of Ohio declined to consider a defendant's exhibits under circumstances similar to those here and described the state of the law: the defendants "do not supply legal authority and the Court has found none demonstrating that exhibits attached to the answer, but not attached to or referenced in the complaint, may be considered in a motion for judgment on the pleadings." *Manigault v. Ohio Dep't of Rehab. & Corr.*, No. 4:14cv585, 2014 U.S. Dist. LEXIS 132033, at *6 (N.D. Ohio Sept. 19, 2014).

Fifth Third's attachments here are not the type of "written instrument" that may be considered incorporated within a pleading. Because "[t]he Sixth Circuit has not defined 'written instrument' within the context of Rule 10(c)," courts in this district "have [] relied upon the definition of 'instrument' set forth in Black's Law Dictionary [] as '[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory

note, or share certificate.'" *LaGuardia v. Designer Brands, Inc.*, No. 2:20-cv-2311, 2020 WL 6280910, at *4 (S.D. Ohio 2020). "Unauthenticated evidence" or "[l]engthy exhibits containing [] evidentiary matter should not be attached to the pleadings." *Id*. at *5 (quoting *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d Cir. 1989)). Likewise, "affidavits are not considered a 'written instrument,' and instead are considered outside the pleading." *Barnard v. Lackawanna County*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016) ("Consideration of an affidavit at this stage would convert the motion to one for summary judgment.").

Additionally, Fifth Third does not meet its burden of showing that all material issues of fact can be resolved on the pleadings and that it is entitled to judgment as a matter of law. *See, e.g., Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991). "An issue of fact is deemed to be material if the outcome of the case might be altered by the resolution of the issue one way rather than another." 5C Wright & Miller, *Federal Practice and Procedure* § 1368 (3d ed. 2022 update). Even if Fifth Third is permitted to introduce these inconclusive extra-pleading attachments from its Amended Answer, the attachments raise a point of contention over whether conduct before October 2015 should be considered—the resolution of which would undoubtedly alter the outcome of this case—and therefore raise a material issue of fact that cannot be resolved on the pleadings. Consequently, the bank's argument that it should be entitled to judgment at this stage still fails.

In any event, the existence of a claim and underlying factual allegations that would allow this Court "to draw the reasonable inference that [Fifth Third] is liable for the misconduct alleged" is enough to dispose of this Rule 12(c) motion. *Patterson v. Novartis Pharms. Corp*., 451 F. App'x 495, 497–98 (6th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Bureau has met this burden by alleging repeated instances of sales misconduct in violation of the CFPA, which grants the Bureau authority to seek relief. And to be sure, Fifth Third has already conceded in its Second Amended Answer that at least some unauthorized credit-card openings occurred between October 2015 and the end of 2016. *See*, *e.g*., Second Am. Answer, Doc. 119, PageID 1189–90, ¶ 74 (admitting that the bank had opened "fewer than 800 potentially

unauthorized accounts . . . in branches between 2010 and 2016”). From the Bureau’s allegations and the bank’s concessions, this Court may reasonably infer that Fifth Third is liable for its misconduct under the CFPA.

Further, Fifth Third does not indicate how many or which unauthorized accounts it claims that the Bureau “discovered” before October 2015. Given that no identifiable set of accounts would be excluded by the statute-of-limitations ruling that Fifth Third seeks, the scope of discovery and the litigation would be unaffected. In similar circumstances, courts considering the Bureau’s discovery of defendants’ illegal acts or practices have declined to dismiss based on the statute of limitations because there would be no practical effect on the course of litigation. *See, e.g.*, *CFPB v. Weltman, Weinberg & Reis Co., L.P.A.*, No. 1:17 CV 817, 2017 WL 4348916, at *7 (N.D. Ohio Sept. 28, 2017) (reserving a decision on statute of limitations where “no claim . . . [would] be completely foreclosed on statute of limitations grounds and all claims are based on the same conduct and thus support the same discovery”); *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1380–81 (N.D. Ga. 2015) (same).

Finally, the limited information contained in the bank’s exhibit plainly does not establish that any violations of law were discovered under the CFPA. As an initial matter, aside from the bank’s affidavit that, other than [redacted] simply quotes from the exhibit itself, there is no evidence to authenticate the document. The face of the document does not indicate an author or recipient; there is no indication of who saw the document or was privy to the underlying information that it ostensibly conveys; the document explicitly states that [redacted] And Fifth Third fails to establish that [redacted]. And even if there were some evidence of discovery of some violations before October 7, 2015, dismissal would not be appropriate because there has been no opportunity for the Bureau to establish whether equitable tolling should apply

to any such discovery date. *See* 12 U.S.C. § 5564(g) ("Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates.").

