**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>Plaintiff,<br><br>v.<br><br>FIFTH THIRD BANK, NATIONAL ASSOCIATION,<br><br>Defendant. | Civil Case No. 1:21-cv-00262-DRC<br>Related Case No. 1:21-cv-00173-DRC<br><br>Judge Douglas R. Cole<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT**
**FIFTH THIRD BANK'S MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS AND SUMMARY OF ARGUMENTS

Page

I. THE BUREAU CITES NO AUTHORITY ALLOWING IT TO PURSUE PRE-TRANSFER DATE CONDUCT. ....................4

The Bureau is barred from challenging conduct that occurred before its enforcement authority began. The statute creating the Bureau clearly states that its enforcement authority was to begin on a date certain: July 21, 2011, as established by the Secretary of the Treasury. The Bureau argues that the Court should not decide this issue because it would not dispose of all claims in this suit, but even the cases it cites do not apply such a broad rule. Courts routinely decide issues that do not dispose of the entire case but have the effect of narrowing claims or the scope of discovery. *See CFPB. v. TCF Nat'l Bank*, 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017).

The Bureau's attempt to penalize Fifth Third for conduct that occurred prior to the Transfer Date, were it to be permitted, would render the CFPA impermissibly retroactive. The CFPA creates new remedies that apply to a panoply of financial protection laws and, under the Bureau's own theory, extends the statute of limitations for those laws. Absent an unequivocal directive from Congress, there is a strong presumption against retroactive application of new statutory relief and statute of limitations provisions to conduct that predates the CFPA's passage. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (citation omitted). Individually or collectively, this amounts to a change in law that "attaches new legal consequences" to the Bank. *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016). The Court should dismiss the Bureau's claims for conduct that pre-dates July 21, 2011.

II. THE CREDIT CARD CLAIMS MUST BE NARROWED BECAUSE OF THE STATUTE OF LIMITATIONS. ....................7

A. The Court May Consider Attachments to the Amended Answer. ....................7

Contrary to the Bureau's argument, a motion for judgment properly considers the pleadings (not just the complaint) and the Federal Rules of Civil Procedure explicitly define "an answer to a complaint" as a "pleading." Fed. R. Civ. P. 7(a). Courts may consider attachments to the pleadings when deciding Rule 12(c) motions. The Bureau's suggestion that there is an authenticity issue with a document sent by its own supervisory examination team borders on frivolous.

B. The Court Can and Should Rule on the Statute of Limitations Issue at the Pleadings Stage. ....................11

The Court should decline the Bureau's invitation to delay resolving the statute of limitations issue. Courts routinely grant early dispositive motions that narrow but do not dispose of entire claims. *See, e.g., TCF*, 2017 WL 6211033, at *3; *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 954 (W.D. Mich. 2003) (dismissing claims "to the extent they rely upon acts occurring more than three years prior to April 25, 2002 – the date Bliss filed its complaint"). Discovery should be calibrated to focus on viable claims, not claims that are time-barred as a matter of law. Here, a ruling for Fifth Third would significantly narrow the scope of discovery and this litigation.

C. Equitable Tolling Is Unavailable. ....................................................................13

The Bureau's arguments for equitable tolling fail because the Bureau does not allege in its Amended Complaint that Fifth Third engaged in any conduct that would warrant equitable tolling; and the Bureau discovered the issue at least by June 2015. Nor is the Bureau in a position to invoke this doctrine, as the Bureau itself is to blame for not bringing a timely action when it miscalculated the tolling provided by the agreements. *Taylor v. Palmer*, Fed. App'x 783, 789 (6th Cir. 2015) ("It is well settled, however, that a mistaken belief in calculating the statute of limitations does not constitute an extraordinary circumstance sufficient to warrant equitable tolling.") (collecting cases).

D. The Bureau's Claims are Untimely Regardless of Which Statute of Limitation Applies. ..........................................................................................14

The Bureau does not substantively engage Fifth Third's argument that FCRA establishes a five-year statute of repose that would allow, at a maximum, claims for conduct after March 9, 2015. Fifth Third's opening brief cited a litany of Supreme Court, Sixth Circuit, and district court cases that stand for the proposition that a statute of repose is an absolute bar and a non-waivable, substantive right. The statute of repose applies in this case and dismissal on this basis is warranted.

III. THE CFPB HAS NOT PLED A COGNIZABLE INJURY SUPPORTING COUNTS 4–7 AS REQUIRED BY STATUTE. ...........................................................15

The Bureau claims in Counts 4, 5, and 6 that giving customers free and highly desirable products and services that they were not required to use constituted "unfair" and "abusive" acts or practices that are "likely to cause substantial injury." The Bureau has not alleged facts which, if proven, show any actual injury to Fifth Third's customers in connection with these products and services The Bureau has not alleged Article III standing for these claims and therefore they should be dismissed.

IV. THE CATCH-ALL CLAIMS ARE IMPROPER, VAGUE, AND DUPLICATIVE. ..........................................................................................19

Counts 1 and 11 are catch-all claims that simply repackage Counts 2 through 7 with less specificity and should be dismissed as duplicative. To the extent the Bureau argues that Counts 1 and 11 encompass claims unrelated to unauthorized account openings, any such claims are also time-barred because the tolling agreements only paused the limitations period for the Bureau's investigation into unauthorized account openings. Count 12 fails because an institution's alleged failure to remediate alleged substantive violations is not itself a separate substantive violation. It also is too vague to satisfy Rule 8 pleading standards, much less the heightened pleading requirement of Rule 9(b).

V. THE CFPB'S FUNDING SCHEME IS UNCONSTITUTIONAL. ..................................22
A. The Funding Statute Violates the Appropriations Clause......................................23

The Bureau's self-funding mechanism violates the Appropriations clause, which specifies that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. U.S. CONST. Art. I, § 9, cl. 7. As the Fifth Circuit has explained, "[t]he Appropriations Clause []

does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power." *Cmty. Fin. Servs. Ass'n of Am., Ltd.("CFSA") v. CFPB*, 51 F.4th 616, 637 (5th Cir. 2022). Congress abdicated its responsibility by exempting the CFPB from the appropriations process and the Court should therefore dismiss the CFPB's complaint because it is the product of an unconstitutional funding structure.

B. The Constitutional Flaw Demands Dismissal. ......................................................28

Without its unconstitutional funding, the Bureau would not have had another means to investigate and bring this action against Fifth Third. The Bank was thus "harmed by the Bureau's improper use of unappropriated funds" to engage in the enforcement action at issue. *CFSA*, 51 F.4th at 643. Because the Bureau's litigation and enforcement efforts are all funded by unappropriated transfers from the Federal Reserve, the Bureau's enforcement action to date against Fifth Third should be unwound and the case dismissed with prejudice because it is now time-barred.