**B. The CFPA's three-year limitations period also applies to the Bureau's claims relating to TILA and FCRA violations.**

Fifth Third's attempts to apply shorter limitations periods to the Bureau's claims relating to the Truth in Lending Act (TILA) (Count 8) and the Fair Credit Reporting Act (FCRA) (Count 10) are unavailing, and, in any event, would not change the result. The TILA and FCRA counts are subject to the CFPA's three-year statute of limitations and not to any other limitations or repose period applicable to private-plaintiff suits under TILA or FCRA. Fifth Third incorrectly argues that the one-year statute of limitations found in TILA, at 15 U.S.C. § 1640(e), applies here. That section of TILA provides that "any action under *this section*" may be brought within one year. "This section"—§ 1640—authorizes actions by individual private plaintiffs and class actions, as well as actions by state attorneys general, but makes no mention of the Bureau.

Rather, the Bureau's authority to enforce TILA is set out in a separate section of TILA, 15 U.S.C. § 1607(a)(6). That section provides that, "[s]ubject to subtitle B of the [CFPA], compliance with the requirements imposed under this subchapter shall be enforced under . . . subtitle E of the [CFPA], by the Bureau, with respect to any person subject to this subchapter." 15 U.S.C. § 1607(a)(6). Subtitle E of the CFPA, in turn, authorizes the Bureau to bring suit "to impose a civil penalty or to seek all appropriate legal or equitable relief," including an injunction, restitution, and other compensation for consumers. 12 U.S.C. §§ 5564(a), 5565(a). Thus, the Bureau's authority to obtain relief for violations of TILA is independent of § 1640, and Count 8 (and, of course, Count 13—"Fifth Third's Additional Violations of the CFPA") is not brought "under" § 1640.

Further, § 1607(b) provides that, in instances in which the Bureau enforces TILA, "a violation of any requirement imposed under [TILA] shall be deemed to be a violation of a requirement imposed under" the CFPA. 15 U.S.C. § 1607(b). To "deem" means "[t]o treat

(something) as if [] it were really something else." Black's Law Dictionary (11th ed. 2019). By providing that a violation of TILA "shall be deemed" a violation of the CFPA, § 1607(b) provides that a violation should be treated as if it were a violation of the CFPA. By virtue of this "deeming" provision in TILA, the Bureau's claims enforcing TILA are subject to the same statute of limitations that applies to CFPA claims.

Of the courts to have considered this issue, all but one have held that TILA claims brought by the Bureau are enforced under the CFPA and are, thus, governed by the CFPA's three-year statute of limitations. Fifth Third cites only to the outlier. Def.'s Mem., Doc. 131, PageID 1462–63 (citing *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015)). The majority-line cases—*CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 48–49 (D.R.I. 2020); *In re Integrity Advance, LLC*, No. 2015-CFPB-0029, slip op. at 28 (Jan. 24, 2020) (Doc. No. 249)[3]; *CFPB v. Ocwen Fin. Corp.*, No. 17-80495, 2019 U.S. Dist. LEXIS 152336, at *74 (S.D. Fla. Sept. 5, 2019)—applied the CFPA's three-year statute of limitations and were all decided after the outlier, *ITT*. The most recent directly addressed the *ITT* ruling and found it to be "unconvincing." *Citizens Bank*, 504 F. Supp. 3d at 48–49.

Fifth Third also errs in arguing that the time limits set forth in § 1681p of FCRA apply to the Bureau. That provision sets time limits on any action "to enforce any liability created under [FCRA]." 15 U.S.C. § 1681p (FCRA). When the Bureau enforces FCRA, it is not enforcing *a liability created* by FCRA. Rather, the defendant's liability to the Bureau is created not by FCRA, but by the CFPA—in particular, by 12 U.S.C. § 5565, which authorizes the Bureau to obtain "any appropriate legal or equitable relief" for violations of law including FCRA. And similar to TILA, FCRA provides that a violation of that law "shall be deemed to be a violation" of the CFPA. 15 U.S.C. § 1681s(d). As described above, this "deeming" language makes the Bureau's FCRA claim subject to the CFPA's three-year statute of limitations.