CONCLUSION ........................................................................................................................29

# TABLE OF AUTHORITIES

## CASES

Page(s)

*AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341 (2021)........................................7

*Ashdown v. Buchanan*, 2021 WL 2643111 (S.D. Ohio June 28, 2021)........................................15

*BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 2012 WL 3283397 (S.D. Ohio Aug. 10, 2012) ........................................20

*Barnard v. Lackawanna Cty.*, 194 F. Supp. 3d 337 (M.D. Pa. 2016)........................................9

*BellSouth Telecomm., Inc. v. Se. Tel., Inc.*, 462 F.3d 650 (6th Cir. 2006)........................................7, 8

*Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943 (W.D. Mich. 2003)........................................5, 12

*Buchholz v. Meyer Njus Tanick*, 946 F.3d 855 (6th Cir. 2020) ........................................17, 18

*Carter v. Medtronic, Inc.*, 2020 WL 2319729 (S.D. Ohio May 11, 2020)........................................21

*CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218 (5th Cir. 2022) ........................................27, 28

*CFPB v. Com. Fin. Servs. Assn.*, No. 22-448, 2023 WL 2227658 (U.S. Feb. 27, 2023) ..............29

*CFPB. v. TCF Nat'l Bank*, 2017 WL 6211033 (D. Minn. Sept. 8, 2017) ........................... *passim*

*CFPB v. Weltman, Weinberg & Reis Co.*, 2017 WL 4348916 (N.D. Ohio Sept. 28, 2017)..........13

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) ........................................4, 24, 28, 29

*Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, No. 18-15431, 2023 WL 566112 (9th Cir. Jan. 27, 2023)........................................29

*Day v. DeLong*, 2017 WL 5903761 (S.D. Ohio Nov. 30, 2017) ........................................9, 10

*Dundee v. Univ. Hosps. Corp*, 2019 WL 7195317 (N.D. Ohio Dec. 3, 2019) ........................................9

*EEOC v. Crothall Servs. Grp., Inc.*, 2016 WL 3519710 (E.D. Pa. 2016) ........................................20

*Fox v. Cty. of Saginaw*, 2021 WL 120855 (E.D. Mich. Jan. 13, 2021) ........................................21

*FTC v. Amazon.com, Inc.*, 2016 WL 10654030 (W.D. Wash. 2016) ........................................17

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008) ........................................17

*Gay v. Sullivan,* 966 F.2d 1124 (7th Cir. 1992) ....................7

*Geiling v. Wirt Fin. Servs., Inc.*, 2014 WL 8473822 (E.D. Mich. Dec. 31, 2014) ....................23

*Gordon v. B. Braun Med. Inc.*, 2020 WL 1491378 (S.D. Ohio Mar. 27, 2020) ....................20

*Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. W. Div. of Michigan*, 369 F.3d 960 (6th Cir. 2004) ....................25

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ....................27

*Hollis v. Erdos*, 480 F. Supp. 3d 823 (S.D. Ohio 2020) ....................10

*Hy Cite Corp. v. Regal Ware, Inc.*, 2011 WL 1206768 (W.D. Wis. Mar. 15, 2011) ....................20

*Krottner v. Starbucks Corp.*, 406 F. App'x 129 (9th Cir. 2010) ....................18

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ....................7, 8

*Manigault v. Ohio Dep't of Rehab. & Corr.*, 2014 U.S. Dist. LEXIS 132033 (N.D. Ohio Sept. 19, 2014) ....................9, 10

*Moss v. Martin,* 2005 WL 4717594 (C.D. Ill. May 16, 2005) ....................9

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629 (7th Cir. 2007) ....................18

*Pope v. Kroger Co.*, 2020 U.S. Dist. LEXIS 108231 (S.D. Ohio June 19, 2020) ....................18, 19

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ....................26, 28

*Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016) ....................7

*Straythorn v. Wheth Pharms., Inc.*, 737 F.3d 378 (6th Cir. 2013) ....................23

*Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533 (E.D. Mich. 2020) ....................19

*U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ....................26

*United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002) ....................19

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. CONST. Art. I, § 9, cl. 7 ....................26

12 U.S.C. § 243 ....................24

12 U.S.C. § 5497 .................... *passim*

12 U.S.C. § 5531 ....................16

12 U.S.C. § 5565 .......... 7

15 U.S.C. § 53(b) .......... 7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 7(a) .......... 8

Fed. R. Civ. P. 9 .......... 22

Fed. R. Civ. P. 10 .......... 8, 9

Fed. R. Civ. P. 12 .......... *passim*

Fed. R. Evid. 201 .......... 11

The Bureau's opposition invites the Court either to ignore the facts properly before it, or defer dispositive issues to some later date—a monumental waste of party and judicial resources. Incredibly, it claims that there would be "no practical effect" in deciding these issues now because no claim would be foreclosed in its entirety. Opp. to Def's Mot. for J. on the Pleadings (Dkt. 134) ("Opp.") at 14. And with no trace of irony, it claims that Fifth Third has not identified a distinct universe of excludable accounts, even as the CFPB has yet to identify a single unauthorized account not previously detected and remediated by Fifth Third. The very premise of the Bureau's Opposition is belied by the clear parameters that the Bank elucidated in its opening motion, namely the exclusion of:

- All accounts opened prior to the July 21, 2011 Transfer Date;
- All credit card accounts opened before October 7, 2015 (125 days after the [redacted]; and
- All EAX and online banking accounts.

The Bureau tacitly concedes that the law supports Fifth Third on the Transfer Date and statute of limitations issues but urges the Court to kick the can down the road. The Court should decline that invitation. Deciding these issues will dramatically narrow the scope of discovery in this case. Ruling now will ensure that discovery focuses on matters that fall within the Bureau's enforcement authority and does not stray into areas barred by Congress, the statute of limitations, or for which the Bureau cannot satisfy statutory and constitutional injury requirements. It is hard to imagine a more practical effect than that.

As discussed in Section I, the CFPA transferred enforcement authority to the Bureau on July 21, 2011. Pointing to the fact that some statutes (such as TILA and FCRA) preexisted the Transfer Date, the CFPB contends that "[n]othing in the statute says that the Bureau can pursue only those violations of law that occurred after the Bureau gained authority to enforce the law,"

Opp. at 17, implying that there has been no intervening change in law. The Bureau is mistaken. Congress authorized new remedies (penalties up to $1 million per day, along with restitution and disgorgement) and adopted a more expansive statute of limitations (three years from the date of discovery) that the Bureau contends governs not just the CFPA, but supplants statutes of limitation for 17 other enumerated statutes. Opp. at 15. These changes attach new legal consequences to Fifth Third's pre-Transfer Date conduct, and therefore cannot be applied retroactively absent an express statutory mandate. Congress did not unambiguously give the CFPB authority to pursue open-ended enforcement actions for conduct that pre-dates the Transfer Date. By establishing a prospective Transfer Date, Congress did the very opposite. As Fifth Third's opening brief made clear, another court decided this same question on a Rule 12 motion and rejected the same argument. *See CFPB. v. TCF Nat'l Bank*, 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017) ("[T]he Bureau cannot assert claims under the statute arising before July 21, 2011, the CFPA's effective date."). Rather than engage with or attempt to distinguish that persuasive authority, the Bureau simply ignores it and invites the Court to take a step that no other court has ever taken.

Regarding the statute of limitations for its credit card-related claims (Counts 3, 8, 10, and 13), the Bureau attacks the procedural propriety of Fifth Third's motion and suggests that the Bureau's discovery of unauthorized accounts cannot be imputed to its enforcement division. There is no basis to cabin the CFPB's knowledge to one division (Supervision) rather than another (Enforcement) when they are part of the same agency. As discussed in Section II.A, there is a good reason why both the Federal Rules of Civil Procedure and case law permit consideration of matters attached to pleadings as long as they are authentic, central to the issues, and do not contradict allegations in the complaint: it makes no sense for courts to ignore authentic, relevant

evidence, only to revisit the issue on summary judgment after a pointless and wasteful expenditure of party and judicial resources.

Regarding its Early Access, online banking, and overdraft protection claims (Counts 4–7), addressed in Section III, the Bureau—whose mission is to protect consumers—astonishingly asserts that it need not allege actual injury to consumers from alleged unauthorized enrollment in these products and services. The Bureau is not exempt from Article III's standing requirements, and in any event, the CFPA independently requires actual harm to consumers. The Bureau does not address the fundamental flaw in its complaint: its allegations that free enrollment in these services posed an "increased risk" of harm are insufficient to state a claim for unfairness or abusiveness.

Counts 1, 11, and 12 are improper, vague, duplicative, and time-barred (to the extent they encompass something other than unauthorized account openings) and should be dismissed (Section IV). Count 12 is particularly problematic because it presupposes a violation and then seeks to impose liability on a failure to remediate. Enforcement actions must be based on statutory or regulatory violations, not a failure to meet some unspecified agency expectation. This count amounts to impermissible regulation by enforcement, where an institution is faulted for failing to comply not with laws or regulations but with unspecified "reasonable measures."