---

[3] Available at https://files.consumerfinance.gov/f/documents/cfpb_2015-CFPB-0029_Document-249_2020-01.pdf (last visited Feb. 8, 2023).

**C. The Transfer Date does not preclude any Bureau claims.**

Fifth Third's final time-limitation argument—concerning the date that enforcement authority for violations transferred to the Bureau (the Transfer Date, July 21, 2011)—is also unavailing. As an initial matter, Fifth Third fails to establish the number of violations that allegedly preceded the Transfer Date. So, again, no claim could be foreclosed entirely.

Additionally, the Bureau has authority to bring claims for violations of enumerated consumer laws, including TILA, FCRA, and the Truth in Savings Act (TISA), that occurred before the Transfer Date. Those laws all took effect long before the Transfer Date. *See* Pub. L. No. 91-508, § 503(1) (1970) (establishing October 26, 1970 as effective date of relevant TILA provision, 15 U.S.C. § 1642, added by Pub. L. No. 91-508, § 502(a)); Pub. L. No. 104-208, § 2420(a) (1996) (establishing "365 days after" September 30, 1996 as effective date of relevant FCRA provision, 15 U.S.C. § 1681b(f), added by Pub. L No. 104-208, § 2404(b)); 57 Fed. Reg. 43,337, 43,378-79 (Sept. 21, 1992) (adopting relevant regulation implementing TISA and establishing March 21, 1993 as mandatory compliance date).[4] Fifth Third has been subject to those laws since they took effect, and Fifth Third offers no argument suggesting otherwise. Fifth Third appears to assert that the Bureau cannot assert claims for violations of those laws that occurred before the Transfer Date, but the statute says no such thing. Rather, the statute provides that the provisions vesting the Bureau with authority to bring claims for violations of federal consumer financial law (which includes the violations of TILA, FCRA, and TISA asserted here, *see* 12 U.S.C. § 5481(14), (12)(F), (O), (P)) took effect on the "designated transfer date."[5] *See* Pub. L. No. 111-203, § 1058 (2010). Nothing in the statute says that the Bureau can pursue only those violations of law that occurred after the Bureau gained authority to enforce the law. Rather, as of the Transfer Date, the Bureau gained authority to bring actions to address violations of the

[4] In December 2011, the Bureau republished regulations that it inherited from other agencies in new locations in the Code of Federal Regulations, but the provisions that are relevant to this matter have been substantively the same for all relevant periods. 76 Fed. Reg. 79275 (Dec. 21, 2011) (Regulation DD); 76 Fed. Reg. 79767 (Dec. 22, 2011) (Regulation Z); *see also* 76 Fed. Reg. 43569 (July 21, 2011) (explaining that the Bureau can enforce the previous versions).
[5] The designated transfer date was established as July 21, 2011. *See* 12 U.S.C. § 5582; 75 Fed. Reg. 57,252, 52,253 (Sept. 20, 2010).

laws that it is charged with administering, regardless of when those violations occurred (subject, of course, to the applicable statutes of limitations).

And to the extent that Fifth Third means to object only that the Bureau cannot pursue violations of the CFPA's prohibition on unfair and abusive practices that occurred before the Transfer Date, that objection is beside the point. Because no unfairness or abusiveness claim would be foreclosed entirely, there is no need to consider whether the Bureau could seek to hold Fifth Third liable for the unspecified unfair and abusive conduct that predated the Transfer Date.

## III. The Bureau cannot be treated as a private plaintiff for Article III standing purposes.

The Supreme Court recently reaffirmed decades of jurisprudence providing that injury-in-fact is an Article III standing concept that ensures that, in private suits, the plaintiff has "a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). This is a sensible safeguard, because "if the law of Article III did not require plaintiffs to demonstrate a 'concrete harm,' Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law." *TransUnion LLC*, 141 S. Ct. at 2206.