Finally, the Bureau does not dispute the features that make the agency constitutionally infirm under the Appropriations Clause, but asks the Court to ignore those features or rule that there is no remedy for the violation. As the Fifth Circuit has explained, "[t]he Appropriations Clause [] does more than reinforce Congress's power over fiscal matters; it affirmatively obligates Congress to use that authority to 'maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power.'" *Cmty. Fin. Servs. Ass'n of Am.,*

*Ltd. ("CFSA") v. CFPB*, 51 F.4th 616, 637 (5th Cir. 2022) (citation omitted). Congress abdicated its responsibility by exempting the CFPB from the appropriations process and the Court should therefore dismiss the CFPB's complaint because it is the product of an unconstitutional funding structure. In light of the fact that the Supreme Court recently granted *certiorari* to decide this question, the parties are likely to have a definitive answer to this question by next Term.

## I. THE BUREAU CITES NO AUTHORITY ALLOWING IT TO PURSUE PRE-TRANSFER DATE CONDUCT.

The Transfer Date forecloses all conduct that pre-dates July 21, 2011. The Bureau admits that its enforcement authority did not vest before July 21, 2011, Opp. at 11, yet the Amended Complaint alleges wrongdoing dating back to 2008, Amended Complaint (Dkt. 73) ("Compl.") ¶¶ 43–44, 210. The Bureau contends that once the Transfer Date rolled around, it was permitted to bring enforcement actions for violations of any enumerated statute in the CFPA that occurred before July 21, 2011 subject only to a three-year statute of limitations that runs from when the Bureau discovers a violation. Opp. at 17–18. As the Bureau puts it, "Nothing in the statute says that the Bureau can pursue only those violations of law that occurred after the Bureau gained authority to enforce the law." Opp. at 17.

At the outset, the Bureau contends that the Court should not decide this question of law because granting judgment for Fifth Third on this issue would not dispose of any claim in its entirety. Opp. at 17. It cites cases that declined to decide certain legal questions when they would not have a "practical effect" on the litigation. *Id.* at 14. The Bureau's argument fails its own test. Eliminating accounts opened before the Transfer Date would knock out a significant percentage of accounts at issue, particularly in light of allegations in the complaint that purport to reach back to 2008, and would dramatically narrow the scope of discovery in this sprawling and speculative case. Moreover, as discussed in more detail below, courts can and commonly do dismiss portions

of claims at the Rule 12(b)(6) stage, particularly when those decisions will have a practical effect on the litigation. *See, e.g.*, *TCF*, 2017 WL 6211033, at *3; *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 953–54 (W.D. Mich. 2003) (dismissing claims "to the extent they rely upon acts occurring more than three years prior to April 25, 2002 – the date Bliss filed its complaint"). The Bureau's insistence on absolutes would needlessly waste party and judicial resources on discovery related to violations that the Bureau cannot pursue as a matter of law.

The *TCF* case perfectly illustrates this principle. In a case Fifth Third cited but the CFPB ignores, another court decided this exact question even though doing so did not eliminate any claim in its entirety. There, the Bureau alleged that TCF had misled consumers since 2009 to opt-in to overdraft coverage for ATM and debit card transactions. TCF moved to dismiss, arguing that the Transfer Date limited the CFPB's authority to pursue enforcement actions only for conduct that occurred after July 21, 2011. The court rejected the Bureau's argument that it could reach back to pre-Transfer Date violations:

> [T]he Court agrees that the Bureau cannot assert claims under the statute arising before July 21, 2011, the CFPA's effective date. The Bureau attempts to salvage earlier claims under a type of continuing-violation theory, arguing it has 'alleged conduct violating the CFPA that post-dates its effective date.' But accepting the Bureau's argument theoretically could render unlawful every account opening ever conducted by TCF, since some of them occurred after the CFPA's effective date. That is clearly not the law.

*TCF Nat'l Bank*, 2017 WL 6211033, at *3 (internal citation omitted). The court thus excluded pre-Transfer Date violations at the motion-to-dismiss stage even though all of the claims survived the motion to dismiss ***in part***. *Id.* at *7. The same result is warranted here. Dismissing accounts opened before July 21, 2011 would have a significant impact on this litigation and would streamline discovery by excluding a clearly identifiable universe of accounts and practices that pre-dated the Transfer Date, even though no single claim would be eliminated entirely.

The Bureau's attempt to penalize Fifth Third for conduct that occurred prior to the Transfer Date, were it to be permitted, would render the CFPA impermissibly retroactive. The "presumption against retroactive legislation" is a well-established one. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (citation omitted). "[C]ourts should not construe congressional enactments and administrative rules to have retroactive effect unless their language requires this result." *BellSouth Telecomm., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006) (quoting *Landgraf*, 511 U.S. at 244, 264). If the retroactive application "attaches new legal consequences," as this one undoubtedly would by increasing Fifth Third's liability for conduct that would otherwise be time-barred, then a court should refrain from a retroactive application. *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 892 (6th Cir. 2016).

In this case, the CFPA indisputably creates new remedies that apply to violations of TILA, TISA, FCRA and other consumer financial protection laws. *See* 12 U.S.C. § 5565. For example, under 12 U.S.C. § 5565(c)(2)(C), the Bureau may seek damages up to $1,000,000 for each day any alleged violation continued as well as restitution and disgorgement, *id.* § 5565(a)(2)(C)-(D). Section 13(b) of the FTCA (the applicable TILA remedies provision prior to CFPA) provides no such remedies, 15 U.S.C. § 53(b), and the Supreme Court recently held that it does not allow the government to obtain "equitable monetary relief such as restitution or disgorgement." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1344 (2021). Similarly, the Bureau argues that the CFPA extended TILA's one-year statute of limitations period to three years from discovery. Opp. at 15–16. Individually or collectively, this amounts to a change in law that "attaches new legal consequences" to the Bank. *Siding & Insulation Co.*, 822 F.3d at 892.

The prospective Transfer Date clearly established Congress' intent to limit the CFPB's authority to violations that occurred after July 21, 2011. *See Gay v. Sullivan,* 966 F.2d 1124, 1128

(7th Cir. 1992) ("[A] provision for a future effective date [is] strong evidence of a congressional rejection of retroactivity."). Tellingly, the Bureau never identifies any statutory provision that expressly authorizes it to pursue misconduct that pre-dates the Transfer Date. This omission is fatal to the Bureau's argument. "[C]ourts should not construe congressional enactments and administrative rules to have retroactive effect unless their language requires this result." *BellSouth Telecomm., Inc.* 462 F.3d at 657. Absent an unequivocal directive from Congress, there is a strong presumption against retroactive application of new statutory relief and statute of limitations provisions to conduct that predates the CFPA's passage. *See Landgraf*, 511 U.S. at 283. Accordingly, this Court should follow the *TCF* decision and Congress' clear directive and decline the CFPB's invitation to become the first court ever to allow the CFPB to pursue pre-Transfer Date claims.

## II. THE CREDIT CARD CLAIMS MUST BE NARROWED BECAUSE OF THE STATUTE OF LIMITATIONS.

The Bureau concedes that its credit card claims are timely only if it lacked notice of them as of October 7, 2015. *See* Opp. at 11. The CFPB supervisory document attached to Fifth Third's Amended Answer unequivocally establishes that the Bureau had notice of its claims in June 2015. The pre-October 2015 credit card claims—Counts 3, 8, 10, and 13—are therefore time-barred.