But the United States, as sovereign, is not a private plaintiff. As the Federal Circuit has explained, applying Supreme Court precedent: "From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'" *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) (quoting *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)); *see also*, *e.g.*, *EEOC v. Crothall Servs. Grp., Inc.*, No. 15-CV-3812, 2016 WL 3519710, at *3 (E.D. Pa. June 28, 2016) ("EEOC need not identify a specific individual who has been injured by [the defendant's] alleged recordkeeping violation in order to demonstrate standing because 'a violation of a statute inherently constitutes an injury to the United States.'" (quoting *Stauffer*, 619 F.3d at 1325) (original alterations omitted)). Another court, after considering the caselaw, observed that "it is unlikely the government has ever been

denied standing to enforce its own laws." *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-CV-168, 2011 WL 1206768, at *3 (W.D. Wis. Mar. 15, 2011); *see also Stauffer*, 619 F.3d at 1325 ("The parties have not cited any case in which the government has been denied standing to enforce its own law.").

Nothing in Article III caselaw requires the Bureau to act like a private plaintiff and plead an injury in fact to private parties so that it can enforce the law. Quite the opposite. The Supreme Court has made clear that the application of the injury-in-fact requirement for standing to private plaintiffs protects the *Article II* authority of Executive agencies and avoids private infringement on the agency's exercise of its discretion to "prioritize" and to determine "how aggressively to pursue legal actions against defendants who violate the law." *TransUnion LLC*, 141 S. Ct. at 2207. The Bureau is "an Executive agency, as defined in section 105 of title 5." 12 U.S.C. § 5491(a). Here, Fifth Third has injured the government's interests by violating its laws, and Congress has authorized the Bureau to vindicate that interest. Nothing in Fifth Third's lengthy discussion of its views about the quality of the Bureau's allegations of injury or likelihood of injury changes this, even if Fifth Third could rely on its extra-pleading submissions, which it cannot.

Although not relevant to Article III standing, the Bureau does plead the requisite injury or likelihood of injury to consumers for the unfairness claims that require that showing under the governing statute, 12 U.S.C. § 5531(c)(1)(a). For each of these claims, the Bureau alleges that Fifth Third's illegal conduct is likely to cause one or more of the incurrence of fees, increased risk of data theft, money theft, improper personal-data use, negative effects on consumers' credit profiles, negative effects on consumer-reporting-agency information, and the expenditure of consumer time and effort determining the facts and attempting to monitor and mitigate the harm. Second Am. Answer, Doc. 119, PageID 1215–17, 1219 ¶¶ 164, 171, 179, 187.

Fifth Third's argument is largely a factual one, and it is improperly supported by extra-pleading assertions, *see* Def.'s Mem., Doc. 131, PageID 1468, 1470, that cannot be considered on a motion for judgment on the pleadings. Fed. R. Civ. P. 12(d). Even if those assertions could

be considered, they would not support dismissal of any claim or portion of any claim. Fifth Third's primary factual contentions are that online banking, overdraft protection, and EAX are free, at least until used, that they are "highly desirable," and that they cause no reporting to credit agencies. Def.s Mem., Doc. 131, PageID 1467–68. There is nothing in the Amended Complaint or other material properly considered at this stage of the litigation to support these factual contentions, but the contentions miss the mark anyway.

As to EAX, Fifth Third seems to misunderstand the allegation. The Bureau alleges that unauthorized EAX products affect a consumer's "credit profile." Am. Compl., Doc. 73, PageID 87, ¶ 171. The Bureau does not allege that a credit profile is limited to information reported by Fifth Third to a consumer-reporting agency.

Fifth Third's contention that some of its unauthorized products are free is also of no moment. Injury or likelihood of injury under the CFPA is not limited to monetary injury. *See* 12 U.S.C. § 5531(c)(1)(a). In fact, many courts have recognized as injurious that consumers must spend time investigating unauthorized products. *See*, *e.g.*, *FTC v. Amazon.com, Inc*., No. C14-1038-JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) (finding substantial injury under the FTC Act's definition of unfairness where consumers' children made purchases without adult consent and the adults spent time pursuing refunds); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 721 (S.D. Tex. 2008) (finding that time spent seeking a refund for and cancellation of unrequested services was injury sufficient to support an unfairness claim under the FTC Act).