### A. The Court May Consider Attachments to the Amended Answer.

The Bureau first advocates for a categorical rule that judgment on the pleadings on statute of limitations grounds is proper only if the defense appears on the face of the complaint. Opp. at 11 (citing *Hollis v. Erdos*, 480 F. Supp. 3d 823 (S.D. Ohio 2020) (Cole, J.)). Contrary to the Bureau's argument, a motion for judgment properly considers the ***pleadings*** (not just the complaint) and the Federal Rules of Civil Procedure explicitly define "an answer to a complaint" as a "pleading." Fed. R. Civ. P. 7(a)(2). Courts may consider attachments to the pleadings when

deciding Rule 12(c) motions. Rule 10(c) in turn recognizes that a "copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). The Bureau urges a narrow interpretation for what constitutes a "written instrument," Opp. at 12–13, but many courts have adopted a more expansive view to permit consideration of documents attached to an answer but not referenced in or attached to the complaint. *See*, *e.g.*, *Dundee v. Univ. Hosps. Corp*, 2019 WL 7195317 (N.D. Ohio Dec. 3, 2019), *report and recommendation adopted*, 2019 WL 7194657 (N.D. Ohio Dec. 26, 2019) (considering letter from EEOC); *Barnard v. Lackawanna Cty.*, 194 F. Supp. 3d 337 (M.D. Pa. 2016) (considering letters, paystub, and collective bargaining agreement); *Moss v. Martin,* 2005 WL 4717594, at *1 (C.D. Ill. May 16, 2005) (considering position description).

*Barnard* is particularly instructive. The complaint had no attachments, but the defendant county attached five exhibits to its answer (only one of which was referenced in the complaint) and moved for judgment on the pleadings. The court granted the motion after discussing why each exhibit was properly considered. The documents consisted of (1) a collective bargaining agreement, (2) a letter from the county to the plaintiff notifying her of a due process hearing, (3) a second letter notifying plaintiff of her suspension, (4) a grievance form submitted by the plaintiff, and (5) a pay stub. The Court found that each exhibit was a "written instrument" under Rule 10(c) because they defined the parties' rights, duties, or liabilities. *See Barnard*, 194 F. Supp. 3d at 340–41. So, too, with Exhibit 1, [redacted] It therefore defined Fifth Third's duties and liabilities such that Fifth Third had to, and did, act on it.

*Day* and *Manigault*, cited by the Bureau, are easily distinguishable. In both, the defendants relied on documents authored by themselves and third parties that directly contradicted the allegations in the complaint or whose authenticity was disputed. *See Day v. DeLong*, 2017 WL 5903761, at *1 (S.D. Ohio Nov. 30, 2017) (written report attached to answer "tells a story at odds with [plaintiff's] allegations"); *id.* at *7 ("Defendants essentially ask the Court to accept as true the version of the events they describe in their written reports and the EMT form."); *Manigault v. Ohio Dep't of Rehab. & Corr.*, 2014 U.S. Dist. LEXIS 132033, at *5 (N.D. Ohio Sept. 19, 2014) ("Plaintiff argues that Defendants' exhibits are not authenticated and so the Court should not consider the attached exhibits."). None of the exhibits contradict the facts of the complaint and therefore these cases are inapposite.

Likewise, the *Hollis* case does not categorically limit pleadings to only the complaint. Neither the complaint nor answer in *Hollis* had any attachments. *Id.* at 826–27. Therefore, the Court's passing observation that a statute of limitations defense may be entertained at the Rule 12 stage "if it is apparent on the face of the complaint" cannot be taken to mean that had exhibits been attached, the Court would have ignored them. *Id.* at 829; Opp. at 2. The Court was not asked to decide that question in *Hollis*. In addition, the specific circumstances in that case warranted denial because the complaint was at most untimely by three days, and it was "plausible—indeed, exceedingly likely" that there were at least three days of tolling due to plaintiffs' participation in the required administrative exhaustion process. *Hollis*, 480 F. Supp. 3d at 832. Here, by contrast, the credit card claims were untimely by months, and the Bureau has not alleged any plausible means of extending the limitations period.

The Bureau suggests there is an authenticity issue with the [redacted] because it does not list an author or recipient and

because there is supposedly no information of who saw the document or was privy to the underlying information that it conveys. Opp. at 12 (referring to Dkt. 119-1 (Exhibit 1)). This attempt to deflect the Court's attention borders on frivolous. For starters, the Litchfield affidavit filed under seal in connection with Fifth Third's Second Amended Answer authenticates the document as [redacted] *See* Litchfield Affidavit at 1–2 (Dkt. 124). Moreover, the Bureau's examination manual expressly required examiners [redacted] Bureau's attempt to distance itself from this [redacted]—even as it opportunistically latches onto the attached tolling agreements—is not surprising, [redacted]

[1] The Court can take judicial notice of the CFPB's examination manual, which is publicly available on the CFPB website. *See* Fed. R. Evid. 201(b)(2) (court can take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Last, the Bureau's brief suggestion that CFPB supervisory staff's knowledge of unauthorized accounts should not be imputed to the "Bureau at large" equally fails. Opp. at 14. The Bureau offers zero support for its argument that the statute of limitations did not accrue until the CFPB's enforcement division discovered unauthorized credit card accounts. In all events, it could not possibly be the law that only discovery by the Bureau's enforcement attorneys would trigger the statute of limitations. Under that theory, no claim would ever be time-barred because the Bureau's supervisory staff could take informal discovery for as long as it wished—decades, even—without triggering the statute of limitations unless and until they finally referred the matter to the Bureau's enforcement attorneys. Exhibit 1 unambiguously demonstrates that [redacted] That indisputably reflects the CFPB's knowledge and awareness of the issue, and countenances dismissal of Counts 3, 8, 10, and 13.

**B. The Court Can and Should Rule on the Statute of Limitations Issue at the Pleadings Stage.**

Instead of engaging on the merits, the Bureau invites the Court to delay resolving the statute of limitations issue because it would not dispose of the credit card claims entirely. *See* Opp. at 13. Eliminating all credit card accounts opened before October 7, 2015 would dramatically narrow the number of credit card accounts at-issue. Courts routinely grant early dispositive motions that narrow but do not dispose of entire claims. *See, e.g.*, *TCF*, 2017 WL 6211033, at *3; *Bliss Clearing Niagara*, 270 F. Supp. 2d at 954. Doing so is common sense: the sooner claims can be narrowed, the less burdensome the case is for the parties and the court.

The Bureau offers two cases, *Weltman* and *Frederick J. Hanna*, in support of its argument. Opp. at 14. Both are distinguishable. In those cases, a holding that the Bureau missed the statute

of limitations would have had no impact on discovery; and to reach that question, the courts would have had to resolve a novel legal issue, which they were not inclined to do. Specifically, in *CFPB v. Frederick J. Hanna & Assocs.*, the CFPB alleged violations of the Fair Debt Collections Practices Act ("FDCPA") and the CFPA premised on the same conduct, and the issue was whether the FDCPA's one-year statute of limitations or the CFPA's three-year statute of limitations applied to the FDCPA count, an issue that had almost no precedent. 114 F. Supp. 3d 1342, 1375–76 (N.D. Ga. 2015). It was undisputed that the CFPA count was subject to a three-year-from-discovery limitations period and was timely. *See id.* at 1380. Because the underlying conduct supporting each count was identical, the Bureau still would have been entitled to the same discovery no matter how the court resolved the novel statute-of-limitations issue. *See id. Weltman* addressed the same question and, relying on *Frederick J. Hanna*, reached the same conclusion. *See CFPB v. Weltman, Weinberg & Reis Co.*, 2017 WL 4348916, at *6–7 (N.D. Ohio Sept. 28, 2017) (reserving ruling on FDCPA statute of limitations because "all claims are based on the same conduct and thus support the same discovery"). Both courts were guided by the practical consideration that "a decision between the one- and three-year limitations period would do little to narrow the scope of discovery." 114 F. Supp. 3d at 1380-81; 2017 WL 4348916, at *6–7.