Fifth Third's self-serving view that the products are "highly desirable" is not dispositive of unfairness or any other CFPA claims. *Cf*, *e.g*., *Ohio Nat'l Life Ins. Co. v. Cetera Advisor Networks, LLC*, No. 1:19-cv-47, 2021 WL 2819838, at *2 (S.D. Ohio July 7, 2021) (Cole, J.) (noting that a defendant's allegations are not considered on its own Rule 12(c) motion). Fifth Third's view would likely also be of little comfort to the consumers upon whom Fifth Third forced the products without knowledge and consent, and it is at odds with Fifth Third's public

statements about those products.[6] For example, in April 2021, Fifth Third publicly described its June rebranding of EAX as MyAdvance, and further describes it in candid disclaimers as "an expensive form of credit." Fifth Third, *Fifth Third Momentum Banking Offers Ease of a Digital Bank with Personal Support When You Need It*, April 26, 2021, nn.3–4, available at https://ir.53.com/news/news-details/2021/Fifth-Third-Momentum-Banking-Offers-Ease-of-a-Digital-Bank-with-Personal-Support-When-You-Need-It/default.aspx (last visited Feb. 22, 2023). For online banking, as the Bureau alleges in the Amended Complaint, Fifth Third employees effectuated enrollments by setting up consumers' passwords without consumers' knowledge and consent, and Fifth Third's password protocols have been substandard. Am. Compl., Doc. 73, PageID 71, 72, ¶¶ 81, 83. And just three years ago, Fifth Third confessed that some of its former employees "accessed and misused some customers' personal information . . . and may have . . . shared [it] with people outside of the bank." Fifth Third, *Fifth Third Provides Update on Fraud Investigation*, Feb. 13, 2020, at 1, available at https://www.53.com/content/fifth-third/en/media-center/press-releases/2020/press-release-2020-02-13.html (last visited Feb. 22, 2023).

## IV. The Bureau states a claim for relief in Count 12, alleging that Fifth Third engaged in abusive conduct by failing to identify and remediate affected consumers.

Count 12 is a straightforward application of the law. The Bureau describes, in the Amended Complaint, the CFPA's abusiveness prohibition, *Id*. at 79, ¶¶ 126–127, and alleges facts about how Fifth Third takes unreasonable advantage of consumers' lack of understanding, inability to protect themselves, and reasonable reliance on Fifth Third. For example, the Bureau alleges that "Fifth Third knows [of] or consciously disregards" its understatement of the volume of unauthorized accounts. Am. Compl., Doc. 73, PageID 74, ¶ 98. The Bureau also alleges that "Fifth Third has . . . data and other information that would be useful in implementing available

[6] The Bureau recognizes that a public record may only be considered on a motion for judgment on the pleadings if it is "referred to in the complaint and [is] central to the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). Accordingly, the Bureau avers that Fifth Third's webpages should only be considered to counter any of Fifth Third's extra-pleading submissions that are not excluded.

unauthorized-account-identification methods for at least years 2010 to 2021," *id*. at 77, 95, ¶ 119, 217, and that Fifth Third chooses, for selfish reasons, not to use it. *Id*. at 78, 95–96, ¶¶ 121–122, 218–219. The Bureau's allegations continue, stating that some of the victimized consumers "had those [unauthorized] products . . . open for months or years without their knowledge," while Fifth Third told them that Fifth Third "acts in their interests and has identified and remediated all [affected] consumers." *Id*. at 58, 62, 65, 96, ¶¶ 1, 24, 40, 220–221. And Fifth Third admits in its Second Amended Answer that it assured consumers through a fact sheet publicly released in March 2020 that there was a limited and fully identified problem, Second Am. Answer, Doc. 119, PageID 1181, ¶ 50, yet Fifth Third waited a year to roughly double its own estimate of the problem, quietly making this admission in its Amended Answer, Doc. 82, PageID 342, ¶ 51 (and again in its Second Amended Answer, Doc. 119, PageID 1181, ¶ 51).

These facts fit directly into the abusiveness prohibition: consumers cannot understand the risks, costs, or conditions of products that they do not know about; they cannot protect themselves for the same reason; and they have been given every reason by Fifth Third to believe that Fifth Third acts in their interests—including because Fifth Third repeatedly tells consumers this—and to rely on Fifth Third to do so.