Here, a ruling for Fifth Third would significantly narrow the scope of discovery and this litigation. Unlike in *Frederick J. Hanna* and *Weltman*, the Bureau missed the longer CFPA statute of limitations. With some allegations dating back to 2008, *see, e.g.*, Compl. ¶ 210, narrowing the credit card claims to post-October 7, 2015 conduct would dramatically scale back discovery.[2] It

[2] Because the CFPB knew the facts supporting its credit card claims no later than June 3, 2015, only credit card claims that fall within three years of the filing date are still timely. October 7, 2015 is the tolling-adjusted date that is three years before the Bureau filed its March 9, 2020 complaint, accounting for 520 days of tolling in the interim. Limiting the claims to post-October 7, 2015 accounts would substantially narrow the claims because unauthorized credit card account

would allow the parties to focus on credit card accounts that were opened after that date, while avoiding discovery disputes over potentially eight years' worth of documents and data on credit card applications, account opening, activation, and transactions. It also would make depositions more efficient by eliminating the need to depose witnesses on pre-October 2015 incentive compensation for credit cards, controls around credit card openings, and credit card accounts. And, it would eliminate the need for this Court to revisit this same issue on summary judgment.

The Bureau contends that this Court cannot temporally narrow its claims based on the statute of limitations because the relevant accounts have not yet been identified. *See* Opp. at 14. That misses the mark. The argument applies to all credit card accounts opened before October 7, 2015. There is no guesswork at all. Applying this date limitation knocks out an enormous percentage of credit card accounts at issue. At any rate, discovery should be calibrated to focus on viable claims, not claims that are time-barred as a matter of law. If claims could not be narrowed at the pleading stage unless all the underlying facts are known, then no partial Rule 12 motion would ever be granted, and the scope of discovery and concomitant costs would soar.

**C. Equitable Tolling Is Unavailable.**

The Bureau tries to salvage its credit card claims by pointing to the unremarkable fact that the CFPA permits equitable tolling. Opp. at 14. This argument is a non-starter because (i) the Bureau does not allege in its Amended Complaint that Fifth Third engaged in any conduct that would warrant equitable tolling; and (ii) the Bureau discovered the issue at least by June 2015. Ex. 1, at 1. Simply put, the Bureau argues that a court must deny a Rule 12 motion anytime a statute of limitations hypothetically could be tolled by equitable considerations. That is not and

openings were concentrated in a particular region (Chicago) in the early years. *See* Compl. ¶ 45 (noting "consistent problems around unauthorized credit card sales in Chicago" in 2010).

cannot be the law. *Ashdown v. Buchanan*, 2021 WL 2643111, at *4 (S.D. Ohio June 28, 2021) (Graham, J.) ("Equitable tolling under Ohio law is to be applied sparingly and only in exceptional circumstances.") Nor is the Bureau in a position to invoke this doctrine, as the Bureau itself is to blame for not bringing a timely action. The Bureau was aware of the statute of limitations because it sought and received eight tolling agreements from Fifth Third. But the first few agreements did not run consecutively, and those gaps now doom its pre-October 7, 2015 credit card claims. Equitable tolling is unavailable to protect a government agency from its own mistakes and lack of diligence. *Taylor v. Palmer*, 623 Fed. App'x 783, 789 (6th Cir. 2015) ("It is well-settled, however, that a mistaken belief in calculating the statute of limitations does not constitute an extraordinary circumstance sufficient to warrant equitable tolling.") (collecting cases).

### D. The Bureau's Claims are Untimely Regardless of Which Statute of Limitation Applies.

Finally, the Bureau's argument that the CFPA statute of limitations supplants the FCRA and TILA statutes of limitation is irrelevant because the Bureau did not just miss the shorter FCRA and TILA limitations periods, it also missed even the longer CFPA limitations period. *See* Opp. at 15–16. The Bureau does not substantively engage Fifth Third's argument that FCRA establishes a five-year statute of repose that would allow, at a maximum, claims for conduct after March 9, 2015. *See* Mem. at 11. Instead, it simply asserts—without citing authority—that the CFPA trumps "any other limitations or repose period applicable to private-plaintiff suits under TILA or FCRA." Opp. at 15. Fifth Third's opening brief cited a litany of Supreme Court, Sixth Circuit, and district court cases that stand for the proposition that a statute of repose is an absolute bar and a non-waivable, substantive right, and nothing in those decisions limits their holdings to private actions. Mem. at 11. The FCRA claims must (at least) be limited to post-March 9, 2015 conduct.

## III. THE CFPB HAS NOT PLED A COGNIZABLE INJURY SUPPORTING COUNTS 4–7 AS REQUIRED BY STATUTE.

The Bureau has not alleged that anyone was injured by allegedly unauthorized enrollment in the products and services at issue in Counts 4–7. This is no surprise, as enrollment in online access to bank accounts, early access to direct deposits, and overdraft protection are free and do not affect consumer credit profiles because they are not reported to consumer reporting agencies.

The Bureau acknowledges that injury-in-fact is an element of the Bureau's substantive CFPA claims. *See* Opp. at 19 ("[T]he Bureau does plead the requisite injury or likelihood of injury to consumers for the unfairness claims that require that showing under the governing statute."). In particular, the "unfairness" provision requires that an "act or practice causes or is likely to cause ***substantial injury*** to consumers which is not reasonably avoidable by consumers." 12 U.S.C. § 5531(c) (emphasis added). And, as explained in Fifth Third's opening brief, the injury requirement is implicit but equally well recognized in the abusiveness provision—which the Bureau also does not dispute. *See* Mem. at 15 n.9; 12 U.S.C. § 5531(d). Accordingly, to survive at the pleading stage, the Bureau must allege that these free-enrollment products and services caused concrete harm to consumers.

The Bureau cannot do so. Instead, it recites a litany of speculative injuries—everything from "increased risk" of data theft, money theft, and improper personal-data use to negative effects on consumers' "credit profiles" and consumer-reporting-agency information, and expenditure of time and effort. *See* Opp. at 19–20. But the Bureau never grapples with the fundamental flaw in its pleading: that alleging an "increased risk" of harm is insufficient to establish an actual injury—whether under the CFPA or Article III. *See Buchholz v. Meyer Njus Tanick*, 946 F.3d 855, 865 (6th Cir. 2020) ("[T]he Supreme Court has explained that the fear of a future harm is not an injury in fact unless the future harm is certainly impending.") (internal quotation marks and citation

omitted). Despite years of investigation, the Bureau claims only that Fifth Third's alleged conduct was "likely to cause" an "increased risk" of harm. *See* Opp. at 19. None of these hypothetical harms to hypothetical people comes close to pleading a concrete injury, and especially not one that has been the subject of other CFPA cases. *See* Mem. at 16–18. The reliance on speculation is all the more damning given that the Bureau conducted a years-long investigation before it filed this lawsuit.

The Bureau cannot overcome this fatal flaw. Each case it cites involved an injury that was alleged to have actually occurred. Opp. at 20. For example, the Bureau cites two cases involving actual time and effort that actual consumers spent fixing issues caused by the defendants—a far cry from the conjecture that the Bureau offers here. *See FTC v. Amazon.com, Inc.*, 2016 WL 10654030, at *8 (W.D. Wash. 2016) ("The millions of dollars billed to Amazon customers without a mechanism for consent, the thousands of customers complaining about unauthorized charges, and the time spent seeking refunds for those charges, all demonstrate substantial injury."); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 721 (S.D. Tex. 2008) ("consumers were forced to expend substantial time and effort to obtain refunds and cancellation of the service"). Both cases also involved additional, substantial harm (such as "millions of dollars billed" to consumers), and neither held that the government's investigation was itself sufficient harm. The Bureau's investigation here did not provide a basis for the CFPB to make such an allegation.