Additionally, Fifth Third's contention that this CFPA claim must be treated as a "special matter" and pleaded as fraud under Rule 9(b) is unsupported by law. "[T]he United States Supreme Court has consistently cautioned against extending [Rule 9(b)'s] heightened pleading standard beyond claims for fraud or mistake." *Frederick J. Hanna & Assocs*., 114 F. Supp. 3d at 1372 (citing *Leatherman v. Tarrant Cnty. Narcotics Intel*. *& Coordination Unit*, 507 U.S. 163, 164 (1993)). And, as several courts have held, "consumer protection claims [under the CFPA] are not claims of fraud, even if there is a deceptive dimension to them." *Id.*; *Ocwen Fin. Corp*., 2019 U.S. Dist. LEXIS 152336, at *38; *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 768–70 (S.D.N.Y. 2018), *rev'd on other grounds*, 828 F. App'x 68 (2nd Cir. 2020); *CFPB v. Navient Corp*., No. 3:17-CV-101, 2017 WL 3380530, at *24–25 (M.D. Pa. Aug. 4, 2017). Imposing a heightened pleading standard is "not only inconsistent with some of the policy

reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes." *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1373.

Fifth Third cites to two cases that it contends suggest the application of Rule 9(b) here. The cases suggest no such thing. The cases upon which Fifth Third relies stand for the inapplicable and uncontroversial proposition that *private* fraud claims in federal court must meet federal pleading standards for fraud claims. *See Smith v. Bank of Am. Corp*., 485 F. App'x 749, 752 (6th Cir. 2012); *Pugh v. Bank of Am*., No. 13-2020, 2013 WL 3349649, at *16 (W.D. Tenn. July 2, 2013). Fifth Third fails to distinguish garden-variety fraud claims from, in this instance, the government's abusiveness claim under the CFPA.

But even if Rule 9(b) did apply, the Bureau's allegations are sufficient. The Amended Complaint would only need to put Fifth Third "on notice as to the time, place, and content of the alleged misrepresentations." *Smith*, 485 F. App'x at 753. The Bureau alleges, and incorporates into Count 12, that "Fifth Third tells consumers and otherwise creates a reasonable belief that Fifth Third's consumer-financial-product sales are in the consumers' best interests," when, in fact, "Fifth Third designs and conducts its consumer-financial-product sales based on its own financial interests." Am. Compl., Doc. 73, PageID 58, ¶¶ 1, 2, incorporated by ¶ 216. The Bureau also alleges that "Fifth Third's sales goals have been structured to incentivize employees to push products that are most profitable to the bank," but Fifth Third hides this fact from consumers and tells consumers that Fifth Third is essentially acting in a fiduciary capacity. *Id.* at 62, ¶¶ 22–26. As alleged, Fifth Third also conducts a so-called "financial needs assessment" with consumers but trains its employees to exaggerate to promote sales. *Id.* at 63–64, ¶¶ 34–35. As also alleged, Fifth Third employees have opened unauthorized accounts; "changed without consumer consent the types of accounts or services in which consumers were enrolled; made false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in them; used or obtained consumers' credit reports without an authorized purpose; and, without consumer authorization, assigned personal-identification numbers or falsified consumer-contact information, including by creating email

addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers." *Id.* at 65, 66, ¶¶ 42, 47. Per the Amended Complaint, and as described at page 17, above, Fifth Third knows of or disregards its understatement of the problems, *id*. at 74, ¶ 98, avoids the use of information that would help it identify and remediate affected consumers, *id.* at 77, 78, 95–96, ¶ 119, 121–122, 217–219, and, in March 2020, assured the public—incorrectly—that it had fully identified and remediated affected consumers. *Id*. at 66, ¶¶ 50–51. This, with or without the rest of the Amended Complaint, is more than enough to put Fifth Third on notice of the conduct complained about in Count 12: the abusive failure to identify and remediate affected consumers.

**V. Counts 1 and 11 are clear, not duplicative, and should not be dismissed.**

There is no basis to dismiss either Count 1 or Count 11. Rule 8 allows for alternative statements of a claim, whereby a party "may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones." Fed. R. Civ. P. 8(d)(2). Count 1 is an abusiveness claim, while Count 11 is an unfairness claim, and those are separate legal bases for liability under the CFPA. *See* 12 U.S.C. § 5531(c), (d). Even if the counts were otherwise duplicative, they would be appropriate under Rule 8. And in no instance would the remedy for two duplicative claims be dismissal of both, as Fifth Third requests. Rule 8 is clear that "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

At any rate, the claims are neither duplicative nor vague, as Fifth Third alleges. Instead, Fifth Third seems to misunderstand what is clear in Count 1. According to Fifth Third, "Count 1 alleges abusive sales practices led to the issuance of unauthorized financial products or services." Def.'s Mem., Doc. 131, PageID 1472. That is true, but only partly so. Count 1 alleges abusive sales practices under three independent parts of the CFPA's abusiveness subsection, 12 U.S.C. § 5531(d), that are clearly delineated in Count 1. *See* Am. Compl., Doc. 73, PageID 82, 83, ¶¶ 143, 144.