As to credit reporting, the Bureau hypothesizes potential effects on a consumer's "credit profile" but does not explain what a "credit profile" is or how it can be affected when enrollment in Early Access and overdraft protection is not reported to consumer reporting agencies. *See* Opp. at 20. For online banking, the Bureau points to disclosures by the Bank, not contained in the Complaint, discussing the general risks of ***using*** (not enrolling in) online banking. *See* Opp. at 21.

The disclosures are irrelevant: the Bureau's claim is that Fifth Third ***enrolled*** consumers in online banking without authorization—not that online banking was used without authorization. In any event, these general disclaimers regarding hypothetical events do not establish any likelihood of future harm, let alone harm that is "certainly impending." *Buchholz*, 946 F.3d at 865 (citation omitted); *see Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 639 (7th Cir. 2007) (risk of future identify theft insufficient to support cause of action); *Krottner v. Starbucks Corp.*, 406 F. App'x 129, 131 (9th Cir. 2010) (allegations insufficient to plead an unauthorized attempt to open a bank account because there was no actual loss, only "[t]he mere danger of future harm, unaccompanied by present damage") (citation omitted). And, of course, the Bureau cannot satisfy the injury-in-fact requirement with new allegations absent from its Amended Complaint. *See, e.g.*, *Pope v. Kroger Co.*, 2020 U.S. Dist. LEXIS 108231, at *12 (S.D. Ohio June 19, 2020) (Cole, J.).

Although this failure to comply with the statutory requirements is dispositive (and avoids the constitutional standing question), the Bureau also lacks standing under Article III. In direct contravention of basic constitutional standing rules, the Bureau asserts that it can bring suit in federal court without alleging an injury to anyone at all. That is ironic coming from an agency with a mandate to protect consumers from financial harm, and it finds no support in the law. When the Supreme Court in *TransUnion LLC v. Ramirez* instructed that "Article III standing requires a concrete injury even in the context of a statutory violation," it did not limit its directive to private litigants. 141 S.Ct. 2190, 2205 (2021) (citations omitted). When the Court explained that "an injury in law is not an injury in fact," *id.*, it did not then add, "except when the federal government is involved." And for good reason: as the Court also explained in *TransUnion*, because "federal courts do not adjudicate hypothetical or abstract disputes," "under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.'" *Id.* at 2203 (citation omitted).

Counts 4 through 7 present no such controversy, even if it is the government that asserts them. *See United States v. Miami Univ.*, 294 F.3d 797, 807 (6th Cir. 2002) ("[A]gencies do not automatically have standing to sue for actions that frustrate the purposes of their statutes.") (citation omitted); *see also Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533, 547 (E.D. Mich. 2020) ("Plaintiff cannot show that Michigan First's alleged violation of the FCRA, alone, created an Article III injury-in-fact and her complaint must be dismissed.").

The Bureau's cases do not excuse this fatal defect. The Bureau cites *Stauffer v. Brooks Bros., Inc.* for the sweeping proposition that the federal government always has standing in civil suits whenever its laws are allegedly violated, irrespective of the law, the violation, or the absence of injury—a rule that would obliterate Article III's injury requirement altogether. 619 F.3d 1321, 1325 (Fed. Cir. 2010). *Stauffer* established no such rule, instead concluding that under a *qui tam* provision of a particular patent statute, Congress had "defined an injury in fact to the United States"—a targeted designation that not even the Bureau claims is present here. *Id.*

*Stauffer* (and the Bureau's other cases) involved violations that were alleged to actually cause concrete, identifiable harm. *See id.* at 1322 (defendant allegedly sold falsely marked bow ties); *Hy Cite Corp. v. Regal Ware, Inc.*, 2011 WL 1206768, at *1 (W.D. Wis. Mar. 15, 2011) (defendant allegedly "sold falsely marked salad cutters and made injurious statements about plaintiff's products"); *EEOC v. Crothall Servs. Grp., Inc.*, 2016 WL 3519710, at *3 (E.D. Pa. 2016) (defendant illegally used criminal history assessments to reject potential employees). The Bureau's cited authority therefore reaffirms that "[e]very plaintiff"—including the federal government—"must demonstrate standing, a jurisdictional prerequisite under Article III's case-or-controversy requirement." *Stauffer*, 619 F.3d at 1325.

## IV. THE CATCH-ALL CLAIMS ARE IMPROPER, VAGUE, AND DUPLICATIVE.

The Opposition's additional discussion of Counts 1, 11, and 12 does not make them any less improper, vague, or duplicative. Opp. at 21–26. The Bureau misunderstands Fifth Third's argument on Counts 1 and 11. Counts 1 and 11 allege, respectively, that Fifth Third's "sales practices" writ large (i) were abusive because they led to the opening of unauthorized accounts and (ii) were unfair because the unauthorized accounts were likely to cause substantial injury to consumers. Compl. ¶¶ 129–144, 210–214. The Bureau appears to read Fifth Third's motion as calling for dismissal of these counts because they duplicate ***each other***. Opp. at 24–25. That is incorrect; they duplicate ***other counts***. Specifically, Counts 2–7 also allege abusiveness and unfairness violations, but as to particular products and services—deposits (Count 2), credit cards (Count 3), online banking (Count 4), Early Access (Count 5), overdraft protection (Count 6), and a catch-all claim for "other consumer financial products" (Count 7)—that supposedly resulted from Fifth Third's "sales practices." Thus, Counts 1 and 11 on the one hand, and Counts 2–7 on the other, allege the same thing; the only difference is the level of generality or specificity in pleading. Such duplication warrants dismissal of the general claims. *See Gordon v. B. Braun Med. Inc.*, 2020 WL 1491378, at *5 (S.D. Ohio Mar. 27, 2020); *BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 2012 WL 3283397, at *3 (S.D. Ohio Aug. 10, 2012) (dismissing more general count as duplicative); *Fox v. Cty. of Saginaw*, 2021 WL 120855, at *8 (E.D. Mich. Jan. 13, 2021) ("there is no reason that duplicative claims should survive a motion to dismiss").

The Bureau argues that Fifth Third "misunderstand[s]" Counts 1 and 11, and that they encompass claims unrelated to unauthorized account openings. Opp. at 24–26. Such claims are also time-barred because the tolling agreements only paused the limitations period for the Bureau's investigation into unauthorized account openings—not for generalized sales practices. *See* Dkt. 119-3 – 119-10, Second Am. Answer, Exs. 3 (First Tolling Agreement) – 10 (Eighth Tolling

Agreement). These agreements are limited to the "investigation…of Fifth Third to determine whether, ***in connection with unauthorized consumer bank, credit card, and other accounts***, there were violations . . . ." (Emphasis added.) As explained in the Bank's opening brief, tolling agreements are strictly construed since they alter the ordinary legal framework. Mem. at 21 (citing *United States v. FedEx*, 2016 WL 107065 (N.D. Cal. March 18, 2016) (strictly construing tolling agreement against government). The Bureau failed to address the Bank's arguments on this point. As such, dismissal of these claims is warranted for lack of opposition to Fifth Third's time-bar argument. "The Sixth Circuit's position on a plaintiff's abandonment of a claim is well established. [A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion [requesting judgment as a matter of law]." *Carter v. Medtronic, Inc.*, 2020 WL 2319729, at *3 (S.D. Ohio May 11, 2020) (quoting *Brown v. VHS of Mich.*, Inc., 545 F. App'x 368, 372 (6th Cir. 2013)).

Count 12, too, is riddled with defects warranting dismissal. It asserts that Fifth Third should be independently liable under the "abusiveness" prong for not identifying and remediating additional consumers (whom the Bureau does not identify) who supposedly had unauthorized accounts or services opened. Compl. ¶¶ 217–18. In essence, the Bureau tries to punish Fifth Third for contesting its claims by manufacturing a separate claim, not for the underlying violation of allegedly opening unauthorized accounts, but for the supposed failure to identify and remediate those accounts. The Bureau cites no case supporting the proposition that an alleged failure to identify and remediate allegedly abusive conduct amounts to a standalone claim of abusiveness. If this were the law, then institutions would automatically face double-liability in any abusiveness suit by the CFPB: once for the substantive offense, and once more for litigating its scope. An

institution's alleged failure to remediate the alleged substantive violation is not itself a separate substantive violation.