First, under § 5531(d)(2)(C), conduct is abusive if it "takes unreasonable advantage of . . . the reasonable reliance by the consumer on a covered person [(Fifth Third in this case)] to act in the interests of the consumer." The Bureau alleges that (i) Fifth Third told consumers, both directly and publicly, that the bank was acting in the consumers' best interests; (ii) Fifth Third acted in its own financial interests, including by incentivizing sales based on value to the bank and not to the consumer; and (iii) thousands of Fifth Third employees could not meet their sales goals and were therefore subject to discipline or termination. *See* Am. Compl., Doc. 73, PageID 80–81, ¶¶ 128–141. The Bureau further alleges that these sales practices led to a list of discrete types of other bank misconduct—acts, if you will—affecting consumers. *Id*. at 81–82, ¶ 142. Some of those acts relate to unauthorized accounts, and some do not. (Some of these discrete acts are the bases for the claims in Counts 4 through 7 concerning unauthorized products.) Given these facts, including that Fifth Third untruthfully told consumers that it was acting in the consumers' interests, it is not a leap to allege the legal violation that Fifth Third took unreasonable advantage of consumers' reasonable reliance on Fifth Third to act in the consumers' interests. *Id*. at 82, ¶ 143.

Separately, under 12 U.S.C. § 5531(d)(2)(A) and (B), conduct is abusive if it takes unreasonable advantage of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." These second and third bases for finding Fifth Third's sales practices abusive are addressed in Amended Complaint ¶ 144 and relate to the opening or changing of accounts without consumer authorization because these are the accounts where Fifth Third materially interferes with consumers' ability to understand the terms or conditions.

Count 11 is equally clear but addresses a different legal violation. Count 11 is an unfairness claim that Fifth Third knew of the consequences but continued "to foster sales practices that were likely to cause unauthorized products and services and applications therefor." *See* Am. Compl., Doc. 73, PageID 94, ¶ 210. And that conduct violates the CFPA's unfairness

prohibition, with unfairness defined as an "act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers." 12 U.S.C. § 5531(d)(2)(C).

Fifth Third's contention seems to be that the Bureau should choose which of Fifth Third's violations to pursue. Of course, no such decision is required. The one case that Fifth Third cites in support of its argument about duplicative claims involves implied-warranty claims that were duplicative of claims under, and abrogated by, the Ohio Product Liability Act (OPLA). *See Gordon v. B. Braun Med. Inc.*, No. 1:19-cv-121, 2020 WL 1491378, at *5 (S.D. Ohio Mar. 27, 2020). In that case, the OPLA claim survived, and the claims it abrogated did not. *See id*. That is not helpful here, where both abusiveness and unfairness prohibitions under the CFPA are alive and well. The Bureau properly cites each of Fifth Third's violations under the applicable statutory provision, such that neither Count 1 alleging abusiveness nor Count 11 alleging unfairness is subject to dismissal.

## CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court deny Fifth Third's Motion for Judgment on the Pleadings. Though neither party requests conversion of this motion to one for summary judgment, if the Court converts it *sua sponte*, the Bureau requests that the Court permit it to take discovery before responding.

Dated: February 22, 2023

Respectfully Submitted,

*/s/ Leanne E. Hartmann*

LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
LANE C. POWELL, MI Bar #P79432
Email: lane.powell@cfpb.gov
JACOB SCHUNK
Email: jacob.schunk@cfpb.gov
WILLIAM HINTON
Email: william.hinton@cfpb.gov
STEPHANIE B. GARLOCK, D.C. Bar #1779629
Email: stephanie.garlock@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9787; Facsimile: (415) 844-9788
Attorneys for the Bureau of Consumer Financial Protection

**Certificate of Service**

I certify that, on February 22, 2023, the foregoing PLAINTIFF BUREAU OF CONSUMER FINANCIAL PROTECTION'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS was filed electronically using the Court's CM/ECF system, and notice of this filing will be sent to attorneys of record who are registered users of the system.

s/ Leanne E. Hartmann