Given the nature of the allegations in this Count—an intentional decision not to make reasonable efforts to identify affected consumers, Compl. ¶ 219, and unspecified statements by unspecified speakers that misled consumers, *id.* ¶ 221, which plainly sound in fraud—Rule 9(b)'s heightened pleading requirements apply. The Bureau's out-of-circuit cases are distinguishable. Opp. at 22. For example, in *CFPB v. RD Legal Funding, LLC*, the defendants offered the much broader argument that "because the Government's claims are all premised on an alleged unified course of fraudulent conduct and the Complaint fails to distinguish between fraud and non-fraudulent claims, Rule 9(b)'s heightened pleading standard should apply to all of the claims alleged in the Complaint." 332 F. Supp. 3d 729, 767 (S.D.N.Y. 2018). That is not the case here, where Fifth Third asserts only that Rule 9(b) applies to one count that is squarely premised on the notion that Fifth Third supposedly misled consumers. Under Rule 9(b), the Complaint's allegations obviously fail for lack of particularity: No specific statement or conduct is identified.

Even if Rule 9(b) were inapplicable, Count 12 would still be impermissibly vague because, among other things, the Bureau does not articulate how the Bank was supposed to identify consumers who might have been affected by unauthorized account openings and how it supposedly misled its consumers. Fifth Third is closely supervised by regulators who conduct examinations and require supervisory corrections. [redacted] Bureau does not explain what else it claims in Count 12 Fifth Third should have done. What are the "reasonable methods" supposedly available to identify additional consumers affected by alleged unauthorized accounts? Compl. ¶ 217. What are the statements that Fifth Third made that

supposedly caused reasonable consumers to believe that Fifth Third had identified and remediated all consumers that it subjected to unauthorized financial products or services? Compl. ¶ 221. The Amended Complaint is silent on these points. In addition, the Bureau does not even attempt to explain how Fifth Third's alleged failure to identify and remediate actually satisfies the elements of abusiveness. All it does is make "[t]hreadbare recitals of the elements" of abusiveness "supported by mere conclusory statements," which is patently insufficient. *Straythorn v. Wheth Pharms., Inc.*, 737 F.3d 378, 400 (6th Cir. 2013) (citation omitted).

The Bureau's attempts to fill that void in its Opposition, Opp. at 23-24, are both improper and futile. The Bureau's "allegations . . . must be in [its] pleading itself and cannot be supplemented by a responsive brief." *Geiling v. Wirt Fin. Servs., Inc.*, 2014 WL 8473822, at *4, *27 (E.D. Mich. Dec. 31, 2014) (citation omitted), *report and recommendation adopted in part*, 2015 WL 1529866 (E.D. Mich. Mar. 31, 2015). But even if the Bureau's extra-pleading assertions were considered, Count 12 would still fail. The Bureau does not identify any statute or regulation that required Fifth Third to take these steps. This Count amounts to impermissible regulation by enforcement.

## V. THE CFPB'S FUNDING SCHEME IS UNCONSTITUTIONAL.

The Appropriations Clause vests the power of the purse in Congress, providing the most politically accountable branch with a necessary check on executive overreach. Congress sidestepped this separation-of-power safeguard when it vested the CFPB with authority to automatically fund its own operations in perpetuity by taking over half a billion dollars from the Federal reserve yearly. The Bureau attempts to excuse this constitutional failing with crabbed interpretations of various statutes and ill-fitting comparisons to other agencies. The Bureau's defenses of Congress' unprecedented abdication of its duty to maintain the boundaries between

the branches and preserve individual liberty do not withstand scrutiny. And the Bureau's last-ditch effort to argue that this violation has no remedy similarly fails.

### A. The Funding Statute Violates the Appropriations Clause.

The Bureau does not dispute it receives up to twelve percent of the Federal Reserve System's annual operating budget automatically upon request, a staggering figure that presently exceeds half a billion dollars. 12 U.S.C. § 5497(a)(2)(A)(iii). Nor does it dispute that this request "shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." *Id.* § 5497(a)(2)(C). It also does not dispute that Federal Reserve itself is independently funded by fees assessed on banks, which is similarly outside the appropriations process. 12 U.S.C. § 243; *see also Cmty. Fin. Servs. Ass'n of Am., Ltd*. ("CFSA") *v. CFPB*, 51 F.4th 616, 624 (5th Cir. 2022) (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020)) (stating the CFPB "receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments").

The Bureau argues that the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" Opp. at 3 (citing *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). On this point, the Bank agrees: the Court should apply the plain language of the Clause. The problem for the Bureau, however, is that its funding is not "appropriated by an Act of Congress," as the Constitution requires. U.S. CONST. Art. I, § 9, cl. 7. Rather Congress delegated to the Bureau discretionary authority to choose its own amount of annual funding with no meaningful cap and to roll over unspent funds for investment. *See* 12 U.S.C. § 5497.

Faced with that reality, the Bureau quibbles with the definition of "appropriation" arguing that "neither the [Bureau] here nor the Fifth Circuit in CFSA attempted to define what they think

constitutes an 'appropriation.'" Opp. at 5. But the Bureau cannot ignore the fact that the statute itself states plainly that the money the Bureau draws "shall not be construed to be Government funds or appropriated monies," 12 U.S.C. § 5497(c)(1)(2). This Circuit has held that courts must give the words in a statute "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. W. Div. of Michigan*, 369 F.3d 960, 967 (6th Cir. 2004). The statute is clear that the Bureau's funding is not appropriated monies. Just last year the Bureau accepted this truth and admitted that the "Dodd-Frank Act explicitly provides that Bureau funds obtained by or transferred to the CFPB are not government funds or appropriated funds."[3] Now, though, faced with an existential constitutional challenge, the Bureau has changed its tune.

To the extent there was any ambiguity (and there is none), the Senate reports on the statute clear it up. They confirm that Congress believed it was "absolutely essential" that the new regulator receive funding through a mechanism "independent of the Congressional appropriations process." S. Rep. No. 111-176, at 163 (2010). The whole point of the CFPB's novel regime was to avoid "the difficulties faced by the Office of Federal Housing Enterprise Oversight (OFHEO)," which faced "repeated Congressional pressure because it was forced to go through the annual appropriations process." *Id.* The 2010 Congress thus provided that the CFPB would not have to "rely on the annual appropriations process" and would "receive[] funding directly from the Federal Reserve." *Seila Law*, 140 S. Ct. at 2193-94. Contrary to the Bureau's arguments, the Clause does not merely require Executive spending to be "authorized by statute;" if so, it would have just said that. It instead requires such spending to be done "in Consequence of Appropriations made by

[3] CFPB Financial Report, November 15, 2022, at 45, available at https://www.consumerfinance.gov/data-research/research-reports/financialreport-cfpb-fiscal-year-2022/.

Law," U.S. CONST. Art. I, § 9, cl. 7, a requirement that the Bureau's current funding structure was expressly designed to avoid.

The Bureau also cannot escape the plain language of the statute that "funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." 12 US.C. § 5497(a)(2)(C). The Bureau asks this Court to ignore that abdication because, according to the Bureau, the statute contains other provisions that allow for Congress to oversee Bureau spending. Opp. at 7-8. But the ability to passively "oversee spending" that you are powerless to deny is not the same as affirmatively providing "Appropriations made by Law." U.S. CONST. Art. I, § 9, cl. 7. The provisions cited by the Bureau only require it to conduct audits, prepare reports for Congress and attend hearings. Opp. at 7-8. The fact that Congress can require the Bureau to appear for a hearing does not change the fact that Congress has ***no control*** over nearly $800 million that the Bureau receives annually. Congress may be able to express displeasure with the Bureau's spending, but it cannot deny the Bureau's request and has no meaningful review of the money sought. "The power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary'" separation of powers. *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012) (Kavanaugh, J.). That power requires the authority to disburse the funds (not just oversee them), which Congress has abdicated to the executive through the CFPB.

The Bureau does not dispute that the CFPB can simply ask the Federal Reserve each year, in perpetuity, for an "amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1). The Bureau seeks to downplay the role of the Federal Reserve board by describing it as a "purely ministerial role in the Bureau's funding" and pointing to the supposedly mitigating fact that "Congress is free to modify the bureau's

funding at any time by simply passing a statute." Opp. at 6. But that argument stands the separation-of-powers on its head. Agencies subject to the appropriations process must get an affirmative vote from Congress to authorize and appropriate funds; the CFPB, as things presently stand, gets to pick its funding amounts without meaningful limitation unless Congress passes a new law changing the Bureau's funding mechanism.

"Congress … may not transfer to another branch 'powers which are strictly and exclusively legislative,'" even pursuant to legislation. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation omitted). More importantly, "the separation of powers does not depend … on whether the encroached-upon branch approves the encroachment." *Free Enter. Fund*, 561 U.S. at 497. "By the same token, the separation of powers does not depend on whether the encroached-upon branch has the hypothetical wherewithal to rebuff the intrusion." *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 238 (5th Cir. 2022) (Jones, J. concurring). Indeed, if Congress' ability to fix statutes that impinge on its own authority was sufficient to excuse an underlying constitutional infirmity, no law could run afoul of Article I. *Id.*

And, even if true, it does not matter that the Federal Reserve board plays a "ministerial" role. Opp. at 6. That does not change the fact that the "funds derived from the Federal Reserve … shall not be subject to review by the Committees on Appropriations." 12 U.S.C. § 5497(a)(2)(C). Thus, instead of "plead[ing] with Congress for funds," "the CFPB Director need only send a perfunctory letter to the Federal Reserve." *All American*, 33 F.4th at 223 & n.7. The fact that the "ministerial" Federal Reserve has a larger role than Congress in the funding process speaks volumes about the separation-of-powers violation posed by the Bureau's funding regime.

The rest of the Bureau's arguments consist of inapt comparisons to other agencies. Opp. at 3–4, 6. Tellingly, the Bureau points to no agency that wields enforcement or regulatory authority

remotely comparable to the authority the [Bureau] may exercise throughout the economy." *CFSA*, 51 F.4th at 641. The Bureau's comparisons are unavailing; it "is in an entirely different league. It acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Seila Law*, 140 S. Ct. at 2202 n.8. As the Fifth Circuit found, "[e]ven among self-funded agencies, the Bureau is unique"—"'an innovation with no foothold in history or tradition.'" *Id.* at 641-42 (quoting *Seila Law*, 140 S. Ct. at 2202). Congress has not permanently ceded to any other agency the power to choose the amount of its own public funding for core executive powers. Simply put, a "law-enforcement agency with complete fiscal independence is unprecedented." *All American*, 33 F.4th at 235. This fact alone should cause the Court to closely review the constitutionality of the Bureau. *See Seila Law*, 140 S. Ct. at 2201 ("Perhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it.").

Last, the Bureau's argument that *CFSA* is the only case that has entertained the Appropriations Clause argument fails to appreciate the changing legal landscape. Nearly a month before the Bureau filed its opposition to the Bank's motion, the Ninth Circuit remanded a case against the CFPB with instructions that in light of *CFSA*, the "district court should provide further consideration to Nationwide's argument on the constitutionality of the CFPB's funding mechanism." *Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, No. 18-15431, 2023 WL 566112, at *2 (9th Cir. Jan. 27, 2023). And the Supreme Court recently granted a petition for writ of *certiorari* to determine the issue. *CFPB v. Com. Fin. Servs. Assn.*, No. 22-448, 2023 WL 2227658, at *1 (U.S. Feb. 27, 2023). The Bureau's suggestion that this is a clear-cut issue decided in its favor is simply wishful thinking that ignores recent developments in the law.

### B. The Constitutional Flaw Demands Dismissal.

The Bureau summarily argues that *CFSA* was wrongly decided and failed to do a severability analysis. Opp. at 9–10. The relevant provision, 12 U.S.C. § 5497, removes the appropriations power entirely and perpetually from Congress's hands. As the agency used to acknowledge openly, its "funding outside of the congressional appropriations process" is what "ensure[s] full independence" from the first branch. CFPB, *Strategic Plan* 36 (Apr. 2013), https://bit.ly/3D01fss. The core funding provision is itself the offense, not some ancillary provision. There is no severability analysis that could save the statute.

The Bureau also argues that the Bank is not harmed by this unconstitutional enforcement action because the Bureau would not have acted differently had it been funded by a valid appropriation. Opp. at 10. But that misses the point. Without its unconstitutional funding, the Bureau would not have another means to investigate and bring this action against Fifth Third. The Bank was thus "harmed by the Bureau's improper use of unappropriated funds" to engage in the enforcement action at issue. *CFSA*, 51 F.4th at 643. Moreover, an agency with limited funding might think twice before bringing an enforcement action in a case where it has not identified a single unauthorized account; having virtually infinite resources at its fingertips encourages the Bureau to overreach because it never has to make trade-offs and has no meaningful accountability to Congress.

At bottom, the CFPB's preferred remedy, it seems, is no remedy at all. Its position is that an entity that affirmatively challenges an unconstitutional provision and prevails in court is nevertheless unable to secure any relief. That is not the law. Because the Bureau's litigation and enforcement efforts are all funded by unappropriated transfers from the Federal Reserve, the Bureau's enforcement action to date against Fifth Third should be unwound and the case dismissed with prejudice because it is now time-barred.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment on the pleadings dismissing all counts in this action as unconstitutional; and dismissing claims that pre-date the July 21, 2011 Transfer Date; narrowing claims related to unauthorized credit card accounts (Counts 3, 8, 10, and 13) to post-October 7, 2015 conduct based on the statute of limitations; dismissing the TILA and FCRA claims as time-barred by the statute of limitations and, for FCRA, by the statute of repose (Counts 8, 10, and 13); dismissing Counts 4–7 for failing to plead an actual injury; dismissing Count 12 as non-cognizable and lacking plausibility or particularity; and dismissing Counts 1 and 11 as vague and duplicative and time-barred to the extent they purport to apply to conduct other than unauthorized account openings.

Dated: March 15, 2023

Respectfully submitted,

/s/ Ryan Scarborough
WILLIAMS & CONNOLLY LLP
John K. Villa (*pro hac vice*)
Enu Mainigi (*pro hac vice*)
Ryan Scarborough (*pro hac vice*)
680 Maine Avenue S.W.
Washington, DC 20024
202-434-5000
jvilla@wc.com
emainigi@wc.com
rscarborough@wc.com

DINSMORE & SHOHL LLP
Laurie A. Witek (0083955)
Michael Ferrara (0097584)
Katherine Rasmussen (0093928)
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
513-977-8648
Laurie.Witek@Dinsmore.com
Michael.Ferrara@Dinsmore.com
Katherine.Rasmussen@Dinsmore.com

*Attorneys for Defendant Fifth Third Bank, N.A.*

**CERTIFICATE OF SERVICE**

I certify that the foregoing Reply Memorandum in Support of Defendant Fifth Third Bank's Motion for Judgment on the Pleadings was electronically filed with the Clerk of the Court by utilizing the CM/ECF System on March 15, 2023, which will provide electronic notification to all counsel of record.

/s/ Krysta K. Gumbiner
Krysta K. Gumbiner